**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| JANE DOE, JANET DOE, and JOHN DOE,<br><br>Plaintiffs,<br><br>v.<br><br>VERADIGM LLC d/b/a ALLSCRIPTS<br><br>Defendant. | Case No. 1:25-cv-10147<br><br>AMENDED CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

**AMENDED CLASS ACTION COMPLAINT**

Plaintiffs Jane Doe, Janet Doe, and John Doe, on behalf of themselves and all others similarly situated patients (collectively "Plaintiffs"), upon personal knowledge as to Plaintiffs' own conduct and upon information and belief as to all other matters based upon investigation of counsel, such that each allegation has evidentiary support or is likely to have evidentiary support upon further investigation and discovery, and for their Class Action Complaint against Defendant Veradigm LLC d/b/a "Allscripts" ("Defendant" or "Veradigm"), state as follows:

**NATURE OF THE ACTION**

1. Plaintiffs, individually and on behalf of all members of the proposed class (the "Class Members") bring this action against Veradigm for surreptitiously divulging their health information to Google via Google's online marketing systems, known as Google Analytics, when patients exchanged communications with their healthcare providers via Patient Portals provided by Veradigm (the "Patient Portals"). Veradigm similarly deployed Google analytics technology within the patient portal mobile application it offered patients that shared data with Google (the

"Mobile Application.") Veradigm did so without patients' knowledge, authorization, or consent.

2. Veradigm is one of the largest providers of health information technology services in the United States, providing patient portal access to millions of patients. Veradigm hosts online Patient Portals for healthcare providers across the country and similarly provides a patient portal mobile application, both of which allow patients to manage their healthcare online by, *e.g.*, viewing medical records, scheduling appointments, and messaging members of their care team.

3. As a Patient Portal provider, Veradigm operates as a "business associate" under HIPAA, which requires Veradigm to maintain patients' Protected Health Information in a manner consistent with HIPAA regulations ("Protected Health Information" or "PHI").[1] In addition to HIPAA, Veradigm is obligated to maintain the confidentiality of Protected Health Information under state and federal law.

4. Despite these obligations, and unbeknownst to patients, Veradigm deployed various Google digital marketing and automatic rerouting tools on its Patient Portals and Mobile Application. Via these tools, Veradigm purposefully and intentionally disclosed patients' Protected Health Information to third parties who exploited the information and used it for advertising. By using these tools, Veradigm took patients' confidential communications and Protected Health Information and automatically sent them to Google—a clear violation of patients'

[1] Under HIPAA, "Protected Health Information" means "individually identifiable health information: (1) Except as provided in paragraph (2) of this definition, that is: (i) Transmitted by electronic media; (ii) Maintained in electronic media; or (iii) Transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103. HIPAA defines "Individually Identifiable Health Information" to mean "information that is a subset of health information, including demographic information collected from an individual, and: (1) Is created or received by a health care provider, health plan, employer, or health care clearinghouse; and (2) Relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and (i) That identifies the individual; or (ii) With respect to which there is a reasonable basis to believe the information can be used to identify the individual.").

reasonable expectations of privacy, their rights as patients, and their rights under federal and state law.

5. Veradigm's conduct violates reasonable expectations of patient privacy. Veradigm did not provide patients with any warnings that using its Patient Portals would result in Veradigm divulging their Protected Health Information and the substance of their communications with their healthcare providers to Google and its advertising systems.

6. There is no dispute that Veradigm's conduct is unlawful. In December 2022, the Office of Civil Rights at the United States Department of Health and Human Services ("HHS") issued a bulletin ("the Bulletin") reminding both covered entities and business associates alike of their patient privacy obligations "when using online tracking technologies."[2] HHS expressly stated that "[t]racking on user-authenticated webpages … such as a patient or health plan beneficiary portal" must comply with the HIPAA privacy rule and all information relating to such use by patients must be "protected and secured in accordance with the HIPAA Security Rule."[3] HHS further clarified that health information cannot be shared with "tracking technology vendors" unless they have signed a "business associate agreement (BAA)" to ensure that health information is "protected in accordance with HIPAA."[4]

---

[2] *See* Office for Civil Rights, Department of Health and Human Services, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.
[3] *Id.*
[4] *Id.*

7. Similarly, Google warns entities like Veradigm who provide password protected patient portals that Google Analytics should not be deployed on "authenticated" pages—*i.e.,* pages requiring patient logins:[2]

> ### Can Google Analytics be used in compliance with HIPAA?
>
> Customers must refrain from using Google Analytics in any way that may create obligations under HIPAA for Google. HIPAA-regulated entities using Google Analytics must refrain from exposing to Google any data that may be considered Protected Health Information (PHI), even if not expressly described as PII in Google's contracts and policies. Google makes no representations that Google Analytics satisfies HIPAA requirements and does not offer Business Associate Agreements in connection with this service.
>
> For HIPAA-regulated entities looking to determine how to configure Google Analytics on their properties, the HHS bulletin provides specific guidance on when data may and may not qualify as PHI. Here are some additional steps you should take to ensure your use of Google Analytics is permissible:
>
> - Customers who are subject to HIPAA must not use Google Analytics in any way that implicates Google's access to, or collection of, PHI, and may only use Google Analytics on pages that are not HIPAA-covered.
> - Authenticated pages are likely to be HIPAA-covered and customers should not set Google Analytics tags on those pages.
> - Unauthenticated pages that are related to the provision of health care services, including as described in the HHS bulletin, are more likely to be HIPAA-covered, and customers should not set Google Analytics tags on HIPAA-covered pages..
> - Please work with your legal team to identify pages on your site that do not relate to the provision of health care services, so that your configuration of Google Analytics does not result in the collection of PHI.

8. Despite Plaintiffs' and Class Members' reasonable expectations that Veradigm would not share their Health Information with Google via the use of marketing tools, Veradigm routinely divulged patients' information anyway.

9. Veradigm did so through a multi-step process.

a. *First*, Veradigm required patients to have first-party cookies enabled to access its "secure" Patient Portals. This requirement is a general security and usability standard for "authenticated" websites. First-party cookies are typically used to confirm that the user is who they

say they are when they sign-in—and to keep them signed-in as they exchange communications within "authenticated" portions of a website.

b. *Second*, Veradigm placed, enabled, or permitted the placement of Google source code on its Patient Portals and inside the patient portal mobile application that it made available to the public.

c. *Third*, when a patient visited Veradigm's Patient Portals or clicked to login to a Patient Portal, the Google source code that Veradigm deployed enabled Google cookies to be placed on a patient's communications device that were disguised as "first-party" cookies belonging to Veradigm or the healthcare provider. By disguising the Google cookies, Veradigm prevented patients from blocking the deposit of the Google cookies through the use of third-party cookie blockers. In addition, because Veradigm required the use of first-party cookies to access the portal, Veradigm assured that all patients who entered its Patient Portals would have the Google cookies placed on their device.

d. *Fourth,* the Google source code that Veradigm deployed in its Patient Portals both captured patients' communications and commanded patients' computing devices to re-direct and divulge patient and device identifiers and the content of patient communications to Google via its various marketing services.

e. *Fifth,* both Veradigm and Google used this information for marketing

purposes.

10. Veradigm did not make any attempt to obtain Plaintiffs' or Class Members' consent for sharing patients' protected PHI with Google nor does Veradigm have express written consent from any Plaintiff or Class Member to share their Protected Health Information with Google.

11. Veradigm's unauthorized disclosures violate both state and federal law. Moreover, through its unauthorized disclosures, Veradigm breached its fiduciary duties, was unjustly enriched, and committed multiple torts and crimes, including criminal violations of the Electronic Communications Privacy Act. As courts have found across the country, violating these privacy rights harms patients, as it misappropriates their rights to control how information about them is distributed and exploits the value their health data in the marketplace. *Doe v. Virginia Mason Medical Center*, 2024 WL 3517759 (Wash. Super.) ("If it did not have value, then entire industries that sell and trade this data would not exist").

12. Veradigm's conduct caused damage to Plaintiffs and Class Members:

a. Sensitive and confidential Protected Health Information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Veradigm eroded the essential confidential nature of the provider-patient relationship;

c. Veradigm took something of value (*i.e.*, personal and private Protected Health Information and other personal data), from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' or Class Members' knowledge, informed consent, or authorization, and without sharing the benefit derived; and

d. Veradigm's actions diminished the value of Plaintiffs' and Class Members' Protected Health Information and other personal data.

**PARTIES TO THE ACTION**

13. Plaintiff Jane Doe is a resident of Westmoreland County, Pennsylvania, and a patient of Frick Hospital and Latrobe Hospital and the Independence Health System. Plaintiff Jane Doe has been a registered user of the Veradigm "FollowMyHealth" Patient Portal for more than four years and has regularly used it to review test results, look at doctor's notes, and research treatment information related to her treatment for breast cancer. Plaintiff Jane Doe has also downloaded and used the Veradigm "FollowMyHealth" mobile application to access her Veradigm patient portal account. After accessing the Veradigm patient portal to review her treatment information, Plaintiff Jane Doe began receiving advertisements on her social media account for cancer treatments and neuropathy creams.

14. Plaintiff Janet Doe is a resident of Westmoreland County, Pennsylvania and a patient of Latrobe Hospital and the Independence Health System. Plaintiff Janet Doe has been a registered user of the Veradigm "FollowMyHealth" Patient Portal for more than two years and has regularly used it to review appointment information, checked prescription information, review test results and doctors notes, and research medical treatments related to her ongoing treatment for heart and dermatology issues. Plaintiff Janet has also downloaded and used the Veradigm "FollowMyHealth" mobile application to access her Veradigm patient portal account.

15. Plaintiff John Doe is a resident of Westmoreland County, Pennsylvania and a patient of Latrobe Hospital and Independence Health System. Plaintiff John Doe has been a registered user of the Veradigm "FollowMyHealth" Patient Portal for more than five years and has regularly used it to review appointment details, check test results, review doctors notes and messages, and research his medical treatment in connection with his ongoing treatment for high cholesterol, chronic obstructive pulmonary disease, and peripheral neuropathy. After accessing

the Veradigm Patient Portal to review his treatment information, Plaintiff John Doe began receiving advertisements on his social media account for cholesterol medications, COPD treatments, and neuropathy treatments.

16. Plaintiff John Doe is a resident of Slymar, California, and a patient of Northeast Valley Health Corporation. Plaintiff John Doe has been a registered user of the Veradigm Patient Portal operated by Veradigm for more than four years and has regularly used it to review medical records and doctor notes, including records related to psychiatric treatment.

17. Defendant Veradigm LLC is a North Carolina Limited Liability Corporation with its principal place of business at 222 Merchandise Mart Plaza, Suite 2024, Chicago, Illinois 60654. Veradigm supplies electronic health record ("EHR") products and provides Patient Portals for healthcare providers nationwide. Veradigm manages more than 20 million unique patient charts. Prior to January 2023, Veradigm was known as Allscripts Healthcare Solutions, Inc. In January 2023, the company rebranded itself as "Veradigm."

## JURISDICTION AND VENUE

18. This Court has jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332, because: (a) this is a proposed class action in which there are at least 100 Class Members; (b) the parties are minimally diverse, as at least one member of the proposed Class is domiciled in a different state than at least one Defendant; and (c) the combined claims of Class members exceed $5,000,000, exclusive of interest, attorneys' fees, and costs. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under the laws of the United States, including the Electronic Communications Privacy Act ("ECPA").

19. This Court additionally has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a), because they are so related to Plaintiffs' federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

20. This Court has personal jurisdiction over Veradigm because Veradigm has sufficient minimum contacts with this District in that it operates and markets its services throughout this District.

21. Venue is also appropriate in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL BACKGROUND

### A. Veradigm Systematically and Routinely Disclosed Patients' Protected Health Information to Third Parties, including Google.

22. Plaintiffs and Class Members are patients who have used password-protected Veradigm Patient Portals. These patient portals are typically branded as "FollowMyHealth" Patient Portals by Veradigm.

23. Healthcare providers and their business associates like Veradigm have fiduciary, common law, and statutory duties to protect the confidentiality of their patients' Protected Health Information and to refrain from making unauthorized disclosures to third parties about their patients' Protected Health Information.

24. Medical patients like Plaintiffs and Class Members have a legal interest in preserving the confidentiality of their communications with healthcare providers.

25. Patients also have reasonable expectations of privacy that their Protected Health Information will not be disclosed to third parties without their express written consent and authorization.

26. Veradigm operates Patient Portals for more than 1,000 healthcare providers and health care systems across the United States, including Northwell Health, Excela Health, Blessing Health, and Atlantic General Hospital.

27. Veradigm encourages patients to use digital tools on its Patient Portals and Mobile

Application to seek and receive health care services.

28. Veradigm's Patient Portals are designed for interactive communication with patients, including scheduling appointments, searching for physicians, paying bills, reviewing medical records and lab results, exchanging communications with providers, and renewing prescriptions. Source code on Veradigm's Patient Portals causes these communications to be intercepted and disclosed to Google.

29. Notwithstanding patients' reasonable expectations of privacy and Veradigm's legal duties, Veradigm systematically and routinely disclosed patients' Protected Health Information, including the contents of patients' communications with their healthcare providers, via automatic data collection mechanisms embedded in its Patient Portals and Mobile Application. Veradigm did this without Plaintiffs' or other patients' knowledge, authorization, or consent. In doing so, Veradigm continuously and systematically violated the medical privacy rights of Plaintiffs and Class Members by causing the unauthorized disclosure of their communications to third parties like Google.

30. Plaintiffs and Class Members provided their private Protected Health Information through Veradigm's Patient Portal and Mobile Application with the reasonable understanding that Veradigm would secure and preserve the confidentiality of that information, consistent with its legal obligations.

31. The Protected Health Information of Plaintiffs and Class Members has been—and likely will be—further disseminated to additional third parties that utilize the information for retargeting.

32. Veradigm intentionally incorporated analytics tracking tools into its Patient Portal and Mobile Application and never disclosed to Plaintiffs or Class Members that it shared their

Protected Health Information with Google and other third parties. Nor did Veradigm inform patients that it was permitting Google to exploit their Protected Health Information for marketing purposes. As a result, Plaintiffs and Class Members were unaware that their Protected Health Information was being surreptitiously transmitted to Google when they visited Veradigm's Patient Portal.

33. The tracking tools that Veradigm uses on its Patient Portals and Mobile Application are—by design—invisible to patients. Once integrated into a website, the tracking tools are executed in the background, meaning that they can operate in the background on a website or a mobile application without ever alerting website users of their presence. Further, because of how these tools are designed, they are able to collect, store, and transmit user data in ways that cannot be blocked by "ad blocker" software or by a user refusing to give their consent to data being collected.

34. By using data collected by analytics tracking tools, Google is able to connect a website user's data to their real-world identity by linking their data to profiles maintained by Google, including user's Google accounts.

35. Once Google connects a user's data to their real-world identity, Google processes, analyzes, and assimilates that data so that it can be sold to online advertisers and funneled back to clients like Veradigm in the form of aggregated analytics data.

36. Online advertisers—taking advantage of Google's trove of personally identifying data—are able to create marketing campaigns that target their advertisements towards specific users

37. Veradigm did not warn or otherwise disclose to Plaintiffs and Class Members that Veradigm bartered their Protected Health Information to Google and other third parties for

marketing purposes.

38. Plaintiffs and Class Members never consented, agreed, or otherwise authorized Veradigm to disclose their Protected Health Information to advertising companies like Google.

39. Upon information and belief, Veradigm intercepted and disclosed at least the following Protected Health Information to third parties including Google:

a. Plaintiffs' and Class Members' status as patients;

b. Plaintiffs' and Class Members' use of Veradigm's Patient Portals;

c. Information related to Plaintiffs' and Class Members' requests for, receipt of, and communications regarding medical treatment, including their review of lab and test results, medications, appointments, and communications with their treating physicians.

40. Veradigm interfered with Plaintiffs' and Class Members' privacy rights when it implemented technology (including Google Analytics) that surreptitiously tracked, recorded, and disclosed Plaintiffs' and Class Members' Protected Health Information to Google and other third parties.

41. Veradigm also breached its obligations to patients in multiple other ways, including (1) failing to obtain their consent to disclose their Protected Health Information to third parties, (2) failing to adequately review its marketing programs and web-based technology to ensure its Patient Portals were safe and secure, (3) failing to remove or disengage software code that was known and designed to share Plaintiffs' and Class Members' Protected Health Information with third parties if placed inside Veradigm's Patient Portals, (4) failing to take steps to block the transmission of Plaintiffs' and Class Members' Protected Health Information to third-party advertising companies, (5) failing to warn Plaintiffs and Class Members that Veradigm was

routinely bartering their Protected Health Information to Google, and (6) otherwise ignoring Veradigm's common law and statutory obligations to protect the confidentiality of Plaintiffs' and Class Members' Protected Health Information.

42. The transmission of Plaintiffs' and Class Members' Protected Health Information to Google was not necessary for Veradigm's Patient Portal, Mobile Application, or other services to function. Indeed, the entire publicly stated purpose of those services was to facilitate the provision of healthcare to Plaintiffs and other patients, and as described Veradigm was under unambiguous legal obligations to ensure that patients' Protected Health Information transmitted in that process remained confidential. Given its legal obligations, Veradigm did not and could not have had any permissible purpose for placing Google source code inside its Patient Portal and Mobile Application. Veradigm's primary, secret, and improper purpose in doing so was, instead, to allow Veradigm and Google to exploit patient Protected Health Information and communications for advertising and marketing purposes.

43. Upon information and belief, Veradigm's improper disclosure of Plaintiffs' and Class Members' Protected Health Information to Google has been ongoing for many years, and continues to this day. The time period during which Veradigm had Google Analytics operative in its Patient Portals, as further described and alleged in this complaint, shall be defined for all purposes herein as the "Class Period."

### B. Veradigm Set Up its Patient Portals to Permit the Surreptitious Capture and Disclosure of Patients' Protected Health Information to Third Parties like Google.

44. Veradigm's Patient Portals are used by numerous healthcare providers around the United States and have been throughout the Class Period.

45. The Patient Portals provide patients and providers:

a. the ability to send and receive electronic communications;

b. computer storage of electronic health record and communications information; and

c. processing services for electronic information.

46. When a patient goes to a Veradigm Patient Portal to "Sign In," Google source code that Veradigm placed or permitted to be placed on its Patient Portals will deposit "first-party" cookies named _ga, _gid, _gcl, and _au on the patient's computing device. As "first party" cookies, the _ga, _gid, _gcl, and _au cookies are disguised as belonging to Veradigm, which will permit them to be placed on the patient's device. In fact, however, these are Google cookies, not Veradigm cookies.

47. By disguising the Google cookies as belonging to Veradigm instead of Google, Veradigm circumvents attempts to block such tracking.

48. Further, Veradigm ***requires*** patients to have first-party cookies enabled to access its Patient Portals, which further assures that Veradigm will be able to deposit Google cookies on patient computing devices while patients are on and inside Patient Portals.

49. Veradigm's software permitted the deployment of "custom analytics scripts" within the Patient Portals including, for example, Google Analytics, Google Ads, and Google DoubleClick source code (collectively, "Google source code"), through which patient identifiers and communications content are divulged to Google while patients are exchanging communications with their healthcare providers and while the communications content is in electronic storage within Veradigm's Patient Portals.

50. Veradigm knowingly and secretly deployed Google source code on Patient Portal login pages and inside its Patient Portals.

51. Further, Veradigm actively encouraged its healthcare clients to deploy Google

marketing tools to drive patient engagement.

52. In short, the Google source code that Veradigm deployed on its Patient Portals deposited Google cookies on patients' browsers; disguised Google cookies as being associated with Veradigm rather than Google; and commanded Plaintiffs' and Class Members' browsers to re-direct identifiers and communications content on and inside the Patient Portals to Google. Further, Veradigm implemented multiple measures to ensure that Plaintiffs and Class Members would not and could not prevent all this from taking place.

53. The Google source code Veradigm deployed inside its Patient Portals intercepted patients' communications for the purpose of redirecting Plaintiffs' and Class Members' Protected Health Information to Google, including at least the following identifiers:

a. Patient IP addresses;

b. Unique, persistent patient cookie identifiers;

c. Device identifiers;

d. Account numbers;

e. URLs;

f. Other unique identifying numbers, characteristics, or codes; and

g. Browser-fingerprints.

50. The Google source code Veradigm deployed inside its patient portals intercepted patients' communications for the purpose of redirecting Plaintiffs' and Class Members' Protected Health Information to Google, including at least the following communications content:

a. Actions to log in to Patient Portals;

b. Actions to sign up for Patient Portals;

c. Actions to log out of Patient Portals;

d. Actions taken inside Patient Portals;

e. Any actions that patients take on their healthcare providers' properties while logged in to Patient Portals, including searching or exchanging communications about a specific doctor, condition, or treatment.

f. Plaintiffs' and Class Members use of Veradigm's Mobile Application;

g. Plaintiffs' and Class Members' searches for information regarding specific conditions and treatments, their medical providers, and their physical location.

51. The amount of data collected is significant. When patients interacted with its Patient Portals, Veradigm disclosed a full-string, detailed URL to Google, typically containing the name of the website, folder, and sub-folders on the webserver; the name of the precise file requested; and the exact contents of the patients' communications. For example, when a patient clicks on a link to view a specific test result or make an appointment with a specific physician, Google receives the precise text of the patient's query.

52. Veradigm similarly offers a patient portal mobile application that is available for download:




53. Veradigm deployed Google Firebase Code within the Mobile Application that Veradigm offered to the public. The deployment of this Google tracking technology on Veradigm's Mobile Application resulted in significant amounts of patients' personal data being shared with Google, including logins, page views, IP addresses, advertiser IDs, device properties (such as brand, model, and operating system), app events (such as screen views and notifications), marketing identifiers specific to the device, and device information, including geo-location information. The data provided by the tracking technologies that Veradigm deployed on these

devices permitted Google to specifically identify the users and exploit their data for marketing purposes.

54. Veradigm offers both an IOS (Apple) version of its mobile application and an Android (Google) version of its mobile application.

55. Because it is not possible for an Android user to even download the FollowMyHealth mobile application without being logged into a personal Google account, Google has complete access to the names and email addresses for every Veradigm patient who uses the FollowMyHealth mobile application that has been downloaded on an Android phone.

56. The Google Firebase technology deployed on the IOS mobile app version likewise shares a number of identifiers with Google, which permits Google to personally identify mobile app users and target them with advertising.

57. As a result of the foregoing, Google consistently received throughout the Class Period the precise text of the communications that Plaintiffs and Class Members made about specific medical providers, treatments, conditions, appointments, tests, medications, payments, and registrations.

58. The contents of patients' communications with their treating physicians plainly relate to (and disclose) the past, present, or future physical or mental health or condition of individual patients who interact with Veradigm's Patient Portals. 45 C.F.R. § 160.103. Worse, no matter how sensitive the area of the portal site that a patient reviewed, the referral URL was acquired by Google along with other Protected Health Information embedded in patients' interactions with the Patient Portals.

59. The nature of the collected data is important. Veradigm's unauthorized disclosures resulted in Google's obtaining the comprehensive history of individual patients, no matter how

sensitive their medical condition. Google was then able to correlate that history with other known information regarding the user, including their identity, their prior searches, the time of day, and other user actions. This process resulted in Google acquiring a vast repository of personal data about patients that was then used for marketing purposes—all without patients' knowledge, consent, or authorization, or any further action by patients.

60. By design, Google received the exact contents of patients' communications while they were in storage in Veradigm's systems but before the full response from the healthcare providers had been rendered on the screen of patients' devices.

### C. What Happens When Patients Communicate with Veradigm's Patient Portals

61. When patients logged-in to Veradigm's Patient Portals either through a website or via the Veradigm mobile application, Veradigm re-directed the precise content of the patients' communication and patients' identifiers to Google at various Google domains.

62. When patients signed-in or exchanged communications inside the portal, Veradigm immediately placed the content of that communication in storage within the Patient Portals.

63. Veradigm's immediate storage of the contents (and the identity of the person who was exchanging the communication) is required by federal law. *See* 45 C.F.R. § 164.312.

64. After Veradigm had stored the content of the communication, but while the Patient Portal exchange with patients was still occurring, Veradigm re-directed patients' information to the following Google domain: www.google-analytics.com.

**Re-directed Patient Identifiers to www.google-analytics.com**

65. The patient identifiers that were re-directed to Google-Analytics include:

a. The patient's IP address;

b. The patient's User-Agent information and other data that, when combined, is sufficient to uniquely identify the device; and

c. Google cookies disguised as Veradigm's cookies which serve as device identifiers and that Google connects to patients. These cookies include but

may not be limited to the _ga and _ga_HK3FDYQCRR cookies.

66. Google will always receive at least the device-identifying NID cookie regardless of whether a person is signed in to a Google Account. Regardless of a person's Google Account holder status, the NID cookie is a device identifier that is considered personally identifiable as a matter of law when the data includes protected Protected Health Information protected by federal law.

67. Further if a Google Account holder has signed-in to a Google Account on the device in question and did not formally sign out before sending a separate communication to the Patient Portals, then Veradigm will re-direct both the device identifier cookie (IDE) and the Google Account identifying cookie (DSID). By re-directing both cookies at the same time, Veradigm enables Google to connect the IDE device-identifying cookie to specific Google Account holder such that, once Google has made the connection, it only needs to see the IDE cookie in order to connect a later re-directed communication with the specific Google Account holder.

**D. Veradigm's Actions Permitted Google to Connect Patients' Data Across Domains.**

68. Google publicly states that it connects data that advertisers and publishers (like Veradigm here) send to it across the different Google Analytics, Google.com, and Doubleclick.net domains.

69. Veradigm uses the same tools and source code throughout Patient Portals. Thus,

the types of Google cookies deposited on patient devices and the types of Protected Health Information and communications content disclosed (as explained above) occurred every time a patient logged into or took any action within the Patient Portals.

### E. Google's Business Model: Exploiting Consumers' Personal Information for Profit

70. By any measure, Google is the world's largest data company. Among other services, Google operates the world's most popular search engine (Google), email provider (Gmail), video website (YouTube), mapping service (Google Maps), Internet analytics service for web developers (Google Analytics), and web-browser (Chrome). It also operates various ad services that are among the world's most popular in their respective categories, including the advertising services of Google DoubleClick and Google AdWords.

71. Google Analytics has massive reach. As described by the Wall Street Journal, it is "far and away the web's most dominant analytics platform" and "tracks you whether or not you are logged in."[5]

72. Google cookies provide personally identifiable data about patients who visit Veradigm's Patient Portals to Google. Veradigm transmits personally identifiable Google cookie data to Google.

73. Google specifically warns developers and advertisers that Google Analytics is not appropriate for HIPAA-covered entities like Veradigm, publicly stating:[6]

> Customers must refrain from using Google Analytics in any way that may create obligations under HIPAA for Google. HIPAA-regulated entities using Google Analytics must refrain from exposing to Google any data that may be considered Protected Protected Health Information (PHI), even if not expressly described as PII

[5] *Who Has More of Your Personal Data than Facebook? Try Google*, The Wall Street Journal (April 22, 2018) (available at https://www.wsj.com/articles/who-has-more-of-your-personal-data-than-facebook-try-google-1524398401).
[6] Google, *HIPAA and Google Analytics,* https://support.google.com/analytics/answer/13297105?hl=en

in Google's contracts and policies. Google makes no representations that Google Analytics satisfies HIPAA requirements and does not offer Business Associate Agreements in connection with this service.

For HIPAA-regulated entities looking to determine how to configure Google Analytics on their properties, the HHS bulletin provides specific guidance on when data may and may not qualify as PHI. Here are some additional steps you should take to ensure your use of Google Analytics is permissible:

- Customers who are subject to HIPAA must not use Google Analytics in any way that implicates Google's access to, or collection of, PHI, and may only use Google Analytics on pages that are not HIPAA- covered.

- Authenticated pages are likely to be HIPAA-covered and customers should not set Google Analytics tags on those pages.

- Unauthenticated pages that are related to the provision of health care services, including as described in the HHS bulletin, are more likely to be HIPAA-covered, and customers should not set Google Analytics tags on HIPAA-covered pages.

- Please work with your legal team to identify pages on your site that do not relate to the provision of health care services, so that your configuration of Google Analytics does not result in the collection of PHI.

74. Google tracks Internet users with IP addresses, cookies, geolocation, and other unique device identifiers.

75. Google cookies are personally identifiable. For example, Google explains the following about certain cookies that it uses:

a. "[C]ookies called 'SID' and 'HSID' contain digitally signed and encrypted records of a user's Google account ID and most recent sign-in time."[7]

b. "Most people who use Google services have a preferences cookie

[7] *Privacy & Terms, Types of Cookies Used by Google*, Google, http://web.archive.org/web/20210916060858/https:/policies.google.com/technologies/cookies?hl=en-US (archived from September 16, 2021).

called 'NID' in their browsers. When you visit a Google service, the browser sends this cookie with your request for a page. The NID cookie contains a unique ID Google uses to remember your preferences and other information[.]"[8]

c. "We use cookies like NID and SID to help customize ads on Google properties, like Google Search. For example, we use such cookies to remember your most recent searches, your previous interactions with an advertiser's ads or search results, and your visits to an advertiser's website.

This helps us to show you customized ads on Google."[9]

d. "We also use one or more cookies for advertising we serve across the web. One of the main advertising cookies on non-Google sites is named 'IDE' and is stored in browsers under the domain doubleclick.net. Another is stored in google.com and is called ANID. We use other cookies with names such as DSID, FLC, AID, TAID, and exchange_uid. Other Google properties, like YouTube, may also use these cookies to show you more relevant ads."[10]

76. Google warns web-developers that Google marketing tools are not appropriate for every type of website or webpage, including health-related webpages and websites.

77. Google also warns developers in its Personalized Advertising policies page that

---

[8] *Privacy & Terms, Types of Cookies Used by Google*, Google, http://web.archive.org/web/20210101020222/https:/policies.google.com/technologies/cookies?hl=en-US (archived from January 1, 2021).
[9] Id.
[10] Id.

"Health in personalized advertising" is a "Prohibited category" for Google's personalized advertising tools. Specifically, Google's advertising policies page states:[11]

> We take user privacy very seriously, and we also expect advertisers to respect user privacy. These policies define how advertisers are allowed to collect user data and use it for personalized advertising. They apply to advertisers using targeting features, including remarketing, affinity audiences, custom affinity audiences, in- market audiences, similar audiences, demographic and location targeting, and keyword contextual targeting. …
>
> You aren't allowed to do the following:

| |
|---|
| ⊗ Collect information related to sensitive interest categories (see Personalized advertising policy principles below for more about sensitive interest categories) |

78. The United States Department of Health and Human Services has made clear that "it is insufficient for a tracking technology vendor to agree to remove PHI from the information it receives or to de-identify the PHI before the vendor saves the information. Any disclosure of PHI to the vendor without individuals' authorizations requires the vendor to have a signed BAA in place and requires that there is an applicable Privacy Rule permission for disclosure."[12]

79. Google refuses to sign business associate agreements ("BAA") with healthcare companies.

80. After Google collects data that is transmitted to it by Google Analytics, Google analyzes and processes that data for use in selling advertising.

81. Google also uses the data that it collects from tracking pixels to provide clients like Veradigm with analytics data that those clients use to bolster their marketing and advertising

---

[11] *Advertising Policies Help, Personalized Advertising*, Google, http://web.archive.org/web/20191031223446/https://support.google.com/adspolicy/answer/143465?hl=en (archived from October 31, 2019).

[12] Office for Civil Rights, Department of Health and Human Services, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

strategies. Clients like Veradigm also use the analytics data that they receive back from Google to optimize their websites. Veradigm benefited financially from sharing Plaintiffs' and Class Members' Protected Health Information via tracking pixels by receiving, among other things, better and more cost-effective marketing in exchange for patient data.

### F. Veradigm Shared a Trove of Personally Identifiable Information with Google.

#### IP Addresses Are Personally Identifiable

82. An IP address is a number that identifies a computer or other device (such as a mobile phone) connected to the Internet.

83. IP addresses are used to identify and route communications on the Internet.

84. IP addresses of individual Internet users are used by websites and tracking companies to facilitate and track Internet communications and target those users with advertising using IP addresses.

85. Under HIPAA, an IP address is considered personally identifiable information. See 45 C.F.R. § 164.514(b)(2)(i)(O).

86. Whenever a patient logged into or used Veradigm's Patient Portals, Veradigm caused the disclosure of the patient's IP addresses to Google, along with each re-directed communication described herein, including patient communications concerning individual providers, conditions, and treatments.

#### Internet Cookies Are Personally Identifiable

87. In the early years of the Internet, advertising on websites followed the same model as traditional newspapers. Just as a sporting goods store would choose to advertise in the sports section of a traditional newspaper, advertisers on the early Internet paid for ads to be placed on specific web pages based on the type of content displayed on the web page.

88. Computer programmers eventually developed "cookies"—small text files that web servers can place on a person's device when that person's web browser interacts with the server. Cookies can perform different functions, like saving a user's login or other site settings. Eventually, some cookies were designed to acquire and record an individual Internet user's communications and activities on websites across the Internet.

89. Cookies are designed to and, in fact, most often do operate as means of identification for Internet users.

90. Cookies are protected personal identifiers under HIPAA. 45 C.F.R. § 164.514(b)(2)(i)(H), (J), (M), (N), and (R).

91. In general, cookies are categorized by duration and party.

92. There are two types of cookies classified by duration:

a. "Session cookies" are placed on a user's computing device only while the user is navigating the website that placed and accesses the cookie. The user's web browser typically deletes session cookies when the user closes the browser.

b. "Persistent cookies" are designed to survive beyond a single Internet-browsing session. The party creating the persistent cookie determines its lifespan. As a result, a persistent cookie can acquire and record a user's Internet communications for years and over dozens or hundreds of websites. Persistent cookies are sometimes called "tracking cookies."

93. Cookies are also classified by the party that uses the collected data:

a. "First-party cookies" are set on a user's device by the website with

which the user is exchanging communications. First-party cookies can be helpful to the user, server, and/or website to assist with security, log in, and functionality.

b. "Third-party cookies" are set on a user's device by website servers other than the website or server with which the user is exchanging communications. For example, the same patient who visits an Veradigm Patient Portal will typically also have cookies on their device from third parties, such as Google. Unlike first-party cookies, third-party cookies are not typically helpful to the user. Instead, third-party cookies are typically used for data collection, behavioral profiling, and targeted advertising.

94. Data companies like Google have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications to sell advertising that is customized to that person. To build individual profiles of Internet users, third-party data companies assign each user a unique identifier or set of unique identifiers.

95. Traditionally, first- and third-party cookies were kept separate. An Internet security policy known as the same-origin policy required web browsers to prevent one web server from accessing the cookies of a separate web server. For example, although Veradigm can deploy source code that uses Google third-party cookies to help Google acquire and record the patient's communications, they are not permitted direct access to Google third-party cookie values. The reverse is also true: Google was not provided direct access to the values associated with first-party cookies set by Veradigm.

96. Google designed a way to circumvent the same-origin policy so that third-party data companies can gain access to first-party cookies—and Veradigm adopted it.

97. Javascript source code developed by third-party data companies and placed on a webpage by developers such as Veradigm can bypass the same-origin policy to send a first-party cookie value in a tracking pixel to the third-party data company. This technique is known as "cookie synching," and it allows two cooperating websites to learn each other's cookie identification numbers for the same user. Once the cookie synching operation is completed, the two websites can exchange any information they have collected and recorded about a user that is associated with a cookie identification number. The technique can also be used to track an individual who has chosen to use third-party cookie blockers.

98. Whenever a patient uses Veradigm's Patient Portals, Veradigm intercepts, uses, and causes the disclosure of patient cookie identifiers with each re-directed communication described herein, including patient communications about providers, conditions, treatments, appointments, bills, registration, and log-ins to the Patient Portals.

99. Veradigm's cookie disclosures include the deployment of cookie synching techniques through which Veradigm deposits Google cookies on patient computing devices by disguising the Google cookies as belonging to Veradigm.

100. Veradigm then re-directs the disguised Google cookies to Google.

**Advertising IDs Are Personally Identifiable**

101. An advertising ID is a unique identifier used by advertisers to track user activity and serve personal advertisements on mobile phones. Advertising IDs allow advertisers to understand user behavior, measure ad performance, and tailor advertisements based on user interests. Examples include the Google Advertising ID (GAID) for Android and the IDFA

Advertising ID for iOS devices.

102. Each Android device has a unique GAID advertising ID. Whenever an Android device connects to Google services, it is automatically assigned a GAID. Advertisers can use the GAID to target users with advertisements. Likewise, Google can use the GAID ID to link users with their individual Google accounts.

103. Mobile marketers use advertising IDs like the Google Advertising ID to understand which ads, creatives, and channels are most effective. In android advertising, ad networks utilize the GAID to get an idea of a user's behaviors and interests. Meanwhile, advertisers use the GAID to monitor ad engagement and conversions. Advertisers and developers can see views and clicks of ads, as well as when a user subsequently installs an app, makes a purchase, or signs up for a subscription or other service.

104. Together, this data allows mobile app marketers to deliver targeted and retargeted ads to app users using precision segmentation for highly personalized experiences. Creating these personalized ads provides advertisers an efficient tool for targeting specific users to show specific advertisements directed to specific interests based on browsing history and other data that the advertising ID allows companies like Google to obtain.

**Browser-Fingerprints Are Personally Identifiable**

105. Browser-fingerprints are information collected about a computing device that can be used to identify the device.

106. Browser-fingerprints can be used to identify devices when the devices' IP addresses are hidden, and cookies are blocked.

107. The Electronic Frontier Foundation has explained:

> When a site you visit uses browser fingerprinting, it can learn enough information about your browser to uniquely distinguish you

> from all the other visitors to that site. Browser fingerprinting can be used to track users just as cookies do, but using much more subtle and hard-to-control techniques. In a paper EFF released in 2010, we found that a majority of users' browsers were uniquely identifiable given existing fingerprinting techniques. Those techniques have only gotten more complex and obscure in the intervening years. By using browser fingerprinting to piece together information about your browser and your actions online, trackers can covertly identify users over time, track them across websites, and building an advertising profile of them.[13]

108. In 2017, researchers showed that browser fingerprinting techniques can successfully identify 99.24 percent of Internet users.[14]

109. Browser-fingerprints are protected personal identifiers under HIPAA. 45 C.F.R. § 164.514(b)(2)(i)(M), (R).

110. Whenever patients use Veradigm Patient Portals, Veradigm intercepts, uses and causes disclosures of data sufficient to form browser fingerprints with each re-directed communication described herein, including patient communications concerning individual providers, conditions, and treatments.

111. Each of the individual data elements described above is personally identifiable on its own. However, Veradigm's disclosures of such personally identifiable data elements do not occur in a vacuum. The disclosures of the different data elements are tied together and, when taken together, are even more accurate in identifying individual patients, particularly when disclosed to data companies such as Facebook, Google, and other internet marketing companies

---

[13] Katarzyna Szymielewicz and Bill Dudington, *The GDPR and Browser Fingerprinting: How It Changes the Game for the Sneakiest Web Trackers*, Electronic Frontier Foundation (June 19, 2018) (available at https://www.eff.org/deeplinks/2018/06/gdpr-and-browser-fingerprinting-how-it-changes-game-sneakiest-web-trackers).

[14] Yinzhi Cao, Song Li and Erik Wijmans, *(Cross-)Browser Fingerprinting via OS and Hardware Level Features*, Proceedings of the Network and Distributed Security Symposium (March 2017) (available at https://yinzhicao.org/TrackingFree/crossbrowsertracking_NDSS17.pdf).

that expressly state that they use such data elements to identify individuals and have developed sophisticated algorithms and infrastructure for doing so.

112. Veradigm knowingly discloses information that allows Google and other advertisers to link Plaintiffs' and Class Members' Protected Health Information to their private identities and target them with advertising. Veradigm intentionally shared the Protected Health Information of Plaintiffs and Class Members with Google in order to gain access to the benefits of Google Analytics.

113. The information Plaintiffs and Class Members provide to Veradigm via its Patient Portals website (which is then shared illegally with Google) can be combined with other information in Google's possession, like Plaintiffs' and Class Members' names, dates of birth, and phone numbers, to more effectively target Plaintiffs and Class Members with advertisements or sell their data to third parties.

114. Veradigm knew that by embedding Google Analytics—a Google marketing tool—in its Patient Portals, it was permitting Google to collect, use, and share Plaintiffs' and Class Members' Protected Health Information, including sensitive medical information and personally identifiable data. Veradigm was also aware that such information would be shared with Google simultaneously with patients' interactions with its Patient Portals. Veradigm chose to barter Plaintiffs' and Class Members' Protected Health Information to Google because it wanted access to Google Analytics and related Google tools. That bargain financially benefited Veradigm and Google by betraying the rights of and Veradigm's obligations to Plaintiffs and Class Members.

### G. Veradigm's Secret Google Source Code Improperly Disclosed Plaintiffs' and Class Members' Protected Health Information to Google Systematically Throughout the Class Period.

115. The intentional design and operation of Veradigm's Patient Portals to improperly and surreptitiously disclose Plaintiffs' and other Class Members' Protected Health Information to

Google, as described above and throughout this Complaint, was ongoing, consistent, and systematic throughout the Class Period.

116. Veradigm's Patient Portals did in fact operate as described above and throughout this Complaint with respect to the named Plaintiffs in this matter.

117. For example, Plaintiff John Doe has used the Veradigm Patient Portal via his personal computer for more than four years in connection with healthcare provided by Latrobe Hospital and Independence Health System. Plaintiff John Doe has sought treatment from Latrobe Hospital in connection with his treatment for high cholesterol, chronic obstructive pulmonary disease ("COPD"), and peripheral neuropathy. During that time, Plaintiff John Doe regularly logged into the Veradigm Patient Portal and used the portal to confirm appointment details, review messages from his treating physicians, check test results, and message his doctors. When using the Veradigm Patient Portal, Plaintiff John Doe entered data inside the Patient Portal related to his COPD, high cholesterol, and neuropathy conditions that was shared with Google via the analytics technologies that Veradigm deployed inside the Patient Portal. Veradigm likewise sent Google data such as the location of Plaintiff John Doe's treaters, the names of his physicians, when he logged in and out of his Patient Portal, when he reviewed treatment information and his physician's specialties.

118. Likewise, Plaintiff Jane Doe used the Veradigm Patient Portal in connection with healthcare she received at Frick Hospital and Latrobe Hospital, which are both facilities within the Independence Health system. Plaintiff Jane Doe has received treatment from Frick Hospital and

Latrobe Hospital in connection with breast cancer. In the course of her treatment Plaintiff Jane Doe has regularly logged into the Veradigm Patient Portal via the Veradigm FollowMyHealth mobile application and used it to review test results, review doctor's notes, and search for treatment information in connection with her ongoing breast cancer treatment.

119. Without Plaintiff Jane Doe's knowledge or consent, Veradigm intercepted and disclosed her confidential Protected Health Information to Google, including information about her patient status, messages she sent to her doctors, details about her medical condition, details about her treatment, and the precise days and times she logged into her Veradigm patient portal.

120. As a result of Veradigm's deployment of Google Analytics inside its Patient Portal, Plaintiff Jane Doe's Protected Health Information Google was able to link Plaintiff Jane's Does's Protected Health Information with her real-world identity, including by linking this data to her Google account, and then used and sold her Protected Health Information for commercial purposes. For example, after entering information in her Veradigm Patient Portal related to her cancer treatment, Plaintiff began receiving cancer-treatment-related advertisements on her social media account.

121. Similarly, Plaintiff Janet Doe is a patient of Latrobe Hospital and Independence Health System who has regularly used the Veradigm Patient Portal for more than two years. During that time, Plaintiff Janet Doe has regularly logged into the Veradigm Patient Portal using the Veradigm Mobile Application and used the Veradigm Patient Portal to review appointment details, review messages from her treating physicians, research treatment information, and check lab results in connection with her ongoing treatment for heart and dermatology issues. Patient Janet Doe has also regularly used the Veradigm Patient Portal to review updates from her primary care physician.

122. Every time Plaintiffs John Doe, Jane Doe, and Janet Doe accessed the Veradigm Patient Portal, Veradigm intercepted and shared their login with Google, along with other Protected Health Information such as their patient status, their appointment scheduling, and the URLs of the pages they reviewed inside the Patient Portal, along with personally identifying information such as their IP addresses, browser fingerprints, and Google cookies. Such Protected Health Information, including Plaintiffs' patient status, their medical conditions, and when and where they sought treatment are specifically protected by HIPAA against unauthorized disclosure to third parties.

123. While Veradigm could have sought consent from Plaintiffs and Class Members to intercept, collect, and share their Protected Health Information with Google, Veradigm chose not to because of the likelihood that the majority of patients would refuse. Instead, Veradigm surreptitiously deployed hidden analytics tracking tools it obtained from Google in an effort to circumvent patients' refusing and/or blocking the exploitation of their Health Information for advertising purposes.

124. Veradigm intentionally deployed Google Analytics inside its Patient Portal (and thereby shared Plaintiffs' Protected Health Information with Google) in return for access to free marketing tools and aggregated data about how individuals interacted with its Patient Portal. Veradigm took the aggregated patient data it received back from Google and used that data to optimize its marketing and product designs, thereby increasing Veradigm's profitability at the expense of Plaintiffs and Class Members.

125. Upon information and belief and the investigation of counsel, each Class Member had his or her interactions with the Patient Portals intercepted and shared with Google in a manner substantially similar to what occurred with the named Plaintiffs as detailed above, such that named

Plaintiffs' claims are typical of those of the proposed Class as a whole.

### H. Plaintiffs' Personal Health Data that Veradigm collected, disclosed, and exploited is Plaintiffs' property, has economic value, and its illicit disclosure caused Plaintiffs harm.

126. The value of data that companies like Google extract from people who use the Internet is well understood and generally accepted in the e-commerce industry.

127. In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people."[15]

128. In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price."[16] This price is only increasing. According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164 per year between 2013 and 2020.[17]

129. In June 2025, Google began soliciting individuals in the United States to purchase their computer and mobile phone internet browsing history for $540 a year per household participant.

130. Personal information is now viewed as a form of currency. Professor Paul M. Schwartz noted in the Harvard Law Review:

> Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information.[18]

---

[15] https://ig.ft.com/how-much-is-your-personal-data-worth/
[16] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[17] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[18] Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 HARV. L. REV. 2055, 2056-57

131. Despite the protections afforded by law, there is an active market for health information. Medical information obtained from health providers garners substantial value because of the fact that it is not generally available to third-party data marketing companies because of the strict restrictions on disclosure of such information under state and federal laws and provider standards, including the Hippocratic oath. Even with these restrictions, however, a multi-billion-dollar market exists for the sale and purchase of such private medical information.[19]

132. Individuals can sell or monetize their own data if they so choose. For example, Facebook has offered to pay individuals for their voice recordings,[20] and has paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smart phones.[21]

133. Myriad other companies and apps such as DataCoup, Nielsen Computer, Killi, and UpVoice also offer consumers money in exchange for access to their personal data.[22]

134. Veradigm was compensated for its disclosures of Plaintiffs' and Class Members' Protected Health Information by the Health Information's third-party recipients in the form of enhanced analytics and marketing services. Among other things, Veradigm used the analytics data that it received from Google to enhance the Patient Portal product it marketed and sold to healthcare systems. In turn, Google used the Protected Health Information it received from

---

(2004).

[19] https://revealnews.org/blog/your-medical-data-is-for-sale-and-theres-nothing-you-can-do-about-it/; *see also https://slate.com/technology/2022/06/health-data-brokers-privacy.html*

[20] https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-prounounciations-app

[21] https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html

[22] https://www.creditdonkey.com/best-apps-data-collection.html; *see also* https://www.monetha.io/blog/rewards/earn-money-from-your-data/

Veradigm to sell advertising to other third parties, targeted to the patients whom Veradigm was supposedly serving and protecting from privacy violations.

135. Veradigm did not pay (or offer to pay) Plaintiffs and Class Members for their Protected Health Information before Veradigm shared this data with Google and other advertisers.

136. Veradigm profited from Plaintiffs' and Class Members' information without ever intending to compensate Plaintiffs and Class Members or inform them that the disclosures had been made.

137. Veradigm was unjustly enriched by its conduct.

138. A data broker is a company that collects and sells personal information about individuals to other businesses. Data brokers gather consumers' personal information from a variety of sources, and then compile comprehensive profiles they sell for purposes such as targeted advertising, risk assessment, and background checks. Data brokers mass collection and sale of personal information raise significant consumer privacy concerns. The personal data that data brokers collect and sell can be used to harm individuals, for example, by influencing insurance rates, loan denials, and unwanted advertising.

139. Both Facebook and Google have a history of sharing the data they receive via analytics technologies with data brokers. For example, when advertisers use Google's real-time bidding system (RTB), RTB lets hundreds of companies bid for ad space on individual consumers based on their Google profile, which can include information such as age, sex, and interests. While only one company will win the auction, hundreds of participating companies receive sensitive information about the potential recipient of the ad—device identifiers and cookies, web browsing and location data, IP addresses, and unique demographic information such as age and gender. Worse, many companies participating in the RTB system are not there to fill ad spaces but instead

use RTB to collect users' personal data. Likewise, for users using cell phones or other Android devices that run on a Google operating system, every time they open an app on their Android phone or tablet, Google will timestamp it, and every ad the user is shown will be recorded and associated with their device profile.

140. Facebook is no better. Facebook has historically collaborated with data brokers to gather consumer data and enhance its user profiles for targeting advertising. Facebook itself acts as a first-party data broker, collecting data from user activities on its platform to offer targeted advertising, which is its primary revenue source. Facebook's data ecosystem extends through external partnerships, allowing Facebook to collect data from user interactions on other websites and apps. Companies that pay for ads on Facebook can then direct users to their websites, which embed trackers that collect information such as IP addresses and device IDs from visitors.

141. Facebook also has a history of sharing its customers data with third parties, including most infamously Cambridge Analytica, who gained access to the data of tens of millions of Facebook users. Facebook has also shared its customers data with "partners," such as Acxiom, Oracle, Epsilon, and Experian. Once this data is shared, neither Facebook or its users have control over this data as it is endlessly sold and resold to data brokers around the world.

142. As a consequence of Veradigm's unauthorized disclosure of patients' Protected Health Information to Google, Plaintiff and Class Members have further been harmed by their loss of control over their own personal information, which has now been shared with numerous data brokers participating in the online data market.

143. The only remedy for patients whose Protected Health Information has been shared with Google is to use services such as DeleteMe and CyEx Privacy Shield Pro that go out into the online market place and "delete" patients' personal data from data broker rolls. These services,

however, cost anywhere from $100 to $300 a year on average for consumers to try and regain control over their personal information.

## I. Plaintiffs and Class Members Have a Reasonable Expectation of Privacy in Their Protected Health Information.

144. As patients, Plaintiffs and Class Members had a reasonable expectation that Veradigm would not disclose their Protected Health Information or the content of their communications to third parties without their express authorization.

145. As patients using Veradigm's Patient Portals, Plaintiffs and Class Members had a reasonable expectation that Veradigm would not disclose their Protected Health Information or the content of their communications to third parties without their express authorization.

146. Plaintiffs' and Class Members' reasonable expectations of privacy in their Protected Health Information and communications exchanged with Veradigm are derived from multiple sources, including at least:

- Veradigm's status as Plaintiffs' and Class Members' healthcare Patient Portal provider;
- Veradigm's common law obligations to maintain the confidentiality of Protected Health Information and communications;
- State and federal laws and regulations protecting the confidentiality of Protected Health Information;
- State and federal laws protecting the confidentiality of communications and computer data;
- State laws protecting against unauthorized use of personal means of identification; and

147. It was reasonable for Plaintiffs and Class Members to assume that Veradigm's privacy policies were consistent with Veradigm's duties to protect the confidentiality of patients' Protected Health Information.

148. Indeed, multiple studies examining the collection and disclosure of consumers' sensitive medical information confirm that the disclosure of sensitive medical information violates expectations of privacy that have been established as general social norms.

149. Privacy polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

150. For example, a recent study by *Consumer Reports* showed that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believed that internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[23]

151. Users act consistently with these preferences. For example, following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to share data when prompted.[24]

152. "Patients are highly sensitive to disclosure of their health information," particularly because it "often involves intimate and personal facts, with a heavy emotional overlay." Peter A. Winn, *Confidentiality in Cyberspace: The HIPAA Privacy Rules and the Common Law*, 33

[23] https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/
[24] https://www.wired.co.uk/article/apple-ios14-facebook

RUTGERS L.J. 617, 621 (2002). Unsurprisingly, empirical evidence demonstrates that "[w]hen asked, the overwhelming majority of Americans express concern about the privacy of their medical records." Sharona Hoffman & Andy Podgurski, *E-Health Hazards: Provider Liability and Electronic Health Record Systems*, 24 BERKLEY TECH L.J. 1523, 1557 (2009).

153. The concern about sharing Protected Health Information is compounded by the reality that advertisers view this type of information as particularly valuable. Indeed, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born. As one recent article noted, "What is particularly worrying about this process of datafication of children is that companies like [Facebook] are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[25]

154. Many privacy law experts have expressed serious concerns about patients' sensitive medical information being disclosed to third-party companies like Facebook. As those critics have pointed out, having a patient's personal Protected Health Information disseminated in ways the patient is unaware of could have serious repercussions, including affecting their ability to obtain life insurance, how much they might pay for such coverage, the rates they might be charged on loans, and the likelihood of their being discriminated against.

**J. Plaintiffs' and Class Members' Protected Health Information is protected against unauthorized disclosure by both state and federal law.**

155. The confidentiality of Plaintiffs' and Class Members' Protected Health Information is specifically protected by law. *E.g.*, N.C. Stat. § 15A-287; 45 C.F.R. § 164.514. The prohibitions against disclosing Health Information include prohibitions against disclosing personally identifiable information such as patient names, IP addresses, and other unique characteristics or

[25] https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/

codes. *E.g.*, 45 C.F.R. § 164.51. Both state and federal law also restrict the use of Plaintiffs' and Class Members' Health Information, including their status as patients, to only those uses related to their care unless patients have provided express written authorization to the contrary.

156. Veradigm does not have a legal right to share Plaintiffs' and Class Members' Protected Health Information with third parties without their written consent because this information is protected from such disclosure by law. 45 C.F.R. § 164.508. Nor is Veradigm permitted to disclose Plaintiffs' and Class Members' Protected Health Information to advertising and marketing companies like Google without express written authorization from patients. 45 C.F.R. § 164.502(a)(5)(ii).

157. Indeed, as discussed above, the United States Department of Health and Human Services ("HHS") recently confirmed that hospitals are prohibited from transmitting Health Information via tracking technology like Google Analytics without a patient's authorization and other protections like a business associate agreement with the recipient of the Health Information. Among other things, HHS warned hospitals like those for whom Veradigm provides its Patients Portals that: "Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of Health Information to tracking technology vendors or any other violations of the HIPAA Rules. For example, disclosures of Health Information to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures."[26]

158. Veradigm failed to obtain a valid written authorization from Plaintiffs or Class Members to allow the capture and exploitation of their Protected Health Information and the contents of their communications for marketing purposes.

[26] https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html

159. Plaintiffs' and Class Members' Protected Health Information is protected by federal law under HIPAA and its implementing regulations, which are promulgated by HHS.

160. The HIPAA Privacy Rule, located at 45 CFR Part 160 and Subparts A and E of Part 164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[27]

161. Business associates like Veradigm also must also comply with the privacy obligations imposed by HIPAA.[28]

162. The Privacy Rule broadly defines "protected health information" ("PHI") as "individually identifiable health information" ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. §160.103; *see* n.1, *supra*.

163. In relevant part, PHI is defined as "individually identifiable health information . . . transmitted by electronic media [or] maintained in electronic media."

164. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable

[27] Department of Health and Human Services, *Health Information Privacy* (Mar. 31, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

[28] 78 Fed. Reg. 5568 (2013) (extending certain HIPAA Privacy and Security Rules, like those described here, to business associates).

basis to believe the information can be used to identify the individual." 45 C.F.R. §160.103.

165. Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed:

> A. Names;
>
> . . .
>
> H. Medical records numbers;
>
> . . .
>
> J. Account numbers;
>
> . . .
>
> M. Device identifiers and serial numbers;
>
> N. Web Universal Resource Locators (URLs);
>
> O. Internet Protocol (IP) address numbers; … and
>
> R. Any other unique identifying number, characteristics, or code…; and"
>
> the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

45 C.F.R. § 164.514.

166. The HIPAA Privacy rule requires covered entities and business associates to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information

without authorization. 45 C.F.R. §§ 160.103, 164.502.

167. An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

168. Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b). There is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both."

169. Courts have recognized that patient status is protected by HIPAA. *In re Meta Pixel Healthcare Lit.*, Case No. 3:22-cv-03580-WHO, Dkt. 159 at 12 (N.D. Cal. Dec. 22, 2022) ("I agree that the information at issue here appears to show patient status and thus constitutes protected health information under HIPAA."); *id.* at 15 ("[T]he Pixel captures information that connects a particular user to a particular health care provider – i.e., patient status – which falls within the ambit of information protected under HIPAA.").

170. Guidance from HHS confirms that patient status is protected by HIPAA:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this

> information would not be PHI because it is not related to health data. … **If such information was listed with health condition, health care provision** or payment data, **such as an indication that the individual was treated at a certain clinic**, then this information would be PHI.[29]

171. In December 2022, HHS issued a Bulletin "to highlight the obligations" of health care providers and their business associates under the HIPAA Privacy Rule "when using online tracking technologies" such as the "Meta Pixel," which "collect and analyze information about how internet users are interacting with a regulated entity's website or mobile application."[30]

172. In the Bulletin, which was amended in June 2024, HHS explained that tracking technologies on Patient Portals "generally have access to PHI" and may access diagnosis and treatment information, in addition to other sensitive data:

> Regulated entities may have user-authenticated webpages, which require a user to log in before they are able to access the webpage, such as a patient or health plan beneficiary portal or a telehealth platform. **Tracking technologies on a regulated entity's user-authenticated webpages generally have access to PHI.** Such PHI may include, for example, an individual's IP address, medical record number, home or email addresses, dates of appointments, or other identifying information that the individual may provide when interacting with the webpage. **Tracking technologies within user-authenticated webpages may even have access to an individual's diagnosis and treatment information, prescription information, billing information, or other information within the portal**. Therefore, a regulated entity must configure any user-authenticated webpages that include tracking technologies to allow such

[29] Office for Civil Rights, Department of Health and Human Services, *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule* at 5 (emphasis added) (Nov. 26, 2012), https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

[30] Office of Civil Rights, Department of Health and Human Services, HHS Office of Civil Rights Issue Bulletin on Requirements under HIPAA for Online Tracking Technologies to Protect the Privacy and Security of Health Information (Dec. 1, 2022), https://www.hhs.gov/about/news/2022/12/01/hhs-office-for-civil-rights-issues-bulletin-on-requirements-under-hipaa-for-online-tracking-technologies.html.

> technologies to **only** use and disclose PHI in compliance with the HIPAA Privacy Rule and must ensure that the electronic protected health information (ePHI) collected through its website is protected and secured in accordance with the HIPAA Security Rule.[31]

173. The HHS Guidance further explained that tracking technology vendors like Google are considered business associates under HIPAA and that entities who use their services must obtain a business associate agreement ("BAA") before utilizing their services:

> [T]racking technology vendors are business associates if they create, receive, maintain, or transmit PHI on behalf of a regulated entity for a covered function (*e.g.* health care operations) or provide certain services to or for a covered entity (or another business associate) that involve the disclosure of PHI. In these circumstances, regulated entities must ensure that the disclosures made to such vendors are permitted by the Privacy Rule and enter into a business associate agreement (BAA) with these tracking technology vendors to ensure that PHI is protected in accordance with the HIPAA Rules. For example, if an individual makes an appointment through the website of a covered health clinic for health services and that website uses third party tracking technologies, then the website might automatically transmit information regarding the appointment and the individual's IP address to a tracking technology vendor. In this case, the tracking technology vendor is a business associate and a BAA is required.[32]

174. HHS reiterated that "[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of HIPAA Rules."[33]

175. As HHS explained, an "impermissible disclosure" of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms:

> For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish,

[31] Office of Civil Rights, Department of Health and Human Services, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last reviewed June 26, 2024) (emphasis added).
[32] *Id.*
[33] *Id.*

> or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.[34]

**TOLLING, CONCEALMENT, AND ESTOPPEL**

176. The applicable statutes of limitation have been tolled because of Veradigm's knowing and active concealment and denial of the facts alleged herein.

177. Veradigm seamlessly incorporated trackers into its Patient Portals and Mobile Application, providing no indication to Plaintiffs and Class Members that they were being tracked for marketing purposes. Veradigm had knowledge that its Patient Portals and Mobile Application incorporated tracking technologies yet failed to disclose that by interacting with the Patient Portals, Plaintiffs' and Class Members' Protected Health Information would be intercepted, collected, used by, and disclosed to third parties.

178. Plaintiffs and Class Members could not, with due diligence, discover the full scope of Veradigm's conduct, because there were no disclosures or other indication that they were interacting with Patient Portals employing Google Analytics or other tracking technologies.

179. All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Additionally, Veradigm was under a duty to disclose the nature and significance of its data collection practices but did not do so. Veradigm is therefore estopped from relying on any statute of limitations defenses.

**CLASS ACTION ALLEGATIONS**

180. Plaintiffs re-allege and incorporate by reference the allegations set forth above.

181. Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2), and (b)(3) of the

---

[34] *Id.*

Federal Rules of Civil Procedure on behalf of the following Class and subclass:

> **Nationwide Class:** During the fullest period allowable by law, all patients in the United States who logged into the Patient Portals and/or the Mobile Applications provided by Veradigm where Google Analytics and/or Firebase Analytics was deployed.
>
> **California Subclass:** During the fullest period allowable by law, all current California citizens who logged into the Patient Portals and/or the Mobile Applications provided by Veradigm where Google Analytics and/or Firebase Analytics was deployed.

182. Excluded from the Class are Veradigm and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; and the Court staff assigned to this case and their immediate family members. Plaintiffs reserve the right to modify or amend the Class definition, as appropriate, during the course of this litigation.

183. This action has been brought and may properly be maintained on behalf of the Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

184. **Numerosity—Federal Rule of Civil Procedure 23(a)(1)** – Class Members are so numerous that their individual joinder is impracticable. The precise number of Class Members and their identities are unknown to Plaintiffs at this time but will be determined through discovery through the records of Veradigm.

185. **Commonality and Predominance—Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3)** – Common questions of law and fact exist and predominate over questions affecting only individual Class Members. These common legal and factual questions include the following:

a. Whether Veradigm's practices relating to disclosures of Plaintiffs' and Class Members' Protected Health Information to third parties were intentional;

b. Whether Veradigm profited from disclosures to the third parties;

c. Whether Veradigm's conduct violates the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq.* and 18 U.S.C. § 2701, *et seq.*;

d. Whether Veradigm's practices constitute an unauthorized intrusion upon seclusion;

e. Whether Veradigm's practices constitute identity theft;

f. Whether Veradigm's practices constitute a breach of fiduciary duty;

g. Whether Veradigm's practices constitute tampering with computer data;

h. Whether Veradigm's practices constitute unjust enrichment;

i. Whether placement of the Google cookies disguised as belonging to Veradigm on Plaintiffs' and Class Members' computing devices is a highly offensive intrusion upon seclusion;

j. Whether Veradigm's conduct harmed and continues to harm Plaintiffs and Class Members, and if so, the extent of the injury;

k. Whether and to what extent Plaintiffs and Class Members are entitled to damages and other monetary relief;

l. Whether and to what extent Plaintiffs and Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction; and

m. Whether and to what extent Plaintiffs and Class Members are entitled to attorneys' fees and costs.

186. **Typicality—Federal Rule of Civil Procedure 23(a)(3)** – Plaintiffs' claims are

typical of the claims of the Class and Plaintiffs have substantially the same interest in this matter as other Class Members. Plaintiffs have no interests that are antagonistic to, or in conflict with, the interests of the other Class Members. Plaintiffs' claims arise out of the same set of facts and conduct as all other Class Members. Plaintiffs and all Class Members are patients who used Veradigm Patient Portals and are victims of Veradigm's unauthorized disclosures to third parties. All Plaintiffs' and Class Members' claims are based on Veradigm's wrongful conduct and unauthorized disclosures.

187. **Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4)** – Plaintiffs will fairly and adequately protect the interests of Class Members. Plaintiffs have retained competent counsel experienced in complex class action privacy litigation and Plaintiffs will prosecute this action vigorously. Plaintiffs have no interests adverse or antagonistic to those of the Class.

188. **Declaratory and Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2)** – Veradigm acted or refused to act on grounds generally applicable to Plaintiffs and the other Class Members, thereby making appropriate final injunctive relief and/or declaratory relief, as described below.

189. **Superiority—Federal Rule of Civil Procedure 23(b)(3)** – A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are small compared with the burden and expense that would be entailed by individual litigation of their claims against Veradigm. It would thus be virtually impossible for the Class Members, on an individual basis, to obtain effective redress for the wrongs done them. Furthermore, even if Class Members could afford such individualized litigation, the court system could not. Individualized litigation would

create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

190. Additionally, the Class may be certified under Rule 23(b)(1) or (b)(2) because:

a. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Veradigm;

b. The prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

c. Veradigm has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class Members as a whole.

## COUNT I

## VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT 18 U.S.C. § 2511(1) et seq. Unauthorized Interception, Use, and Disclosure

170. Plaintiffs, individually and on behalf of the Nationwide Class, repeat and reallege

the foregoing paragraphs as if fully alleged herein.

171. Title I of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2510, also known as the Wiretap Act, provides a private cause of action against any person who intercepts an electronic communication.

172. The ECPA protects individuals against eavesdropping committed with an improper purpose.

173. A violation of the ECPA occurs where any person "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any . . . electronic communication" or "intentionally discloses, or endeavors to disclose, to any other person the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication" or "intentionally uses, or endeavors to use, the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication." 18 U.S.C. §§ 2511(1)(a), (c)-(d).

191. Plaintiffs' and Class Members' communications via Patient Portals, including their communications with their treating physicians, are covered communications under the ECPA.

192. The ECPA protects both the sending and receipt of electronic communications.

193. The ECPA provides a private right of action to any person whose electronic communications are "intercepted, disclosed, or intentionally used" in violation of the ECPA.

194. "Electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

195. The transmissions of data between Plaintiffs and Class Members, on the one hand, and their healthcare providers' Patient Portals, which are hosted by Veradigm, on the other, qualify as communications under the ECPA.

196. "Intercept" under the ECPA means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

197. "Contents" includes "*any* information relating to the substance, purport, or meaning" of the communication at issue. 18 U.S.C. § 2510(8) (emphasis added).

198. The "contents" of Plaintiffs' and Class Members' electronic communications included at least:

a. the parties to the communications;

b. the precise text of their search queries;

c. personally identifiable information such as their IP addresses, Facebook IDs, browser fingerprints, and other unique identifiers;

d. the precise text of their communications about specific doctors;

e. the precise text of their communications about specific medical conditions;

f. the precise text of their communications about specific treatments;

g. the precise text of their communications about scheduling appointments with medical providers;

h. the precise text of their communications about billing and payment;

i. the precise text of specific buttons on Veradigm's portal that they clicked to exchange communications, including Logins, Registrations, Requests for Appointments, and other buttons;

j. the precise dates and times when they clicked to Log-In on Veradigm's portal;

k. the precise dates and times when they visited Veradigm's portal;

l. information that is a general summary or informs third parties of the general subject of communications that Veradigm sent back to them in response to requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

m. any other content that Veradigm has aided third parties in scraping from webpages or communication forms in its Patient Portals.

199. Plaintiffs' and Class Members' communications with their healthcare providers via Veradigm constitute "electronic communications" because they were wholly or partially transmitted by wire, electromagnetic, and/or photoelectronic systems including, but not limited to:

a. Plaintiffs and Class Members' personal computing devices;

b. Plaintiffs and Class Members' web browsers;

c. Plaintiffs and Class Members' browser-managed files;

d. Google Analytics;

e. Internet cookies;

f. Veradigm's computer servers; and

g. Third-party source code used by Veradigm.

200. Whenever Plaintiffs and Class Members interacted with Veradigm's Patient Portals and Mobile Application, Veradigm, through the source code it embedded and ran on its Patient Portals and Mobile Application, intentionally intercepted and divulged the contents of Plaintiffs and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Google.

201. Without Plaintiffs' and Class Members' knowledge or consent, Veradigm acquired the content of Plaintiffs' and Class Members' communications while they were still exchanging communications with their healthcare providers inside the Patient Portal and Mobile Application. Veradigm then caused these same communications to be disclosed to Google and third parties in return for marketing and advertising benefits.

202. In violation of 42 U.S.C. § 1320d-6, Veradigm knowingly disclosed "individually identifiable health information to another person"—i.e., Google. Veradigm further violated 42 U.S.C. § 1320d-6 by intentionally disclosing Plaintiffs' and Class Members' Protected Health Information to Google for the purpose of obtaining "commercial advantage" over its rivals in the marketplace such as Epic, Athena Health, and Cerner Health. Specifically, Veradigm shared Plaintiffs' and Class Members' Protected Health Information with Google in return for free advertising and marketing tools from Google, along with aggregated patient data, that Veradigm used to optimize its Patient Portals and marketing campaigns, so that Veradigm could increase its profitability. By exploiting Plaintiffs' and Class Members' Protected Health Information in this manner, Veradigm hoped to take market share away from its business rivals in the patient portal market.

203. Google, in turn, used the Protected Health Information it received from Veradigm

to sell targeted advertising to other third parties. While that bargain may have enriched Google and Veradigm, it came at the expense of Plaintiffs and Class Members.

204. When a patient makes contact with an Veradigm Patient Portal to exchange communications with his or her health care provider, a "TLS handshake" occurs that opens a line between the patient's communications device and the Patient Portal server. The line remains open and communications continue to flow back and forth from the patient's communications device and Veradigm's servers. The patient's communications with his or her healthcare provider flow through this open line. At the same time that the line is open and communications remain "in transit" between the patient's communications device and Veradigm's servers, Veradigm has also placed the content of the communication in temporary electronic storage and long-term storage, rendering a communication in transit, electronic storage, and storage all at the same time.

205. Veradigm was not a party to many of the communications that it intercepted and disclosed. For example, when Plaintiffs and Class Members sent messages to their health care providers or paid their healthcare providers bills, they were not communicating with Veradigm. Rather, Plaintiffs and Class Members were communicating directly with their doctors without any knowledge that Veradigm was secretly intercepting, recording, and disclosing their communications.

206. Veradigm's conduct occurred through the use of "devices" within the meaning of the ECPA, 18 U.S.C. § 2510(5), including:

a. Cookies, including the Google cookies disguised as Veradigm's cookies;

b. Healthcare providers' web servers;

c. Google's web servers;

d. The Veradigm Mobile Application;

e. Veradigm's web servers; and

f. The Google source code described herein.

207. The ECPA provides that a "party to the communication" may liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d).

208. Neither Veradigm nor Google were parties to Plaintiffs' and Class Members' communications with their healthcare providers.

209. But even if Veradigm was a party to the communications, Veradigm is still liable under the ECPA because it acted with the purpose of committing criminal and tortious acts in violation of federal and state laws, including but not limited to:

a. A criminal violation of 42 U.S.C. § 1320d-6 regardless of any subsequent purpose or use of the individually identifiable health data; and

b. A violation of HIPAA, particularly 42 U.S.C. § 1320d-6, which is a criminal offense punishable by fine or imprisonment with increased penalties where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage [or] personal gain."

c. A knowing breach of Veradigm's fiduciary duties to Plaintiffs and the Class.

210. Veradigm accessed and obtained Plaintiffs' and Class Members' Protected Health Information for the purpose of committing the crimes and torts described herein. More specifically, Veradigm intercepted Plaintiffs' and Class Members' communications so it could share those

communication with Google and other third parties in return for advertising and marketing benefits. This intended and intentional disclosure violated both federal and state laws as set out above. Veradigm would not have been able to obtain these advertising or marketing services if it had complied with those laws.

211. Veradigm acted without Plaintiffs' or Class Members' consent.

212. Veradigm acted without the consent of Plaintiffs' or Class Members' healthcare providers.

213. Although Plaintiffs and Class Members consented to Veradigm acquiring their Health Information for purposes of providing medical care and access to their health records, Plaintiffs and Class Members did not consent to Veradigm acquiring their Health Information for purposes of re-directing it to Google or exploiting it for marketing purposes.

214. As such, Defendant cannot viably claim any exception to ECPA liability.

215. As a direct and proximate result of Veradigm's violation of the ECPA, Plaintiffs and Class Members were damaged by Veradigm's conduct:

a. Veradigm harmed Plaintiffs' and Class Members' interest in privacy;

b. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is private no longer;

c. Veradigm eroded the essential confidential nature of the provider-patient relationship;

d. Veradigm took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' authorization, informed consent, or knowledge, and without sharing the benefit;

e. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included their healthcare providers' duty to maintain confidentiality; and

f. Veradigm's actions diminished the value of Plaintiffs and Class Members' Protected Health Information.

216. In violating the ECPA, Veradigm's conduct was a knowing, conscious, and deliberate wrongdoing, and carried out with an evil or wrongful motive, an intent to injure Plaintiffs, and a recklessly negligent or callous indifference to Plaintiffs' and Class Members' protected rights under both state and federal law. Indeed, Veradigm not only intentionally harmed Plaintiffs and Class Members without just cause but also acted with a deliberate and flagrant disregard for their safety and privacy. Specifically:

a. Veradigm knew it had a duty to safeguard and keep confidential Plaintiffs' Class Members' Protected Health Information under HIPAA;

b. Veradigm knew that Plaintiffs and Class Members reasonably expected their communications with their healthcare providers to remain private;

c. Veradigm knew that Plaintiffs' and Class Members' communications involved private and sensitive matters concerning Plaintiffs' and Class Members' healthcare;

d. Veradigm knew it was prohibited by law from intercepting and disclosing Plaintiffs' and Class Members' communications;

e. Veradigm knew that Google used the patient data that it was receiving

via Google Analytics for marketing purposes;

f. Veradigm knew that it was required to sign a business associate agreement with any tracking technology vendor with whom Veradigm was sharing patient data;

g. Veradigm knew that its use of the tracking technology at issue violated its duties under HIPAA, as set forth in the December 2022 HHS Bulletin;

h. Veradigm nonetheless knowingly and deliberately intercepted and disclosed to third-party advertisers Plaintiffs' and Class Members' Protected Health Information without Plaintiffs' or and Class Members' consent, in a knowing violation of the ECPA;

i. Veradigm carried out its unlawful conduct with the wrongful and evil motive to appropriate Plaintiffs' and Class Members' private Protected Health Information at Plaintiffs' and Class Members' expense and for Veradigm's own financial gain; and

j. Veradigm's conduct was particularly egregious and reprehensible because it acquired Plaintiffs' and Class Members' Protected Health Information under the guise of offering healthcare services to Plaintiffs and Class Members.

217. The ECPA provides that persons whose electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119 may recover statutory damages of the greater of $100 a day for each day of violation or $10,000. 18 U.S.C. § 2520.

218. The harm being suffered by Plaintiffs and Class Members is ongoing because—

as of the time of the filing of this complaint—Veradigm continues to deploy Firebase Analytics on the Mobile Application it offers the public.

219. Plaintiffs, individually, on behalf of the Class Members, seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

**COUNT II**

**Negligence**

174. Plaintiffs individually and on behalf of the Nationwide Class repeat and reallege the foregoing paragraphs as if fully alleged herein.

175. Under Illinois law, to state a negligence claim a plaintiff must plead that the defendant owed a duty of care to the plaintiff, that the defendant breached that duty, and that the breach was the proximate cause of the plaintiff's injuries." *Cowper v. Nyberg*, 28 N.E.3d 768, 772 (Ill. 2015).

176. Illinois law recognizes that companies like Veradigm who handle, collect, and otherwise manage non-public health information owe a duty to prevent the unauthorized disclosure of patients' health information. *Mayer v. Midwest Physician Admin. Servs*., LLC, No. 23-CV-3132, 2025 WL 963779, at *5 (N.D. Ill. Mar. 31, 2025)

177. It was foreseeable to Veradigm that deploying Google Analytics on its Patient Portals and Mobile Application would result in the patients' Protected Health Information being shared with Google. By deploying Google Analytics inside its Patient Portals, Veradigm acted with wanton and reckless disregard for the security and confidentiality of Plaintiff and the Class Members' PHI.

178. Veradigm also had a duty to notify Plaintiff and Class Members within a reasonable a reasonable time frame of any breach to the confidentiality and security of their PHI.

This duty is required and necessary for Plaintiffs and Class Members to take appropriate measures to protect the confidentiality of their PHI and to mitigate the harm caused by Veradigm's conveyance of their PHI to Google.

179. Veradigm owed these duties to Plaintiffs and the Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Veradigm knew or should have known would suffer injury-in-fact from Veradigm's deployment of Google Analytics inside its Patient Portals.

180. The risk that Google would access, exploit, and misuse Plaintiffs' and Class Members' PHI was foreseeable. Given that Veradigm holds vast amounts of PHI, and that Google warns health care systems not to share health data with it via Google Analytics, Veradigm was on notice of the need to protect Plaintiffs' and Class Members' PHI from unauthorized disclosures via analytics technologies.

181. PHI is highly valuable, and Veradigm knew or should have known the risks in obtaining, storing, handling, transmitting, and using Plaintiffs' and Class Members' PHI, and the importance of exercising reasonable care in the handling and protection of Plaintiffs' and Class Members' PHI.

182. Veradigm breached its duty of reasonable care to Plaintiffs and Class Members in deploying Google Analytics on its Patient Portals and Mobile Application and by failing to supervise its employees, agents, contractors, and vendors in the acquisition, handling, and securing of the Plaintiffs' and Class Members' PHI. Veradigm further breached its duty of reasonable care to Plaintiffs and Class Members by sharing their PHI with Google, which actually and proximately caused injuries to Plaintiffs and the Class Members.

183. Veradigm also breached its duty of care by failing to provide reasonable and

timely notice to Plaintiffs and the Class Members that their PHI had been shared with Google, which actually and proximately caused additional injuries to Plaintiffs and the Class Members.

184. As a direct and traceable result of Veradigm's negligence, Plaintiffs and Class Members have suffered damages, including monetary damages, increased risk of future harm, loss of privacy, and fear, anxiety, and worry about the their loss of control over their PHI.

185. Veradigm's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiffs' and Class Members' actual, tangible, injury-in-fact and damages, including, without limitation, the improper disclosure of PHI, lost value of their PHI, and lost time and money incurred to mitigate this improper disclosure that resulted from and were caused by Veradigm's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

186. But for Veradigm's wrongful and negligent breach of its duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured. These injuries were the reasonably foreseeable result of Defendant's breach of its duties. Veradigm knew or should have know that it was failing to meet its duties and that its breach would cause Plaintiff and Class Members to suffer the foreseeable harm associated with the exposure of their PHI.

187. A data broker is a company that collects personal information from various sources, including online activities, and sells it to other businesses. These businesses then use this information for marketing, risk assessment, insurance pricing, and other purposes. Data brokers often operate effectively anonymously because they do not have direct contact with consumers. As a result, the vast majority of consumers are not even aware that their personal data is being sold and re-sold.

188. As a consequence of Defendant's negligence, Plaintiffs and Class Members have

been harmed by losing control over their own health information, which has now been shared with Google, with advertisers, and with online data brokers who buy, sell, and resell this information. The only way for Plaintiffs and Class Members to claw back the privacy of their health information is to pay a data broker opt service to go out into the marketplace and remove their personal information from data broker rolls. Such data broker opt out services are offered by a variety of companies including DeleteMe, CyEx, and Optery for prices that range from $100 to $300 a year. Without hiring one of these data broker opt out services, however, Plaintiffs and Class Members have no way of recovering their privacy because Veradigm itself has no control over their PHI once Veradigm shared that data with Google.

189. Had Plaintiffs and Class Members known that Veradigm would not adequately protect their PHI, Plaintiffs and Class Members would not have entrusted Defendant with their PHI.

190. Plaintiffs and Class members had a legitimate and reasonable expectation of privacy with respect to their Health Information and were accordingly entitled to protection of this Information against the acquisition and disclosure of their personal health information by unreasonable means.

191. Veradigm had notice and knew that its deployment of third-party cookies on its Patient Portals, where Plaintiffs' and Class members shared their Health Information, would cause injury to Plaintiffs and Class members. Veradigm, like other healthcare providers, had notice from Google that it was improper to deploy Google Analytics inside a password protected patient portal but did so anyway because it valued profits more than patients' privacy. Veradigm's conduct is reprehensible because it deployed Google Analytics technology knowing that this technology would share patient data with Google from inside a password protected patient portal, but

nevertheless did it anyway—regardless of the consequences for the thousands of patients who trusted Veradigm to safeguard their most sensitive health information.

220. As a proximate result of Veradigm's acts and omissions, Plaintiffs' and Class Members' Health Information was subject to intrusion, causing Plaintiffs and Class Members to suffer injury, including, at minimum, the following damages:

*a.* General damages for invasion of their privacy rights in an amount to be determined by a jury without reference to specific pecuniary harm;

*b.* The cost of purchasing a service such as CyEx Privacy Shield Pro or DeleteMe to scrub their sensitive personal information from data broker rolls;

*c.* Sensitive and confidential information including patient status and appointments that Plaintiffs and Class Members intended to remain private is no longer private;

*d.* Veradigm eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

*e.* Veradigm took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit; and

221. The harm being suffered by Plaintiffs and Class Members is ongoing because—as of the time of the filing of this complaint—Veradigm continues to deploy Firebase Analytics on the Mobile Application it offers the public.

222. Plaintiffs and Class Members have no adequate remedy at law for the injuries that

they have suffered (and will continue to suffer) because of Veradigm's wrongful practices in that a judgment for money damages will not end the invasion of privacy for Plaintiffs and Class Members. Accordingly, Plaintiffs and Class Members seek such injunctive relief as the Court deems legal, equitable, and proper.

## COUNT III

### Violation of the California Invasion of Privacy Act ("CIPA") Cal. Penal Code §§ 630, *Et. Seq.*

223. Plaintiffs repeat and reallege the foregoing paragraphs as if fully alleged herein.

224. Plaintiffs bring this claim on behalf of themselves and all members of the California Class.

225. The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq*. ("CIPA") finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id.* § 630. Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state." *Id.*

226. Cal. Penal Code § 631(a) generally prohibits individuals, businesses, and other legal entities from "aid[ing], agree[ing] with, employ[ing], or conspir[ing] with" a third party to read, attempt to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or to use, or attempt to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained.

227. Cal. Penal Code § 632(a) generally prohibits individuals, businesses, and other

legal entities from recording confidential communications without consent of all parties to the communication.

228. Likewise, Cal. Penal Code § 638.51 prohibits persons from installing or using a pen register or a trap and trace device without first obtaining a court order.

229. All alleged communications between Plaintiffs or Class Members and Defendant qualify as protected communications under CIPA because each communication is made using personal computing devices (e.g., computers, smartphones, tablets) that send and receive communications in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.

230. Defendant used a recording device to record the confidential communications without the consent of Plaintiffs or Class members and then transmitted such information to others, such as Facebook and Google.

231. At all relevant times, Defendant's aiding Facebook and Google to learn the contents of communications and Defendant's recording of confidential communications was without authorization and consent.

232. The Plaintiffs and Class Members had a reasonable expectation of privacy regarding the confidentiality of their communications with Defendant. Defendant told them it would not sell, rent, license, or trade their personally identifiable information to third parties without express consent. Defendant never received that express consent. Nor could Defendant have received consent from Plaintiffs and Class Members because Defendant never sought to, or did, obtain Plaintiffs' and Class Members' consent to transmit their Personal Health Information to Facebook or Google.

233. Defendant engaged in and continues to engage in interception by aiding others

(including Facebook and Google) to secretly record the contents of Plaintiffs' and Class Members' wire communications.

234. The intercepting devices used in this case include, but are not limited to:

235. Plaintiffs and Class Members' personal computing devices;

236. Plaintiffs and Class Members' web browsers;

237. Plaintiffs and Class Members' browser-managed files;

238. Facebook's Meta Pixel;

239. The Google Analytics Pixel

240. Google Firebase Code

241. Internet cookies;

242. Defendant's computer servers;

243. Third-party source code utilized by Defendant; and

244. Computer servers of third parties (including Facebook and Google) to which Plaintiffs and Class Members' communications were disclosed.

245. Defendant aided in, and continues to aid in, the interception of contents in that the data from the communications between Plaintiffs and/or Class Members and Defendant that were redirected to and recorded by the third parties include information which identifies the parties to each communication, their existence, and their contents.

246. Defendant aided in the interception of "contents" in at least the following forms:

247. The parties to the communications;

248. The precise text of patient search queries;

249. Personally identifying information such as patients' IP addresses, Facebook IDs,

browser fingerprints, and other unique identifiers;

250. The precise text of patient communications about specific doctors;

251. The precise text of patient communications about specific medical conditions;

252. The precise text of patient communications about specific treatments;

253. The precise text of patient communications about scheduling appointments with medical providers;

254. The precise text of patient communications about billing and payment;

255. The precise text of specific buttons on Defendant's website(s) that patients click to exchange communications, including Log-Ins, Registrations, Requests for Appointments, Search, and other buttons;

256. The precise dates and times when patients click to Log-In on Defendant's website(s);

257. The precise dates and times when patients visit Defendant's websites;

258. Information that is a general summary or informs third parties of the general subject of communications that Defendant send back to patients in response to search queries and requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

259. Any other content that Defendant has aided third parties in scraping from webpages or communication forms at its websites.

260. Plaintiffs and Class Members reasonably expected that their Personal Health Information was not being intercepted, recorded, and disclosed to Facebook or Google.

261. No legitimate purpose was served by Defendant's willful and intentional

disclosure of Plaintiffs' and Class Members' Personal Health Information to Facebook and Google. Neither Plaintiffs nor Class Members consented to the disclosure of their Personal Health Information by Defendant to Facebook or Google. Nor could they have consented, given that Defendant never sought Plaintiffs' or Class Members' consent, or even told visitors to its website that their every interaction was being recorded and transmitted to Facebook and Google via the Tracking Technologies.

262. Defendant gave substantial assistance to Facebook and Google in violating the privacy rights of Defendant's patients, despite the fact that Defendant's conduct constituted a breach of the duties of confidentiality that medical providers owe their patients. Defendant knew that the installation of the Tracking Technologies on its Web Properties and mobile applications would result in the unauthorized disclosure of its patients' communications to Facebook and Google, yet nevertheless did so anyway.

263. Plaintiffs' and Class Members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or wrongful purpose of monetizing their Personal Health Information, including using their sensitive medical information to develop marketing and advertising strategies.

264. Veradigm installed and used pen registers and/or trap and trace devices on its websites, patient portals, and mobile applications without a court order in violation of Cal. Penal Code § 638.51. Specifically, Veradigm deployed Google Analytics on its patient portal and Google Firebase Code on its mobile applications, which recorded and captured Plaintiffs' and Class Members' IP addresses, first and third-party cookie data, and device and browser configuration, including geo-location information, when Plaintiffs and Class Members used Veradigm's websites, patient portals, and mobile applications.

265. Plaintiffs and Class Members did not consent to Veradigm's deployment or use of pen registers, including Google Analytics and Google Firebase Code on Veradigm's websites, patient portals, and mobile applications

266. Plaintiffs and the Class Members seek statutory damages in accordance with § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the Class in an amount to be proven at trial, as well as injunctive or other equitable relief.

267. In addition to statutory damages, Defendant's breach caused Plaintiffs and Class Members, at minimum, the following damages:

268. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

269. Defendant eroded the essential confidential nature of the doctor-patient relationship;

270. Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without sharing the benefit of such value;

271. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality; and

272. Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

273. Plaintiffs and Class Members have also suffered irreparable injury from Defendant's unauthorized acts of disclosure. Their personal, private, and sensitive data has been collected, viewed, accessed, stored, and used by Defendant and Facebook and Google without

their consent and has not been destroyed. Plaintiffs and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights. Plaintiffs continue to desire to search for health information on Veradigm's patient portal and mobile application. Plaintiffs will continue to suffer harm if the website is not redesigned. If the website were redesigned to comply with applicable laws, Plaintiffs would use Veradigm's patient portal and mobile application to search for health information and review their medical records in the future. Due to the continuing threat of injury, Plaintiffs and Class Members have no adequate remedy at law, and Plaintiffs and Class Members are therefore entitled to injunctive relief.

274. Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the other Class Members, respectfully requests relief against Veradigm as set forth below:

a. Certifying the Class and appointing Plaintiffs as the Class's representatives;

b. Finding that Veradigm's conduct as alleged herein was unlawful;

c. Awarding such injunctive and other equitable relief as the Court deems just and proper, including, but not limited to, enjoining Veradigm from making any further disclosure of Plaintiff or Class Members' communications to third parties without the Plaintiff or Class Members' express, informed, and written consent; requiring Veradigm to implement adequate procedures for ensuring the confidentiality of patients' health information; mandating that Veradigm hire third-party monitors for a period of at least three years to ensure that the these steps have been taken; and

mandating that Veradigm provide written verifications on a quarterly basis to the court and counsel for Plaintiffs and Class Members in the form of a declaration under oath that the above steps.

d. Awarding statutory damages of $5,000 per violation for Veradigm's violation of the Electronic Communications Privacy Act;

e. Imposing a constructive trust against Defendants through which Plaintiffs and Class Members can be compensated for any unjust enrichment gained by Defendants;

f. Awarding Plaintiffs and Class Members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

g. Awarding Plaintiffs and Class Members pre-judgment and post-judgment interest as provided by law;

h. Awarding Plaintiffs and Class Members reasonable attorney's fees, costs, and expenses;

i. Awarding costs of suit; and

j. Such other and further relief to which Plaintiffs and Class Members may be entitled.

*[Attorney signature block to follow on next page.]*

Dated: September 17, 2025

Respectfully submitted,

*/s/ Samuel J. Strauss*
Samuel J. Strauss
Raina C. Borrelli
**STRAUSS BORRELLI PLLC**
980 N Michigan Avenue
Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
sam@straussborrelli.com
raina@straussborrelli.com

Foster C. Johnson*
Joseph Ahmad*
**AHMAD, ZAVITSANOS, & MENSING, PLLC**
1221 McKinney, Suite 2500
Houston, Texas 77010
Telephone: (713) 655-1101
Facsimile: (713) 655-0062

*Attorneys for Plaintiffs, Individually and behalf of all others Similarly Situated*

* *Pro Hac Vice Pending*