**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JANE DOE, JANET DOE, JENNIFER DOE, and JESSICA DOE,<br><br>Plaintiffs,<br><br>v.<br><br>VERADIGM, INC. d/b/a ALLSCRIPTS<br><br>Defendant. | Case No. 1:25-cv-10147<br>Honorable Mary M. Rowland<br><br>JURY TRIAL DEMANDED |

# SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs Jane Doe, Janet Doe, Jennifer Doe, and Jessica Doe, on behalf of themselves and all others similarly situated patients (collectively "Plaintiffs"), upon personal knowledge as to Plaintiffs' own conduct and upon information and belief as to all other matters based upon investigation of counsel, such that each allegation has evidentiary support or is likely to have evidentiary support upon further investigation and discovery, and for their Second Amended Class Action Complaint against Defendant Veradigm, Inc. d/b/a "Allscripts" ("Defendant" or "Veradigm"), state as follows:

## NATURE OF THE ACTION

1. Plaintiffs, individually and on behalf of all members of the proposed class (the "Class Members") bring this action against Veradigm for surreptitiously divulging their protected health information ("PHI") to Google via Google's online marketing systems, known as Google Analytics, when patients exchanged communications with their healthcare providers via Patient Portals provided by Veradigm (the "Patient Portals"). Veradigm similarly deployed Google

analytics technology within the patient portal mobile application it offered patients that shared data with Google (the "Mobile Application"). Veradigm did so without patients' knowledge, authorization, or consent.

2. Veradigm is one of the largest providers of health information technology services in the United States, providing patient portal access to millions of patients. Veradigm hosts online Patient Portals for healthcare providers across the country and similarly provides the Mobile Application, both of which allow patients to manage their healthcare online by, *e.g.*, viewing medical records, scheduling appointments, and messaging members of their care team.

3. As a Patient Portal and Mobile Application provider, Veradigm operates as a "business associate" under HIPAA, which requires Veradigm to maintain patients' PHI in a manner consistent with HIPAA regulations.[1] In addition to HIPAA, Veradigm is obligated to maintain the confidentiality of PHI under state and federal law.

4. Despite these obligations, and unbeknownst to patients, Veradigm knowingly and intentionally deployed various Google digital marketing and automatic rerouting tools on its Patient Portals and Mobile Application. Via these tools, Veradigm knowingly and intentionally disclosed patients' PHI to third parties who exploited the information and used it for advertising.

---

[1] Under HIPAA, "Protected Health Information" means "individually identifiable health information: (1) Except as provided in paragraph (2) of this definition, that is: (i) Transmitted by electronic media; (ii) Maintained in electronic media; or (iii) Transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103. HIPAA defines "Individually Identifiable Health Information" as "information that is a subset of health information, including demographic information collected from an individual, and: (1) Is created or received by a health care provider, health plan, employer, or health care clearinghouse; and (2) Relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and (i) That identifies the individual; or (ii) With respect to which there is a reasonable basis to believe the information can be used to identify the individual." *Id.*

By using these tools, Veradigm took patients' confidential communications and PHI and automatically sent them to Google—an unambiguous violation of patients' reasonable expectations of privacy, their rights as patients, and their rights under federal and state law. Veradigm did all this knowing it constituted a violation of HIPAA and state law, for the purpose of reaping the illicit financial gains from its criminal and tortious disclosures of patients' PHI.

5. Veradigm's conduct violates reasonable expectations of patient privacy. Veradigm did not provide patients with any warnings that using its Patient Portals or Mobile Application would result in Veradigm divulging their PHI and the substance of their communications with their healthcare providers to Google and its advertising systems.

6. There is no dispute that Veradigm's conduct is unlawful. In December 2022, the Office of Civil Rights at the United States Department of Health and Human Services ("HHS") issued a bulletin (the "Bulletin") reminding both covered entities and business associates alike of their patient privacy obligations "when using online tracking technologies."[2] HHS expressly stated that "[t]racking on user-authenticated webpages … such as a patient or health plan beneficiary portal" must comply with the HIPAA privacy rule and all information relating to such use by patients must be "protected and secured in accordance with the HIPAA Security Rule."[3] HHS further clarified that PHI cannot be shared with "tracking technology vendors" unless they have signed a "business associate agreement (BAA)" to ensure that health information is "protected in accordance with HIPAA."[4]

[2] *See* Office for Civil Rights, Department of Health and Human Services, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

[3] *Id.*

[4] *Id.*

7. Similarly, Google warns entities like Veradigm who provide password protected patient portals that Google Analytics should not be deployed on "authenticated" pages—*i.e.*, pages requiring patient logins:[2]

> ### Can Google Analytics be used in compliance with HIPAA?
>
> Customers must refrain from using Google Analytics in any way that may create obligations under HIPAA for Google. HIPAA-regulated entities using Google Analytics must refrain from exposing to Google any data that may be considered Protected Health Information (PHI), even if not expressly described as PII in Google's contracts and policies. Google makes no representations that Google Analytics satisfies HIPAA requirements and does not offer Business Associate Agreements in connection with this service.
>
> For HIPAA-regulated entities looking to determine how to configure Google Analytics on their properties, the HHS bulletin provides specific guidance on when data may and may not qualify as PHI. Here are some additional steps you should take to ensure your use of Google Analytics is permissible:
>
> - Customers who are subject to HIPAA must not use Google Analytics in any way that implicates Google's access to, or collection of, PHI, and may only use Google Analytics on pages that are not HIPAA-covered.
> - Authenticated pages are likely to be HIPAA-covered and customers should not set Google Analytics tags on those pages.
> - Unauthenticated pages that are related to the provision of health care services, including as described in the HHS bulletin, are more likely to be HIPAA-covered, and customers should not set Google Analytics tags on HIPAA-covered pages..
> - Please work with your legal team to identify pages on your site that do not relate to the provision of health care services, so that your configuration of Google Analytics does not result in the collection of PHI.

8. Despite Plaintiffs' and Class Members' reasonable expectations that Veradigm would not share their PHI with Google via the use of marketing tools, Veradigm routinely divulged patients' PHI anyway.

9. Veradigm did so through a multi-step process.

a. *First*, Veradigm required patients to have first-party cookies enabled to access its "secure," password-protected Patient Portals. This requirement is a general security and usability standard for "authenticated" websites. First-party cookies are typically used to confirm that the user is who they say they

are when they sign-in—and to keep them signed-in as they exchange communications within "authenticated" portions of a website.

b. *Second*, Veradigm placed, enabled, or permitted the placement of Google source code on its Patient Portals and inside the Mobile Application that it made available to the public.

c. *Third*, when a patient visited Veradigm's Patient Portals or clicked to log in to a Patient Portal, the Google source code that Veradigm deployed enabled Google cookies to be placed on a patient's communications device that were disguised as "first-party" cookies belonging to Veradigm or the healthcare provider. By disguising the Google cookies, Veradigm prevented patients from blocking the deposit of the Google cookies through the use of third-party cookie blockers. In addition, because Veradigm required the use of first-party cookies to access the portal, Veradigm assured that all patients who entered its Patient Portals would have the Google cookies placed on their device.

d. *Fourth,* the Google source code that Veradigm deployed in its Patient Portals both captured patients' communications and commanded patients' computing devices to re-direct and divulge patient and device identifiers and the content of patient communications to Google via its various marketing services.

e. *Fifth,* both Veradigm and Google used this information for marketing purposes.

10. Veradigm did not make any attempt to obtain Plaintiffs' or Class Members' consent for sharing patients' PHI with Google, nor does Veradigm have express written consent from any Plaintiff or Class Member to share their PHI with Google.

11. Veradigm's unauthorized disclosures violate both state and federal law. Moreover, through its unauthorized disclosures, Veradigm breached its fiduciary duties, was unjustly enriched, and committed multiple torts and crimes, including criminal violations of the Electronic Communications Privacy Act ("ECPA"). As courts have found across the country, violating these privacy rights harms patients, as it misappropriates their rights to control how information about them is distributed and exploits the value their health data in the marketplace. *Doe v. Virginia Mason Medical Center*, 2024 WL 3517759 (Wash. Super.) ("If it did not have value, then entire industries that sell and trade this data would not exist").

12. Veradigm's conduct caused damage to Plaintiffs and Class Members:

a. Sensitive and confidential PHI that Plaintiffs and Class Members intended to remain private is no longer private;

b. Veradigm eroded the essential confidential nature of the provider-patient relationship;

c. Veradigm took something of value (*i.e.*, personal and private PHI and other personal data) from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' or Class Members' knowledge, informed consent, or authorization, and without sharing the benefit derived; and

d. Veradigm's actions diminished the value of Plaintiffs' and Class Members' PHI and other personal data.

## PARTIES TO THE ACTION

13. Plaintiff Jane Doe is a resident of Westmoreland County, Pennsylvania, and a patient of Frick Hospital and Latrobe Hospital and the Independence Health System. Plaintiff Jane Doe has been a registered user of the Veradigm Patient Portal for more than four years and has regularly used it to review test results, look at doctor's notes, and research information related to her treatment for breast cancer. Plaintiff Jane Doe has also downloaded and used the Veradigm Mobile Application to access her Veradigm Patient Portal account. After accessing the Veradigm Patient Portal to review her treatment information, Plaintiff Jane Doe began receiving advertisements on her social media account for cancer treatments and neuropathy creams.

14. Plaintiff Janet Doe is a resident of Westmoreland County, Pennsylvania and a patient of Latrobe Hospital and the Independence Health System. Plaintiff Janet Doe has been a registered user of the Veradigm Patient Portal for more than two years and has regularly used it to review appointment information, checked prescription information, review test results and doctors notes, and research medical treatments related to her ongoing treatment for heart and dermatology issues. Plaintiff Janet has also downloaded and used the Veradigm Mobile Application to access her Veradigm Patient Portal account.

15. Plaintiff Jennifer Doe is a resident of Los Angeles County, CA and a patient of PIH Health. Plaintiff Jennifer Doe has been a registered user of Veradigm's Patient Portal and Mobile Application for more than five years and has regularly used them to schedule appointments, review test results, review doctor's notes, review medical records, pay bills, and review information related to her medical treatment in connection with rotator cuff surgery, prior treatment for cancer, and prior treatment for cirrhosis. After accessing the Veradigm Patient Portal and Mobile Application to review her treatment information, Plaintiff Jennifer Doe began receiving advertisements on her social media account related to the medical conditions.

16. Plaintiff Jessica Doe is a resident of Los Angeles County, CA and a patient of PIH Health and Kaiser Permanente. Plaintiff Jessica Doe has been a registered user of Veradigm's Patient Portal and Mobile Application for about four years and has regularly used them to schedule appointments, review test results, review doctor's notes and medical records, pay bills, check and refill prescriptions, and review information related to her medical treatment in connection with hernia surgery and her treatment for bone marrow cancer. After accessing the Veradigm Patient Portal and Mobile Application to review her treatment information, Plaintiff Jessica Doe began receiving advertisements on her social media account related to her hernia surgery and other medical conditions.

17. Defendant Veradigm, LLC is an Illinois Corporation with its principal place of business at 222 Merchandise Mart Plaza, Suite 2024, Chicago, Illinois 60654. Veradigm supplies electronic health record ("EHR") products and provides Patient Portals for healthcare providers nationwide. Veradigm manages more than 20 million unique patient charts. Prior to January 2023, Veradigm was known as Allscripts Healthcare Solutions, Inc. In January 2023, the company rebranded itself as "Veradigm."

## JURISDICTION AND VENUE

18. This Court has jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332, because: (a) this is a proposed class action in which there are at least 100 Class Members; (b) the parties are minimally diverse, as at least one member of the proposed Class is domiciled in a different state than at least one Defendant; and (c) the combined claims of Class members exceed $5,000,000, exclusive of interest, attorneys' fees, and costs. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under the laws of the United States, including the Electronic Communications Privacy Act.

19. This Court additionally has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a), because they are so related to Plaintiffs' federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

20. This Court has personal jurisdiction over Veradigm because Veradigm has sufficient minimum contacts with this District in that it operates and markets its services throughout this District.

21. Venue is also appropriate in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL BACKGROUND

### A. Veradigm Systematically and Routinely Disclosed Patients' PHI to Third Parties, including Google.

22. Plaintiffs and Class Members are patients who have used password-protected Veradigm Patient Portals. These patient portals are typically branded as "FollowMyHealth" Patient Portals by Veradigm.

23. Healthcare providers and their business associates like Veradigm have fiduciary, common law, and statutory duties to protect the confidentiality of their patients' PHI and to refrain from making unauthorized disclosures to third parties about their patients' PHI.

24. Medical patients like Plaintiffs and Class Members have a legal interest in preserving the confidentiality of their communications with healthcare providers.

25. Patients also have reasonable expectations of privacy that their PHI will not be disclosed to third parties without their express written consent and authorization.

26. Veradigm operates Patient Portals and the Mobile Application for more than 1,000 healthcare providers and health care systems across the United States, including PIH Health,

Kaiser Permanente, Northwell Health, Excela Health, Blessing Health, and Atlantic General Hospital.

27. Veradigm encourages patients to use digital tools on its Patient Portals and Mobile Application to seek and receive health care services.

28. Veradigm's Patient Portals and Mobile Application are designed for interactive communication with patients, including scheduling appointments, searching for physicians, paying bills, reviewing medical records and lab results, exchanging communications with providers, and renewing prescriptions. Source code on Veradigm's Patient Portals and Mobile Application causes these communications to be intercepted and disclosed to Google.

29. Notwithstanding patients' reasonable expectations of privacy and Veradigm's legal duties, Veradigm systematically and routinely disclosed patients' PHI, including the contents of patients' communications with their healthcare providers, via automatic data collection mechanisms embedded in its Patient Portals and Mobile Application. Veradigm did this without Plaintiffs' or Class Members' knowledge, authorization, or consent. In doing so, Veradigm continuously and systematically violated the medical privacy rights of Plaintiffs and Class Members by causing the unauthorized disclosure of their communications to third parties like Google.

30. Plaintiffs and Class Members provided their private PHI through Veradigm's Patient Portal and Mobile Application with the reasonable understanding that Veradigm would secure and preserve the confidentiality of that information, consistent with its legal obligations.

31. The PHI of Plaintiffs and Class Members has been—and likely will be—further disseminated to additional third parties that utilize the information for retargeting.

32. Veradigm intentionally incorporated analytics tracking tools into its Patient Portals and Mobile Application and never disclosed to Plaintiffs or Class Members that it shared their PHI with Google and other third parties. Nor did Veradigm inform patients that it was permitting Google to exploit their PHI for marketing purposes. As a result, Plaintiffs and Class Members were unaware that their PHI was being surreptitiously transmitted to Google when they visited Veradigm's Patient Portals and used Veradigm's Mobile Application.

33. The tracking tools that Veradigm uses on its Patient Portals and Mobile Application are—by design—invisible to patients. Once integrated into a website or application, the tracking tools are executed in the background, meaning that they operate without ever alerting users of their presence. Further, because of how these tools are designed, they are able to collect, store, and transmit user data in ways that cannot be blocked by "ad blocker" software or by a user refusing to give their consent to data being collected.

34. By using data collected by analytics tracking tools, Google is able to connect a website user's data to their real-world identity by linking their data to profiles maintained by Google, including users' Google accounts.

35. Once Google connects a user's data to their real-world identity, Google processes, analyzes, and assimilates that data so that it can be sold to online advertisers and funneled back to clients like Veradigm in the form of aggregated analytics data.

36. Online advertisers—taking advantage of Google's trove of personally identifying data—are able to create marketing campaigns that target their advertisements towards specific users

37. Veradigm did not warn or otherwise disclose to Plaintiffs and Class Members that Veradigm bartered their PHI to Google and other third parties for marketing purposes.

38. Plaintiffs and Class Members never consented, agreed, or otherwise authorized Veradigm to disclose their PHI to advertising companies like Google.

39. Upon information and belief, Veradigm intercepted and disclosed at least the following PHI to third parties including Google:

a. Plaintiffs' and Class Members' status as patients;

b. Plaintiffs' and Class Members' use of Veradigm's Patient Portals and Mobile Application;

c. Plaintiffs' and Class Members' appointment scheduling;

d. Plaintiffs' and Class Members' bill payments;

e. Information related to Plaintiffs' and Class Members' requests for, receipt of, and communications regarding medical treatment, including their review of lab and test results, medications, appointments, and communications with their treating physicians.

40. Veradigm interfered with Plaintiffs' and Class Members' privacy rights when it implemented technology (including Google Analytics) that surreptitiously tracked, recorded, and disclosed Plaintiffs' and Class Members' PHI to Google and other third parties.

41. Veradigm also breached its obligations to patients in multiple other ways, including (1) failing to obtain their consent to disclose their PHI to third parties, (2) failing to adequately review its marketing programs and web-based technology to ensure its Patient Portals and Mobile Application were safe and secure, (3) failing to remove or disengage software code that was known and designed to share Plaintiffs' and Class Members' PHI with third parties if placed inside Veradigm's Patient Portals and Mobile Application, (4) failing to take steps to block the transmission of Plaintiffs' and Class Members' PHI to third-party advertising companies, (5)

failing to warn Plaintiffs and Class Members that Veradigm was routinely bartering their PHI to Google, and (6) otherwise ignoring Veradigm's common law and statutory obligations to protect the confidentiality of Plaintiffs' and Class Members' PHI.

42. The transmission of Plaintiffs' and Class Members' PHI to Google was not necessary for Veradigm's Patient Portal, Mobile Application, or other services to function. Indeed, the entire publicly stated purpose of those services was to facilitate the provision of healthcare to Plaintiffs and other patients, and as described Veradigm was under unambiguous legal obligations to ensure that patients' PHI transmitted in that process remained confidential. Given its legal obligations, Veradigm did not and could not have had any permissible purpose for placing Google source code inside its Patient Portals and Mobile Application. Veradigm's primary, secret, and improper purpose in doing so was, instead, to allow Veradigm and Google to exploit patient' PHI and communications for advertising and marketing purposes.

43. Upon information and belief, Veradigm's improper disclosure of Plaintiffs' and Class Members' PHI to Google has been ongoing for many years, and continues to this day. The time period during which Veradigm had Google Analytics operative in its Patient Portals and Mobile Application, as further described and alleged in this Complaint, shall be defined for all purposes herein as the "Class Period."

### B. Veradigm Set Up its Patient Portals and Mobile Application to Permit the Surreptitious Capture and Disclosure of Patients' PHI to Third Parties like Google.

44. Veradigm's Patient Portals and Mobile Application are used by numerous healthcare providers around the United States and have been throughout the Class Period.

45. The Patient Portals and Mobile Application provide patients and providers:

a. the ability to send and receive electronic communications;

b. computer storage of electronic health record and communications information; and

c. processing services for electronic information.

46. When a patient goes to a Veradigm Patient Portal to “Sign In,” Google source code that Veradigm placed or permitted to be placed on its Patient Portals will deposit “first-party” cookies named _ga, _gid, _gcl, and _au on the patient’s computing device. As “first party” cookies, the _ga, _gid, _gcl, and _au cookies are disguised as belonging to Veradigm, which will permit them to be placed on the patient’s device. In fact, however, these are Google cookies, not Veradigm cookies.

47. By disguising the Google cookies as belonging to Veradigm instead of Google, Veradigm circumvents attempts to block such tracking.

48. Further, Veradigm ***requires*** patients to have first-party cookies enabled to access its Patient Portals, which further assures that Veradigm will be able to deposit Google cookies on patient computing devices while patients are on and inside its Patient Portals.

49. Veradigm’s software permitted the deployment of “custom analytics scripts” within the Patient Portals including, for example, Google Analytics, Google Ads, and Google DoubleClick source code (collectively, “Google source code”), through which patient identifiers and communications content are divulged to Google while patients are exchanging communications with their healthcare providers and while the communications content is in electronic storage within Veradigm’s Patient Portals.

50. Veradigm knowingly and secretly deployed Google source code on Patient Portal login pages and inside its Patient Portals and Mobile Application.

51. Further, Veradigm actively encouraged its healthcare clients to deploy Google marketing tools to drive patient engagement.

52. In short, the Google source code that Veradigm deployed on its Patient Portals and Mobile Application deposited Google cookies on patients' browsers; disguised Google cookies as being associated with Veradigm rather than Google; and commanded Plaintiffs' and Class Members' browsers to re-direct identifiers and communications content on and inside the Patient Portals and Mobile Application to Google. Further, Veradigm implemented multiple measures to ensure that Plaintiffs and Class Members would not and could not prevent all this from taking place.

53. The Google source code Veradigm deployed inside its Patient Portals intercepted patients' communications for the purpose of redirecting Plaintiffs' and Class Members' PHI to Google, including at least the following identifiers:

a. Patient IP addresses;

b. Unique, persistent patient cookie identifiers;

c. Device identifiers;

d. Account numbers;

e. URLs;

f. Other unique identifying numbers, characteristics, or codes; and

g. Browser-fingerprints.

54. The Google source code Veradigm deployed inside its Patient Portals and Mobile Application intercepted patients' communications for the purpose of redirecting Plaintiffs' and Class Members' PHI to Google, including at least the following communications content:

a. Actions to log in to Patient Portals;

b. Actions to sign up for Patient Portals;

c. Actions to log out of Patient Portals;

d. Actions taken inside Patient Portals;

e. Any actions that patients take on their healthcare providers' properties while logged in to Patient Portals, including searching or exchanging communications about a specific doctor, condition, or treatment.

f. Plaintiffs' and Class Members use of Veradigm's Mobile Application;

g. Plaintiffs' and Class Members' searches for information regarding specific conditions and treatments, their medical providers, and their physical location.

55. The amount of data collected is significant. When patients interacted with its Patient Portals, Veradigm disclosed a full-string, detailed URL to Google, typically containing the name of the website, folder, and sub-folders on the webserver; the name of the precise file requested; and the exact contents of the patients' communications. For example, when a patient clicks on a link to view a specific test result or make an appointment with a specific physician, Google receives the precise text of the patient's query.

56. Veradigm similarly offers the Mobile Application for public download:




57. Veradigm deployed the Google Firebase SDK within the Mobile Application that Veradigm offered to the public. An SDK is the equivalent of a web pixel for mobile applications: the SDK is loaded onto an app and similarly tracks user interactions with the app. The deployment of this Google tracking technology on Veradigm's Mobile Application resulted in significant amounts of patients' personal data being shared with Google, including logins, page views, IP addresses, advertiser IDs, device properties (such as brand, model, and operating system), app events (such as screen views and notifications), marketing identifiers specific to the device, and

device information, including geo-location information. The data provided by the tracking technologies that Veradigm deployed on these devices permitted Google to specifically identify the users and exploit their data for marketing purposes.

58. Veradigm offers both an iOS (Apple) version of its Mobile Application and an Android (Google) version of its Mobile Application.

59. Because it is not possible for an Android user to even download the FollowMyHealth Mobile Application without being logged in to a personal Google account, Google has complete access to the names and email addresses for every Veradigm patient who uses the FollowMyHealth Mobile Application that has been downloaded on an Android phone.

60. The Google Firebase technology deployed on the iOS version of the Mobile Application likewise shares a number of identifiers with Google, which permits Google to personally identify Mobile Application users and target them with advertising.

61. An SDK is a "set of tools for developers that offers building blocks for the creation of an application instead of developers starting from scratch … For example, Google Analytics provides an SDK that gives insight into user behavior, engagement, and cross-network attribution."[5]

62. An API "acts an intermediary layer that processes data transfer between systems, letting companies open their application data and functionality to external third-party developers [and] business partners."[6] An API can "work[] as a standalone solution or [be] included within an SDK…. [A]n SDK often contains at least one API."[7] APIs "enable[] companies to open up their

[5] *API vs. SDK: The Difference Explained (With Examples)*, https://getstream.io/glossary/api-vs-sdk/.

[6] IBM, *What is an API?*, *available at* https://www.ibm.com/topics/api.

[7] *SDK vs. API: What's The Difference?*, IBM (July 13, 2011), https://www.ibm.com/blog/sdk-vs-api/ ("SDK" stands for software development kit and "is a set of software-building tools for a

applications' [or websites'] data and functionality to external third-party developers, business partners, and internal departments within their companies."[8]

63. Like the pixels on web browsers, the tracking technology in the Google Firebase SDK is called when a user accesses the Mobile Application. The types of user information Google and Veradigm obtain through this tracking include, but are not limited to, users' location information, email addresses, device and advertising identifiers, and usage of the particular app being accessed. The Google Firebase SDK code deployed inside Veradigm's Mobile Application tracked and disclosed to Google at least the following:

a. Virtually every time a patient viewed a new screen within the application, the Google Firebase SDK code deployed inside Veradigm's Mobile Application disclosed the name of that screen to Google. This included patients' accessing the login screen, the post-login welcome screen, the bill payment screen, and the video visit screen for electronic appointments with their providers.

b. Almost 100 "events" within the Mobile Application were also tracked and disclosed by the Google Firebase SDK code. These events tracked patients' activities at a highly granular level—for example, they disclosed not simply the fact that a patient was logging in (though that in itself is improper), but events such as:

- Patient login via their fingerprint;
- Patient password reset;

specific program," while "API" stands for application programming interface).

[8] IBM, *Application Programming Interface (API)*, available at https://www.ibm.com/cloud/learn/api.

- Patient changes to their passcode;
- Appointment creation;
- Appointment cancellation;
- That a patient overpaid their bill, and the amount of the overpayment;
- That a patient messaged their doctor; and
- Patient logout.

64. Another one of the "events" the Google Firebase SDK code deployed inside Veradigm's Mobile Application tracked and disclosed was the patient's gender and age when they updated it within the application.

65. In short, the Google Firebase SDK code deployed inside Veradigm's Mobile Application tracked and disclosed to Google virtually every action patients took, providing Veradigm and Google with patients' identifying information and real-time surveillance of patients' every interaction with their healthcare providers via the Mobile Application.

66. In addition to its own ID tracking, Veradigm collects advertising identifiers that are designed to track the app activity of individual users across different apps. Two of the most prominent are AAIDs (for Android devices) and IDFAs (for iOS devices) (collectively, "Mobile Advertising IDs" or "MAIDs").

67. An AAID is a unique string of numbers which attaches to a device. As the name implies, an AAID is sent to advertisers and other third parties so they can track user activity across multiple mobile applications.[9] So, for example, if a third party collects AAIDs from two separate mobile applications, it can track, cross-correlate, and aggregate a user's activity on both apps.

[9] https://support.google.com/googleplay/android-developer/answer/6048248 (last visited Jan. 8,

68. Although technically resettable, an AAID is a persistent identifier because virtually no one knows about AAIDs and, correspondingly, virtually no one resets that identifier. The fact that the use and disclosure of AAIDs is so ubiquitous evinces an understanding on the part of Veradigm, Google, and others in the field that they are almost never manually reset by users (or else an AAID would be of no use to advertisers). Byron Tau, MEANS OF CONTROL: HOW THE HIDDEN ALLIANCE OF TECH AND GOVERNMENT IS CREATING A NEW AMERICAN SURVEILLANCE STATE at 175 (2024) ("Like me, most people had no idea about the 'Limit Ad Tracking' menu on their iPhones or the AAID that Google had given even Android devices. Many still don't."); *see also Louth v. NFL Enterprises LLC*, 2022 WL 4130866, at *3 (D.R.I. Sept. 12, 2022) ("While AAID are resettable by users, the plaintiff plausibly alleges that AAID is a persistent identifier because virtually no one knows about AAIDs and, correspondingly, virtually no one resets their AAID." (cleaned up)). In addition, resetting an AAID does nothing to eliminate tracking via the other identifiers that Google collects.

69. Using publicly available resources, an AAID can track a user's movements, habits, and activity on mobile applications.[10] Put together, the AAID serves as "the passport for aggregating all of the data about a user in one place."[11]

70. Because an AAID creates a record of user activity, this data can create inferences about an individual, like a person's political or religious affiliations, sexuality, or general reading

2026).

[10] https://www.huffingtonpost.co.uk/entry/using-just-1000-worth-of-mobile-adverts-you-can-effectively-track-anyone_uk_59e87ccbe4b0d0e4fe6d6be5 (last visited Jan. 8, 2026).

[11] https://digitalwatchdog.org/trend-report-apps-oversharing-your-advertising-id/ (last visited Jan. 8, 2026).

and viewing preferences. These inferences, combined with publicly available tools, make AAIDs an identifier that sufficiently permits an ordinary person to identify a specific individual.

71. Similarly, an "Identifier for Advertisers, or IDFA for short, is a unique, random identifier (device ID) that Apple assigns to every iOS device. An IDFA would be the equivalent of a web cookie, in the sense that it enables advertisers to monitor users' engagement with their ads and keep track of their post-install activity."[12]

72. As with the AAID, Google's collection of IDFAs allows Google to track iOS users' activity across the various apps they use. Like the AAID, this data can create inferences about an individual, such as a person's political or religious affiliations, sexuality, or general reading and viewing preferences. These inferences, combined with publicly available tools, sufficiently permit even an ordinary person to identify a specific individual with the IDFA.

73. Regardless of whether these IDs are supposed to be anonymous, MAIDs are often combined with other identifiers to identify users in what is known as "ID bridging." ID bridging is the process of "piecing together different bits of information about" a user "to confidently infer that it is the same individual accessing a publisher's site or sites from various devices or browsers."[13] That is, users can be identified and tracked by "bridging" (or linking) their MAIDs to other sources, such as email addresses, geolocation, or phone numbers.

---

[12] https://www.appsflyer.com/glossary/idfa/#:~:text=Identifier%20for%20Advertisers%2C%20or%20IDFA,of%20
their%20post%2Dinstall%20activity (last visited Jan. 8, 2026).

[13] Kayleigh Barber, *WTF Is The Difference Between Id Bridging And Id Spoofing?*, DIGIDAY (July 8, 2024), https://digiday.com/media/wtf-is-the-difference-between-id-bridging-and-id-spoofing/.




74. ID bridging "has long been the foundation of programmatic advertising,"[14] which is the process by which companies "use [] advertising technology to buy and sell digital ads" by "serv[ing] up relevant ad impressions to audiences through automated steps, in less than a second."[15] It entails a "unique identifier[] assigned to individual devices," including "Google's Advertising ID," personal information like geolocation and e-amil address, and "cross-platform linkage."[16]

75. ID bridging is a money-making machine for advertisers and app developers. On the advertiser side, ID bridging "increase the chances of an ad buying platform finding their inventory to be addressable and, therefore, maximizes their 'ad yields.'"[17] And on the app developer

---

[14] https://www.adexchanger.com/data-driven-thinking/how-can-id-bridging-the-foundation-of-our-space-suddenly-be-a-bad-thing/.

[15] AMAZON, "Programmatic Advertising," https://advertising.amazon.com/blog/programmatic-advertising#.

[16] Anete Jodzevica, *ID Bridging: The Privacy-First Future of Audience Targeting*, SETUPAD (Nov. 15, 2024), https://setupad.com/blog/id-bridging/. Ironically, the example given in this article is a "hashed email," where the email Defendant collected in this example is not hashed.

[17] Bennett Crumbling, *What Is 'ID Bridging' And How Publishers Use It To Grow Direct And*

side, "publishers can boost revenue from direct-sold campaigns by offering advertisers access to more defined and valuable audiences."[18]

76. In other words, advertisers will be able to find users that are more directly and likely interested in what is being sold by having access to significantly more information. And app users' information will be more valuable (and therefore, bring in more money to app developers) because it is combined with a plethora of other information from various sources.

77. Many companies (*e.g.*, data brokers and identity graph providers), publicly advertise their ability to conduct such bridging.

78. While those within the ID bridging industry describe it as privacy-protective, it is anything but. As courts have noted, the "ability to amass vast amounts of personal data for the purpose of identifying individuals and aggregating their many identifiers" creates "dossiers which can be used to further invade [users] privacy by allowing third parties to learn intimate details of [users'] lives, and target them for advertising, political, and other purposes, ultimately harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them." *Katz-Lacabe v. Oracle Am., Inc.*, 688 F. Supp. 3d 928, 940 (N.D. Cal. 2023) (cleaned up).

79. In February 2019, Oracle published a paper entitled "Google's Shadow Profile: A Dossier of Consumers Online and Real World Life," part of which provides as accurate a description of Google's services (and Oracle's, ironically) as Defendant's:

> [A] consumer's "shadow profile" [is a] massive, largely hidden dataset[] of online and offline activities. This information is collected through an extensive web of … services, which is difficult, if not impossible to avoid. It is largely collected invisibly and

---

*Programmatic Revenue?*, OPTABLE (Aug. 22, 2024), https://www.optable.co/blog/what-is-id-bridging.

[18] *Id.*

> without consumer consent. Processed by algorithms and artificial intelligence, this data reveals an intimate picture of a specific consumer's movements, socioeconomics, demographics, "likes", activities and more. It may or may not be associated with a specific user's name, but the specificity of this information defines the individual in such detail that a name is unnecessary.[19]

80. In other words, ID bridging is dangerous because of the sheer expanse of information being compiled by companies like Defendant without the knowledge or consent of users, all of which is being done for pecuniary gain.

81. In addition to the methods described above, which are explicitly designed to track individuals across different devices and apps, Google collects other identifying information that allows it to determine whether the same individual is visiting multiple websites or using multiple apps where technology is called or installed directly.

82. For example, if multiple websites or apps are visited from the same location, the pool of potential individuals who are accessing the website or app is narrowed considerably immediately and can be narrowed to a pinpoint over time.

83. HTTP requests, when intercepted by Google, collect device information that can also identify whether the same user is visiting multiple sites or apps, and can distinguish between the devices being used by a particular person. With every visit, and every subsequent HTTP request, the device information will be identical in each.

84. As a result of the foregoing, Google consistently received throughout the Class Period the precise text of the communications that Plaintiffs and Class Members made through the Patient Portal and Mobile Application about specific medical providers, treatments, conditions,

---

[19] GOOGLE'S SHADOW PROFILE: A DOSSIER OF CONSUMERS' ONLINE AND REAL WORLD LIFE at 1 (Feb. 2019), https://tinyurl.com/2mtuh7vf.

appointments, tests, medications, payments, and registrations, as well as information identifying them—all of which constitute PHI.

85. The contents of patients' communications with their treating physicians plainly relate to (and disclose) the past, present, or future physical or mental health or condition of individual patients who interact with Veradigm's Patient Portals and Mobile Application. 45 C.F.R. § 160.103. Worse, no matter how sensitive the area of the portal that a patient accessed, the referral URL was acquired by Google along with other PHI embedded in patients' interactions with the Patient Portals and mobile Application.

86. The nature of the collected data is important. Veradigm's unauthorized disclosures resulted in Google's obtaining the comprehensive history of individual patients, no matter how sensitive their medical condition. Google was then able to correlate that history with other known information regarding the user, including their identity, their prior searches, the time of day, and other user actions. This process resulted in Google acquiring a vast repository of personal data about patients that was then used for marketing purposes—all without patients' knowledge, consent, or authorization, or any further action by patients.

87. By design, Google received the exact contents of patients' communications while they were in storage in Veradigm's systems but before the full response from the healthcare providers had been rendered on the screen of patients' devices.

### C. What Happens When Patients Communicate with Veradigm's Patient Portals and Mobile Application

88. After patients logged in to Veradigm's Patient Portals or Mobile Application, Veradigm re-directed the precise content of the patients' communication and patients' identifiers to Google at various Google domains.

89. When patients signed in via the Mobile Application or signed in and exchanged communications inside the Patient Portals, Veradigm placed the content of that communication in storage within the Patient Portals and Mobile Application.

90. Veradigm's storage of the contents (and the identity of the person who was exchanging the communication) is required by federal law. *See* 45 C.F.R. § 164.312.

91. Veradigm further re-directed patients' PHI to the following Google domain: www.google-analytics.com.

92. The patient identifiers that were re-directed to Google-Analytics include:

a. The patient's IP address;

b. The patient's User-Agent information and other data that, when combined, is sufficient to uniquely identify the device; and

c. Google cookies disguised as Veradigm's cookies which serve as device identifiers and that Google connects to patients. These cookies include but may not be limited to the _ga and _ga_HK3FDYQCRR cookies.

93. Google will always receive at least the device-identifying NID cookie regardless of whether a person is signed in to a Google Account. Regardless of a person's Google Account holder status, the NID cookie is a device identifier that is considered personally identifiable as a matter of law when the data includes PHI protected by federal law.

94. Further if a Google Account holder has signed in to a Google Account on the device in question and did not formally sign out before sending a separate communication to the Patient Portals, then Veradigm will re-direct both the device identifier cookie (IDE) and the Google Account identifying cookie (DSID). By re-directing both cookies at the same time, Veradigm enables Google to connect the IDE device-identifying cookie to specific Google Account holder

such that, once Google has made the connection, it only needs to see the IDE cookie in order to connect a later re-directed communication with the specific Google Account holder.

**D. Veradigm's Actions Permitted Google to Connect Patients' Data Across Domains.**

95. Google publicly states that it connects data that advertisers and publishers (like Veradigm here) send to it across the different Google Analytics, Google.com, and Doubleclick.net domains.

96. Veradigm uses the same tools and source code throughout Patient Portals and Mobile Application. Thus, the types of Google cookies deposited on patient devices and the types of PHI and communications content disclosed (as explained above) occurred every time a patient logged into or took any action within the Patient Portals or Mobile Application.

**E. Google's Business Model: Exploiting Consumers' Personal Information for Profit**

97. By any measure, Google is the world's largest data company. Among other services, Google operates the world's most popular search engine (Google), email provider (Gmail), video website (YouTube), mapping service (Google Maps), Internet analytics service for web developers (Google Analytics), and web-browser (Chrome). It also operates various ad services that are among the world's most popular in their respective categories, including the advertising services of Google DoubleClick and Google AdWords.

98. Google Analytics has massive reach. As described by the Wall Street Journal, it is "far and away the web's most dominant analytics platform" and "tracks you whether or not you are logged in."[20]

---

[20] *Who Has More of Your Personal Data than Facebook? Try Google*, The Wall Street Journal (April 22, 2018) (available at https://www.wsj.com/articles/who-has-more-of-your-personal-data-than-facebook-try-google-1524398401).

99. Google cookies provide personally identifiable data about patients who visit Veradigm's Patient Portals or log in to its Mobile Application to Google. Veradigm transmits personally identifiable Google cookie data to Google.

100. Google specifically warns developers and advertisers that Google Analytics is not appropriate for HIPAA-covered entities like Veradigm, publicly stating:[21]

> Customers must refrain from using Google Analytics in any way that may create obligations under HIPAA for Google. HIPAA-regulated entities using Google Analytics must refrain from exposing to Google any data that may be considered Protected Protected Health Information (PHI), even if not expressly described as PII in Google's contracts and policies. Google makes no representations that Google Analytics satisfies HIPAA requirements and does not offer Business Associate Agreements in connection with this service.
>
> For HIPAA-regulated entities looking to determine how to configure Google Analytics on their properties, the HHS bulletin provides specific guidance on when data may and may not qualify as PHI. Here are some additional steps you should take to ensure your use of Google Analytics is permissible:
>
> - Customers who are subject to HIPAA must not use Google Analytics in any way that implicates Google's access to, or collection of, PHI, and may only use Google Analytics on pages that are not HIPAA-covered.
> - Authenticated pages are likely to be HIPAA-covered and customers should not set Google Analytics tags on those pages.
> - Unauthenticated pages that are related to the provision of health care services, including as described in the HHS bulletin, are more likely to be HIPAA-covered, and customers should not set Google Analytics tags on HIPAA-covered pages.
> - Please work with your legal team to identify pages on your site that do not relate to the provision of health care services,

[21] Google, *HIPAA and Google Analytics,* https://support.google.com/analytics/answer/13297105?hl=en

> so that your configuration of Google Analytics does not result in the collection of PHI.

101. Google tracks Internet users with IP addresses, cookies, geolocation, and other unique device identifiers.

102. Google cookies are personally identifiable. For example, Google explains the following about certain cookies that it uses:

a. "[C]ookies called 'SID' and 'HSID' contain digitally signed and encrypted records of a user's Google account ID and most recent sign-in time."[22]

b. "Most people who use Google services have a preferences cookie called 'NID' in their browsers. When you visit a Google service, the browser sends this cookie with your request for a page. The NID cookie contains a unique ID Google uses to remember your preferences and other information[.]"[23]

c. "We use cookies like NID and SID to help customize ads on Google properties, like Google Search. For example, we use such cookies to remember your most recent searches, your previous interactions with an advertiser's ads or search results, and your visits to an advertiser's website. This helps us to show you customized ads on Google."[24]

---

[22] *Privacy & Terms, Types of Cookies Used by Google*, Google, http://web.archive.org/web/20210916060858/https:/policies.google.com/technologies/cookies?hl=en-US (archived from September 16, 2021).

[23] *Privacy & Terms, Types of Cookies Used by Google*, Google, http://web.archive.org/web/20210101020222/https:/policies.google.com/technologies/cookies?hl=en-US (archived from January 1, 2021).

[24] Id.

d. "We also use one or more cookies for advertising we serve across the web. One of the main advertising cookies on non-Google sites is named 'IDE' and is stored in browsers under the domain doubleclick.net. Another is stored in google.com and is called ANID. We use other cookies with names such as DSID, FLC, AID, TAID, and exchange_uid. Other Google properties, like YouTube, may also use these cookies to show you more relevant ads."[25]

103. Google warns web-developers that Google marketing tools are not appropriate for every type of website or webpage, including health-related webpages and websites.

104. Google also warns developers in its Personalized Advertising policies page that "Health in personalized advertising" is a "Prohibited category" for Google's personalized advertising tools. Specifically, Google's advertising policies page states:[26]

> We take user privacy very seriously, and we also expect advertisers to respect user privacy. These policies define how advertisers are allowed to collect user data and use it for personalized advertising. They apply to advertisers using targeting features, including remarketing, affinity audiences, custom affinity audiences, in-market audiences, similar audiences, demographic and location targeting, and keyword contextual targeting. …
>
> You aren't allowed to do the following:

Collect information related to sensitive interest categories (see Personalized advertising policy principles below for more about sensitive interest categories)

105. The United States Department of Health and Human Services has made clear that "it is insufficient for a tracking technology vendor to agree to remove PHI from the information it

---

[25] Id.

[26] *Advertising Policies Help, Personalized Advertising*, Google, http://web.archive.org/web/20191031223446/https://support.google.com/adspolicy/answer/143465?hl=en (archived from October 31, 2019).

receives or to de-identify the PHI before the vendor saves the information. Any disclosure of PHI to the vendor without individuals' authorizations requires the vendor to have a signed BAA in place and requires that there is an applicable Privacy Rule permission for disclosure."[27]

106. Google refuses to sign business associate agreements ("BAA") with healthcare companies.

107. After Google collects data that is transmitted to it by Google Analytics, Google analyzes and processes that data for use in selling advertising.

108. Google also uses the data that it collects from tracking pixels to provide clients like Veradigm with analytics data that those clients use to bolster their marketing and advertising strategies. Clients like Veradigm also use the analytics data that they receive back from Google to optimize their websites. Veradigm benefited financially from sharing Plaintiffs' and Class Members' PHI via tracking pixels by receiving, among other things, better and more cost-effective marketing in exchange for patient data.

**F. Veradigm Shared a Trove of Personally Identifiable Information with Google.**

1. IP Addresses Are Personally Identifiable

109. An IP address is a number that identifies a computer or other device (such as a mobile phone) connected to the Internet.

110. IP addresses are used to identify and route communications on the Internet.

[27] Office for Civil Rights, Department of Health and Human Services, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

111. IP addresses of individual Internet users are used by websites and tracking companies to facilitate and track Internet communications and target those users with advertising using IP addresses.

112. Under HIPAA, an IP address is considered personally identifiable information. *See* 45 C.F.R. § 164.514(b)(2)(i)(O).

113. Whenever a patient logged into or used Veradigm's Patient Portals or Mobile Application, Veradigm caused the disclosure of the patient's IP addresses to Google, along with each re-directed communication described herein, including patient communications concerning individual providers, conditions, and treatments.

2. <u>Internet Cookies Are Personally Identifiable</u>

114. In the early years of the Internet, advertising on websites followed the same model as traditional newspapers. Just as a sporting goods store would choose to advertise in the sports section of a traditional newspaper, advertisers on the early Internet paid for ads to be placed on specific web pages based on the type of content displayed on the web page.

115. Computer programmers eventually developed "cookies"—small text files that web servers can place on a person's device when that person's web browser interacts with the server. Cookies can perform different functions, like saving a user's login or other site settings. Eventually, some cookies were designed to acquire and record an individual Internet user's communications and activities on websites across the Internet.

116. Cookies are designed to and, in fact, most often do operate as means of identification for Internet users.

117. Cookies are protected personal identifiers under HIPAA. 45 C.F.R. § 164.514(b)(2)(i)(H), (J), (M), (N), and (R).

118. In general, cookies are categorized by duration and party.

119. There are two types of cookies classified by duration:

a. "Session cookies" are placed on a user's computing device only while the user is navigating the website that placed and accesses the cookie. The user's web browser typically deletes session cookies when the user closes the browser.

b. "Persistent cookies" are designed to survive beyond a single Internet-browsing session. The party creating the persistent cookie determines its lifespan. As a result, a persistent cookie can acquire and record a user's Internet communications for years and over dozens or hundreds of websites. Persistent cookies are sometimes called "tracking cookies."

120. Cookies are also classified by the party that uses the collected data:

a. "First-party cookies" are set on a user's device by the website with which the user is exchanging communications. First-party cookies can be helpful to the user, server, and/or website to assist with security, log in, and functionality.

b. "Third-party cookies" are set on a user's device by website servers other than the website or server with which the user is exchanging communications. For example, the same patient who visits a Veradigm Patient Portal will typically also have cookies on their device from third parties, such as Google. Unlike first-party cookies, third-party cookies are not typically helpful to the user. Instead, third-party cookies are typically used for data collection, behavioral profiling, and targeted advertising.

121. Data companies like Google have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications to sell advertising that is customized to that person. To build individual profiles of Internet users, third-party data companies assign each user a unique identifier or set of unique identifiers.

122. Traditionally, first- and third-party cookies were kept separate. An Internet security policy known as the same-origin policy required web browsers to prevent one web server from accessing the cookies of a separate web server. For example, although Veradigm can deploy source code that uses Google third-party cookies to help Google acquire and record the patient's communications, they are not permitted direct access to Google third-party cookie values. The reverse is also true: Google was not provided direct access to the values associated with first-party cookies set by Veradigm.

123. Google designed a way to circumvent the same-origin policy so that third-party data companies can gain access to first-party cookies—and Veradigm adopted it.

124. JavaScript source code developed by third-party data companies and placed on a webpage by developers such as Veradigm can bypass the same-origin policy to send a first-party cookie value in a tracking pixel to the third-party data company. This technique is known as "cookie synching," and it allows two cooperating websites to learn each other's cookie identification numbers for the same user. Once the cookie synching operation is completed, the two websites can exchange any information they have collected and recorded about a user that is associated with a cookie identification number. The technique can also be used to track an individual who has chosen to use third-party cookie blockers.

125. Cookie syncing is a process that "allow[s] web companies to share (*i.e.*, synchronize) cookies and match the different IDs they assign for the same user while they browse the web."[28] This allows entities to circumvent "the restriction that sites can't read each other's cookies, in order to better facilitate targeting and real-time bidding."[29]

126. Cookie syncing works as follows:

> Let us assume a user browsing several domains like website1.com and website2.com, in which there are 3rd-parties like tracker.com and advertiser.com, respectively. Consequently, these two 3rdparties have the chance to set their own cookies on the user's browser, in order to re-identify the user in the future. Hence, tracker.com knows the user with the ID user123, and advertiser.com knows the same user with the ID userABC.
>
> Now let us assume that the user lands on a website (say website3.com), which includes some JavaScript code from tracker.com but not from advertiser.com. Thus, advertiser.com does not (and cannot) know which users visit website3.com. However, as soon as the code of tracker.com is called, a GET request is issued by the browser to tracker.com (step 1), and it responds back with a REDIRECT request (step 2), instructing the user's browser to issue another GET request to its collaborator advertiser.com this time, using a specifically crafted URL (step 3).
>
> …
>
> When advertiser.com receives the above request along with the cookie ID userABC, it finds out that userABC visited website3.com. To make matters worse, advertiser.com also learns that the user whom tracker.com knows as user123, and the user userABC is basically one and the same user. Effectively, CSync enabled advertiser.com to collaborate with tracker.com, in order to: (i) find

---

[28] Panagiotis Papadopoulos *et al.*, *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/3308558.3313542.

[29] Gunes Acar *et al.*, *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, 6B CCS'14: ACM SIGSAC CONFERENCE ON COMPUTER AND COMMUNICATIONS SECURITY 674, 674 (2014).

> out which users visit website3.com, and (ii) synchronize (i.e., join) two different identities (cookies) of the same user on the web.[30]




127. Through this process, third-party trackers like Google's and Facebook's are not only able to resolve user identities (*e.g.*, learning that who Third Party #1 knew as "userABC" and Third Party #2 knew as "user123" are the same person), they can "track a user to a much larger number of websites," even though they "do not have any collaboration with" the third party.[31]

---

[30] Papadopoulos, *supra*, at 1433.

[31] *Id.* at 1434.

128. On the flip side, "CSync may re-identify web users even after they delete their cookies."[32] "[W]hen a user erases her browser state and restarts browsing, trackers usually place and sync a new set of userIDs, and eventually reconstruct a new browsing history."[33] But if a tracker can "respawn" its cookie or like to another persistent identifier (like an IP address), "then through CSync, all of them can link the user's browsing histories from before and after her state erasure. Consequently: (i) users cannot abolish their assigned userIDs even after carefully erasing their set cookies, and (ii) trackers are enabled to link [a] user's history across state resets."[34]

129. Thus, "syncing userIDs of a given user increases [] user identifiability while browsing, thus reducing their overall anonymity on the Web."[35]

130. Cookie syncing is precisely what is happening here. Google's trackers sync their unique user identifiers with other third parties on the websites. The result of this process is not only that a single user is identified as one person by these multiple third parties, but they share all the information about that user with one another (because the cookie is linked to a specific user profile). This prevents users from being anonymous when they visit websites.

131. Whenever a patient uses Veradigm's Patient Portals or Mobile Application, Veradigm intercepts, uses, and causes the disclosure of patient cookie identifiers with each re-directed communication described herein, including patient communications about providers, conditions, treatments, appointments, bills, registration, and log-ins to the Patient Portals and Mobile Application.

---

[32] *Id.*

[33] *See id.*

[34] *Id.*

[35] *Id.* at 1441.

132. Veradigm's cookie disclosures include the deployment of cookie synching techniques through which Veradigm deposits Google cookies on patient computing devices by disguising the Google cookies as belonging to Veradigm.

133. Veradigm then re-directs the disguised Google cookies to Google.

3. Advertising IDs Are Personally Identifiable

134. An advertising ID is a unique identifier used by advertisers to track user activity and serve personal advertisements on mobile phones. Advertising IDs allow advertisers to understand user behavior, measure ad performance, and tailor advertisements based on user interests. Examples include the Google Advertising ID (GAID) for Android and the IDFA Advertising ID for iOS devices.

135. Each Android device has a unique GAID advertising ID. Whenever an Android device connects to Google services, it is automatically assigned a GAID. Advertisers can use the GAID to target users with advertisements. Likewise, Google can use the GAID ID to link users with their individual Google accounts.

136. Mobile marketers use advertising IDs like the Google Advertising ID to understand which ads, creatives, and channels are most effective. In android advertising, ad networks utilize the GAID to get an idea of a user's behaviors and interests. Meanwhile, advertisers use the GAID to monitor ad engagement and conversions. Advertisers and developers can see views and clicks of ads, as well as when a user subsequently installs an app, makes a purchase, or signs up for a subscription or other service.

137. Together, this data allows mobile app marketers to deliver targeted and retargeted ads to app users using precision segmentation for highly personalized experiences. Creating these personalized ads provides advertisers an efficient tool for targeting specific users to show specific

advertisements directed to specific interests based on browsing history and other data that the advertising ID allows companies like Google to obtain.

4. Browser-Fingerprints Are Personally Identifiable

138. Browser-fingerprints are information collected about a computing device that can be used to identify the device.

139. Browser-fingerprints can be used to identify devices when the devices' IP addresses are hidden, and cookies are blocked.

140. The Electronic Frontier Foundation has explained:

> When a site you visit uses browser fingerprinting, it can learn enough information about your browser to uniquely distinguish you from all the other visitors to that site. Browser fingerprinting can be used to track users just as cookies do, but using much more subtle and hard-to-control techniques. In a paper EFF released in 2010, we found that a majority of users' browsers were uniquely identifiable given existing fingerprinting techniques. Those techniques have only gotten more complex and obscure in the intervening years. By using browser fingerprinting to piece together information about your browser and your actions online, trackers can covertly identify users over time, track them across websites, and building an advertising profile of them.[36]

141. In 2017, researchers showed that browser fingerprinting techniques can successfully identify 99.24 percent of Internet users.[37]

142. Browser-fingerprints are protected personal identifiers under HIPAA. 45 C.F.R. § 164.514(b)(2)(i)(M), (R).

---

[36] Katarzyna Szymielewicz and Bill Dudington, *The GDPR and Browser Fingerprinting: How It Changes the Game for the Sneakiest Web Trackers*, Electronic Frontier Foundation (June 19, 2018) (available at https://www.eff.org/deeplinks/2018/06/gdpr-and-browser-fingerprinting-how-it-changes-game-sneakiest-web-trackers).

[37] Yinzhi Cao, Song Li and Erik Wijmans, *(Cross-)Browser Fingerprinting via OS and Hardware Level Features*, Proceedings of the Network and Distributed Security Symposium (March 2017) (available at https://yinzhicao.org/TrackingFree/crossbrowsertracking_NDSS17.pdf).

143. Whenever patients use Veradigm Patient Portals and Mobile Application, Veradigm intercepts, uses and causes disclosures of data sufficient to form browser fingerprints with each re-directed communication described herein, including patient communications concerning individual providers, conditions, and treatments.

144. Each of the individual data elements described above is personally identifiable on its own. However, Veradigm's disclosures of such personally identifiable data elements do not occur in a vacuum. The disclosures of the different data elements are tied together and, when taken together, are even more accurate in identifying individual patients, particularly when disclosed to data companies such as Facebook, Google, and other internet marketing companies that expressly state that they use such data elements to identify individuals and have developed sophisticated algorithms and infrastructure for doing so.

145. Veradigm knowingly discloses information that allows Google and other advertisers to link Plaintiffs' and Class Members' PHI to their private identities and target them with advertising. Veradigm intentionally shared the PHI of Plaintiffs and Class Members with Google in order to gain access to the benefits of Google Analytics.

146. The information Plaintiffs and Class Members provide to Veradigm via its Patient Portals or Mobile Application (which is then shared illegally with Google) can be combined with other information in Google's possession, like Plaintiffs' and Class Members' names, dates of birth, and phone numbers, to more effectively target Plaintiffs and Class Members with advertisements or sell their data to third parties.

147. Veradigm knew that by embedding Google Analytics—a Google marketing tool—in its Patient Portals and Mobile Application, it was permitting Google to collect, use, and share Plaintiffs' and Class Members' PHI, including sensitive medical information and personally

identifiable data. Veradigm was also aware that such information would be shared with Google simultaneously with patients' interactions with its Patient Portals and Mobile Application. Veradigm chose to barter Plaintiffs' and Class Members' PHI to Google because it wanted access to Google Analytics and related Google tools. That bargain financially benefited Veradigm and Google by betraying the rights of, and Veradigm's obligations to, Plaintiffs and Class Members.

### G. Veradigm's Secret Google Source Code Improperly Disclosed Plaintiffs' and Class Members' PHI to Google Systematically Throughout the Class Period.

148. The intentional design and operation of Veradigm's Patient Portals and Mobile Application to improperly and surreptitiously disclose Plaintiffs' and other Class Members' PHI to Google, as described above and throughout this Complaint, was ongoing, consistent, and systematic throughout the Class Period.

149. Veradigm's Patient Portals and Mobile Application did in fact operate as described above and throughout this Complaint with respect to the named Plaintiffs in this matter.

150. Plaintiff Jane Doe used the Veradigm Patient Portal in connection with healthcare she received at Frick Hospital and Latrobe Hospital, which are both facilities within the Independence Health system. Plaintiff Jane Doe has received treatment from Frick Hospital and Latrobe Hospital in connection with breast cancer. In the course of her treatment Plaintiff Jane Doe has regularly logged into the Veradigm Patient Portal via the Veradigm FollowMyHealth mobile application and used it to review test results, review doctor's notes, and search for treatment information in connection with her ongoing breast cancer treatment.

151. Without Plaintiff Jane Doe's knowledge or consent, Veradigm intercepted and disclosed her confidential PHI to Google, including information about her patient status, messages she sent to her doctors, details about her medical condition, details about her treatment, and the precise days and times she logged in to her Veradigm patient portal.

152. As a result of Veradigm's deployment of Google Analytics inside its Patient Portal, Google was able to link Plaintiff Jane's Doe's PHI with her real-world identity, including by linking this data to her Google account, and then used and sold her PHI for commercial purposes. For example, after entering information in her Veradigm Patient Portal related to her cancer treatment, Plaintiff began receiving cancer-treatment-related advertisements on her social media account.

153. Similarly, Plaintiff Janet Doe is a patient of Latrobe Hospital and Independence Health System who has regularly used the Veradigm Patient Portal for more than two years. During that time, Plaintiff Janet Doe has regularly logged into the Veradigm Patient Portal using the Veradigm Mobile Application and used the Veradigm Patient Portal to review appointment details, review messages from her treating physicians, research treatment information, and check lab results in connection with her ongoing treatment for heart and dermatology issues. For example, Plaintiff Janet Doe used the Veradigm Patient Portal to review blood work results related to her treatment for a blood clot in her heart and lung, and treatment for a collapsed lung. Plaintiff Janet Doe has also regularly used the Veradigm Patient Portal to review updates from her primary care physician.

154. Without Plaintiff Janet Doe's knowledge or consent, Veradigm intercepted and disclosed her confidential PHI to Google, including information about her patient status, messages she sent to her doctors, details about her medical condition, details about her treatment, and the precise days and times she logged in to her Veradigm patient portal.

155. Likewise, Plaintiff Jennifer Doe is a patient of PIH Health. Plaintiff Jennifer Doe has been a registered user of Veradigm's Patient Portal and Mobile Application for more than five years and has regularly used them to schedule appointments, review test results, review doctor's

notes, review medical records, pay bills, and review information related to her medical treatment in connection with rotator cuff surgery, prior treatment for cancer, and prior treatment for cirrhosis. For example, she used Veradigm's Patient Portal and Mobile Application to review test results related to colon cancer screenings and her treatment for thyroid conditions.

156. Without Plaintiff Jennifer Doe's knowledge or consent, Veradigm intercepted and disclosed her confidential PHI to Google, including information about her patient status, messages she sent to her doctors, details about her medical condition, details about her treatment, and the precise days and times she logged in to her Veradigm patient portal.

157. As a result of Veradigm's deployment of Google Analytics inside its Patient Portal and Mobile Application, Google was able to link Plaintiff Jennifer Doe's PHI with her real-world identity, including by linking this data to her Google account, and then used and sold her PHI for commercial purposes. After accessing the Veradigm Patient Portal and Mobile Application to review her treatment information, Plaintiff Jennifer Doe began receiving advertisements on her social media account related to the medical conditions.

158. Plaintiff Jessica Doe is a resident of Los Angeles County, CA and a patient of PIH Health and Kaiser Permanente. Plaintiff Jessica Doe has been a registered user of Veradigm's Patient Portal and Mobile Application for about four years and has regularly used them to schedule appointments, review test results, review doctor's notes and medical records, pay bills, check and refill prescriptions, and review information related to her medical treatment in connection with hernia surgery and her treatment for bone marrow cancer.

159. Without Plaintiff Jessica Doe's knowledge or consent, Veradigm intercepted and disclosed her confidential PHI to Google, including information about her patient status, messages

she sent to her doctors, details about her medical condition, details about her treatment, and the precise days and times she logged in to her Veradigm patient portal.

As a result of Veradigm's deployment of Google Analytics inside its Patient Portal and Mobile Application, Google was able to link Plaintiff Jessica Doe's PHI with her real-world identity, including by linking this data to her Google account, and then used and sold her PHI for commercial purposes. After accessing the Veradigm Patient Portal and Mobile Application to review her treatment information, Plaintiff Jessica Doe began receiving advertisements on her social media account related to her hernia surgery and other medical conditions.

160. Every time Plaintiffs Jane Doe, Jennifer Doe, Jessica Doe, and Janet Doe accessed the Veradigm Patient Portal or Mobile Application, Veradigm intercepted and shared their login with Google, along with other PHI such as their patient status, their appointment scheduling, and the URLs of the pages they reviewed inside the Patient Portal, along with personally identifying information such as their IP addresses, browser fingerprints, and Google cookies. Such PHI, including Plaintiffs' patient status, their medical conditions, and when and where they sought treatment are specifically protected by HIPAA against unauthorized disclosure to third parties. *E.g.*, Hartley v. Univ. of Chicago Med. Ctr., No. 22 CV 5891, 2025 WL 2802317, at *4 (N.D. Ill. Oct. 1, 2025).

161. While Veradigm could have sought consent from Plaintiffs and Class Members to intercept, collect, and share their PHI with Google, Veradigm chose not to because of the likelihood that the majority of patients would refuse. Instead, Veradigm surreptitiously deployed hidden analytics tracking tools it obtained from Google in an effort to circumvent patients' refusing and/or blocking the exploitation of their PHI for advertising purposes.

162. Veradigm intentionally deployed Google Analytics inside its Patient Portals and Mobile Application (and thereby shared Plaintiffs' PHI with Google) in return for access to free marketing tools and aggregated data about how individuals interacted with its Patient Portals and Mobile Application. Veradigm took the aggregated patient data it received back from Google and used that data to optimize its marketing and product designs, thereby increasing Veradigm's profitability at the expense of Plaintiffs and Class Members.

163. Upon information and belief and the investigation of counsel, each Class Member had his or her interactions with the Patient Portals and Mobile Application intercepted and shared with Google in a manner substantially similar to what occurred with the named Plaintiffs as detailed above, such that named Plaintiffs' claims are typical of those of the proposed Class as a whole.

### H. Plaintiffs' PHI that Veradigm collected, disclosed, and exploited is Plaintiffs' property and has economic value, and its illicit disclosure caused Plaintiffs harm.

164. The value of data that companies like Google extract from people who use the Internet is well understood and generally accepted in the e-commerce industry.

165. In 2013, the Financial Times reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people."[38]

166. In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price."[39] This price is only increasing. According to Facebook's own financial statements,

[38] https://ig.ft.com/how-much-is-your-personal-data-worth/

[39] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/

the value of the average American's data in advertising sales rose from $19 to $164 per year between 2013 and 2020.[40]

167. In June 2025, Google began soliciting individuals in the United States to purchase their computer and mobile phone internet browsing history for $540 a year per household participant.

168. Personal information is now viewed as a form of currency. Professor Paul M. Schwartz noted in the Harvard Law Review:

> Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information.[41]

169. Despite the protections afforded by law, there is an active market for health information. Medical information obtained from health providers garners substantial value because of the fact that it is not generally available to third-party data marketing companies because of the strict restrictions on disclosure of such information under state and federal laws and provider standards, including the Hippocratic oath. Even with these restrictions, however, a multi-billion-dollar market exists for the sale and purchase of such private medical information.[42]

170. Individuals can sell or monetize their own data if they so choose. For example, Facebook has offered to pay individuals for their voice recordings,43 and has paid teenagers and

[40] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/

[41] Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 HARV. L. REV. 2055, 2056-57 (2004).

[42] https://revealnews.org/blog/your-medical-data-is-for-sale-and-theres-nothing-you-can-do-about-it/; *see also https://slate.com/technology/2022/06/health-data-brokers-privacy.html*

[43] https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-prounounciations-app

adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smart phones.[44]

171. Myriad other companies and apps such as DataCoup, Nielsen Computer, Killi, and UpVoice also offer consumers money in exchange for access to their personal data.[45]

172. Veradigm was compensated for its disclosures of Plaintiffs' and Class Members' PHI by the PHI's third-party recipients in the form of enhanced analytics and marketing services. Among other things, Veradigm used the analytics data that it received from Google to enhance the Patient Portals and Mobile Application it marketed and sold to healthcare systems. In turn, Google used the PHI it received from Veradigm to sell advertising to other third parties, targeted to the patients whom Veradigm was supposedly serving and protecting from privacy violations.

173. Veradigm did not pay (or offer to pay) Plaintiffs and Class Members for their PHI before Veradigm shared this data with Google and other advertisers.

174. Veradigm profited from Plaintiffs' and Class Members' information without ever intending to compensate Plaintiffs and Class Members or inform them that the disclosures had been made.

175. Veradigm was unjustly enriched by its conduct.

176. A data broker is a company that collects and sells personal information about individuals to other businesses. Data brokers gather consumers' personal information from a variety of sources, and then compile comprehensive profiles they sell for purposes such as targeted advertising, risk assessment, and background checks. Data brokers mass collection and sale of

---

[44] https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html

[45] https://www.creditdonkey.com/best-apps-data-collection.html; *see also* https://www.monetha.io/blog/rewards/earn-money-from-your-data/

personal information raise significant consumer privacy concerns. The personal data that data brokers collect and sell can be used to harm individuals, for example, by influencing insurance rates, loan denials, and unwanted advertising.

177. "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise shar[ing] the data with third parties."[46] Such databases are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and political affiliation," in addition to "inferences [that] can be made from the combined data." And whereas individual data sources "may provide only a few elements about a person's activities, data brokers combine these elements to form a detailed, composite view of the consumer's life."[47]

178. For instance, as a report by NATO found, data brokers collect two sets of information: "observed and inferred (or modelled)." The former "is data that has been collected and is actual," such as websites visited. Inferred data "is gleaned from observed data by modelling or profiling," meaning what consumers may be expected to do. On top of this, "[b]rokers typically collect not only what they immediately need or can use, but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[48]

---

[46] JUSTIN SHERMAN, DUKE SANFORD CYBER POLICY PROGRAM, DATA BROKERS AND SENSITIVE DATA ON U.S. INDIVIDUALS: THREATS TO AMERICAN CIVIL RIGHTS, NATIONAL SECURITY, AND DEMOCRACY, at 2 (2021), https://techpolicy.sanford.duke.edu/wp-content/uploads/sites/4/2021/08/Data-Brokers-and-Sensitive-Data-on-US-Individuals-Sherman-2021.pdf.

[47] Tehila Minkus *et al.*, *The City Privacy Attack: Combining Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: PROCEEDINGS OF THE 2015 ACM ON CONFERENCE ON ONLINE SOCIAL NETWORKS 71, 71 (2015), https://dl.acm.org/doi/pdf/10.1145/2817946.2817957.

[48] HENRIK TWETMAN & GUNDARS BERGMANIS-KORATS, NATO STRATEGIC COMMUNICATIONS CENTRE OF EXCELLENCE, DATA BROKERS AND SECURITY at 11 (2020),

179. Likewise, a report by the Duke Sanford Cyber Policy Program "examine[d] 10 major data brokers and the highly sensitive data they hold on U.S. individuals."[49] The report found that "data brokers are openly and explicitly advertising data for sale on U.S. individuals' sensitive demographic information, on U.S. individuals' political preferences and beliefs, on U.S. individuals' whereabouts and even real-time GPS locations, on current and former U.S. military personnel, and on current U.S. government employees."[50]

180. This data collection has grave implications for Americans' right to privacy. For instance, "U.S. federal agencies from the Federal Bureau of Investigation [] to U.S. Immigration and Customs Enforcement [] purchase data from data brokers—without warrants, public disclosures, or robust oversight—to carry out everything from criminal investigations to deportations."[51]

181. As another example:

> Data brokers also hold highly sensitive data on U.S. individuals such as race, ethnicity, gender, sexual orientation, immigration status, income level, and political preferences and beliefs (like support for the NAACP or National LGBTQ Task Force) that can be used to directly undermine individuals' civil rights. Even if data brokers do not explicitly advertise these types of data (though in many cases they do), everything from media reporting to testimony by a Federal Trade Commission commissioner has identified the risk that data brokers use their data sets to make "predictions" or "inferences" about this kind of sensitive information (race, gender, sexual orientation, etc.) on individuals.
>
> This data can be used by commercial entities within the U.S. to discriminately target goods and services, akin to how Facebook advertising tools allow advertisers to exclude certain groups, such

https://stratcomcoe.org/cuploads/pfiles/data_brokers_and _security_20-01-2020.pdf.

[49] SHERMAN, *supra*, at 1.

[50] *Id.*

[51] *Id.* at 9.

> as those who are identified as people with disabilities or those who are identified as Black or Latino, from seeing advertisements. 59 Many industries from health insurance to life insurance to banking to e-commerce purchase data from data brokers to run advertisements and target their services.
>
> …
>
> Given identified discrimination problems in machine learning algorithms, there is great risk of these predictive tools only further driving up costs of goods and services (from insurance to housing) for minority groups.[52]

182. Similarly, as the report from NATO noted, corporate data brokers cause numerous privacy harms, including but not limited to depriving consumers of the right to control who does and does not acquire their personal information, unwanted advertisements that can even go as far as manipulating viewpoints, and spam and phishing attacks.[53]

---

[52] *Id.*

[53] TWETMAN & BERGMANIS-KORATS, *supra*, at 8.




183. Data brokers are able to compile such vast swaths of information in part by collecting users' IP addresses and other device information, which data brokers use to track users across the Internet.[54] Indeed, as McAfee (a data security company) notes, "data brokers [like

[54] *Id.* at 11.

Defendant] can … even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[55]

184. Data brokers will then:

> take that data and pair it with other data they've collected about you, pool it together with other data they've got on you, and then share all of it with businesses who want to market to you. They can eventually build large datasets about you with things like: "browsed gym shorts, vegan, living in Los Angeles, income between $65k-90k, traveler, and single." Then, they sort you into groups of other people like you, so they can sell those lists of like-people and generate their income.[56]

185. In short, data brokers track consumers across the Internet, compiling various bits of information about users, building comprehensive user profiles that include an assortment of information, interests, and inferences, and offering up that information for sale to the highest bidder. The "highest bidder" is a literal term, as explained below.

186. Both Facebook and Google have a history of sharing the data they receive via analytics technologies with data brokers, which they and the data brokers then monetize as part of their real-time bidding (RTB) auction process for advertising.

187. "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[57]

---

[55] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

[56] Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, FATHOM ANALYTICS (May 10, 2022), https://usefathom.com/blog/data-brokers.

[57] Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.

188. "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)." An SSP "work[s] with website or app publishers to help them participate in the RTB process." "DSPs primarily work with advertisers to help them evaluate the value of user impressions and optimize the bid prices they put forth."[58] And an Advertising Exchange "allows advertisers and publishers to use the same technological platform, services, and methods, and 'speak the same language' in order to exchange data, set prices, and ultimately serve an ad."[59]

189. In other words, SSPs provide user information to advertisers that might be interested in those users, DSPs help advertisers select which users to advertise and target, and an Advertising Exchange is the platform on which all of this happens.

190. The RTB process works as follows:

> After a user loads a website or app, an SSP will send user data to Advertising Exchanges … The user data, often referred to as "bidstream data," contains information like device identifiers, IP address, zip/postal code, GPS location, browsing history, location data, and more. After receiving the bidstream data, an Advertising Exchange will broadcast the data to several DSPs. The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.
>
> Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. Since most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user only actually sees the winner of the auction and would not be aware of the DSPs who bid and lost. But even the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction process. This information can be added to existing dossiers DSPs have on a user.[60]

---

[58] Geoghegan, *supra*.

[59] *Introduction To Ad Serving*, MICROSOFT IGNITE (Mar. 3, 2024), https://learn.microsoft.com/enus/xandr/industry-reference/introduction-to-ad-serving.

[60] Geoghegan, *supra*; *see also Real-Time Bidding*, APPSFLYER, https://www.appsflyer.com/glossary/real-time-bidding/.




191. Facilitating this real-time bidding process means SSPs and DSPs must have as much information as possible about consumers to procure the greatest interest from advertisers and obtain the highest bids for website and app operators' users. But these SSPs and DSPs receive assistance by connecting with Data Management Platforms ("DMPs") or data brokers like Defendant:

> [T]he economic incentives of an auction mean that DSP with more specific knowledge of individuals will win desirable viewers due to being able to target them more specifically and out-bid other entities. As a consequence, the bid request is not the end of the road. The DSP enlists a final actor, the data management platform (DMP) [or data broker, like Defendant]. DSPs send bid requests to DMPs, who enrich them by attempting to identify the user in the request and use a variety of data sources, such as those uploaded by the advertiser, collected from other sources, or bought from data brokers The DSP also wins the right to cookie sync its own cookies with those from the [Advertising Exchange], thus enabling easier linkage of the data to the user's profile in the future.[61]

---

[61] Michael Veale & Federik Zuiderveen Borgesius, *Adtech and Real-Time Bidding under European Data Protection Law*, 23 GERMAN L. J. 226, 232-33 (2022) https://tinyurl.com/yjddt5ey; see also PERION, WHAT IS A SUPPLY-SIDE PLATFORM (SSP): DEFINITION AND IMPORTANCE, https://perion.com/publishers/what-is-a-supply-side-platform-ssp-definition-and-importance/.




192. In other words, before bidding to show a user an advertisement, SSPs and DSPs will attempt to determine what other information about a user may be available. SSPs and DSPs do this by connecting with entities like Google and Facebook, who match a consumer's information from a particular website or mobile application (*e.g.*, their IP address) with any profiles on those users they may have compiled. If there is a match, then advertisers will pay more money to show users an advertisement because the advertisers have more information on which to base their targeting. This naturally enriches website and app operators, as their users are now more valuable. It also enriches SSPs who can offer users to advertisers for more money based on the greater number of traits available, and DSPs who can receive higher bids for the same users. And SSPs and DSPs can continue linking users on a website or mobile application through the Advertising Exchange, which enhances the SSP's and DSP's ability to better identify users in the future and helps the SSP and DSP profit further as well.

193. As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

> (a) "incentiviz[ing] invasive data-sharing" by "push[ing] publishers [*i.e.*, website and app operators] to share as much end-user data as

> possible to get higher valuation for their ad inventory—particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior."
>
> (b) "send[ing] sensitive data across geographic borders."
>
> (c) sending consumer data "to potentially dozens of bidders simultaneously, despite only one of those parties—the winning bidder actually using that data to serve a targeted ad. Experts have previously cautioned that there are few (if any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[62]

194. The last point bears additional emphasis, as it means the data Veradigm provides to Google, Facebook, and data brokers to serve targeted advertisements is even provided to those entities who do not actually serve an advertisement on a consumer. This greatly diminishes the ability of users to control their personal information.

195. Likewise, the Electronic Privacy Information Center ("EPIC") has warned that "[c]onsumers' privacy is violated when entities disclose their information without authorization or in ways that thwart their expectations."[63]

196. For these reasons, some have characterized "real-time bidding" as "[t]he biggest data breach ever recorded" because of the sheer number of entities that receive personal information[64]:

---

[62] FEDERAL TRADE COMMISSION, UNPACKING REAL TIME BIDDING THROUGH FTC'S CASE ON MOBILEWALLA (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.

[63] Geoghegan, *supra*.

[64] DR. JOHNNY RYAN, "RTB" ADTECH & GDPR, https://assortedmaterials.com/rtb-evidence/ (video).




197. All of this is in line with protecting the right to determine who does and does not get to know one's information, a harm that was long recognized at common law and that statutes like the CIPA were enacted to protect against. *Ribas v. Clark*, 38 Cal. 3d 355, 361 (1985) (noting the CIPA was drafted with a two-party consent requirement to protect "the right to control the nature and extent of the firsthand dissemination of [one's] statements"); *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763-64 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

198. When advertisers use Google's real-time bidding system (RTB), RTB lets hundreds of companies bid for ad space on individual consumers based on their Google profile, which can include information such as age, sex, and interests. While only one company will win the auction, hundreds of participating companies receive sensitive information about the potential recipient of the ad—device identifiers and cookies, web browsing and location data, IP addresses, and unique

demographic information such as age and gender. Worse, many companies participating in the RTB system are not there to fill ad spaces but instead use RTB to collect users' personal data. Likewise, for users using cell phones or other Android devices that run on a Google operating system, every time they open an app on their Android phone or tablet, Google will timestamp it, and every ad the user is shown will be recorded and associated with their device profile.

199. Facebook is no better. Facebook has historically collaborated with data brokers to gather consumer data and enhance its user profiles for targeting advertising. Facebook itself acts as a first-party data broker, collecting data from user activities on its platform to offer targeted advertising, which is its primary revenue source. Facebook's data ecosystem extends through external partnerships, allowing Facebook to collect data from user interactions on other websites and apps. Companies that pay for ads on Facebook can then direct users to their websites, which embed trackers that collect information such as IP addresses and device IDs from visitors.

200. Facebook also has a history of sharing its customers data with third parties, including most infamously Cambridge Analytica, who gained access to the data of tens of millions of Facebook users. Facebook has also shared its customers data with "partners," such as Acxiom, Oracle, Epsilon, and Experian. Once this data is shared, neither Facebook or its users have control over this data as it is endlessly sold and resold to data brokers around the world.

201. As a consequence of Veradigm's unauthorized disclosure of patients' PHI to Google, Plaintiff and Class Members have further been harmed by their loss of control over their own personal information, which has now been shared with numerous data brokers participating in the online data market.

202. The only remedy for patients whose PHI has been shared with Google is to use services such as DeleteMe and CyEx Privacy Shield Pro that go out into the online marketplace

and "delete" patients' personal data from data broker rolls. These services, however, cost anywhere from $100 to $300 a year on average for consumers to try and regain control over their personal information.

## I. Plaintiffs and Class Members Have a Reasonable Expectation of Privacy in Their PHI.

203. As patients, Plaintiffs and Class Members had a reasonable expectation that Veradigm would not disclose their PHI or the content of their communications to third parties without their express authorization.

204. As patients using Veradigm's Patient Portals and Mobile Application, Plaintiffs and Class Members had a reasonable expectation that Veradigm would not disclose their PHI or the content of their communications to third parties without their express authorization.

205. Plaintiffs' and Class Members' reasonable expectations of privacy in their PHI and communications exchanged with Veradigm are derived from multiple sources, including at least:

- Veradigm's status as Plaintiffs' and Class Members' healthcare Patient Portal and Mobile Application provider;
- Veradigm's common law obligations to maintain the confidentiality of PHI and communications;
- State and federal laws and regulations protecting the confidentiality of PHI;
- State and federal laws protecting the confidentiality of communications and computer data;
- State laws protecting against unauthorized use of personal means of identification; and

206. It was reasonable for Plaintiffs and Class Members to assume that Veradigm's privacy policies were consistent with Veradigm's duties to protect the confidentiality of patients' PHI.

207. Indeed, multiple studies examining the collection and disclosure of consumers' sensitive medical information confirm that the disclosure of sensitive medical information violates expectations of privacy that have been established as general social norms.

208. Privacy polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

209. For example, a recent study by Consumer Reports showed that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believed that internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[65]

210. Users act consistently with these preferences. For example, following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to share data when prompted.[66]

211. "Patients are highly sensitive to disclosure of their health information," particularly because it "often involves intimate and personal facts, with a heavy emotional overlay."[67]

[65] https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/

[66] https://www.wired.co.uk/article/apple-ios14-facebook

[67] Peter A. Winn, Confidentiality in Cyberspace: The HIPAA Privacy Rules and the Common

Unsurprisingly, empirical evidence demonstrates that "[w]hen asked, the overwhelming majority of Americans express concern about the privacy of their medical records."[68]

212. The concern about sharing PHI is compounded by the reality that advertisers view this type of information as particularly valuable. Indeed, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born. As one recent article noted, "What is particularly worrying about this process of datafication of children is that companies like [Facebook] are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[69]

213. Many privacy law experts have expressed serious concerns about patients' sensitive medical information being disclosed to third-party companies like Facebook. As those critics have pointed out, having a patient's personal PHI disseminated in ways the patient is unaware of could have serious repercussions, including affecting their ability to obtain life insurance, how much they might pay for such coverage, the rates they might be charged on loans, and the likelihood of their being discriminated against.

### J. Plaintiffs' and Class Members' PHI is protected against unauthorized disclosure by both state and federal law.

214. The confidentiality of Plaintiffs' and Class Members' PHI is specifically protected by law. *E.g.*, 410 ILCS 50/3; 45 C.F.R. § 164.514. The prohibitions against disclosing PHI include prohibitions against disclosing personally identifiable information such as patient names, IP addresses, and other unique characteristics or codes. *E.g.*, 45 C.F.R. § 164.51. Both state and

---

Law, 33 Rutgers L.J. 617, 621 (2002).

[68] Sharona Hoffman & Andy Podgurski, E-Health Hazards: Provider Liability and Electronic Health Record Systems, 24 Berkley Tech L.J. 1523, 1557 (2009).

[69] https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/

federal law also restrict the use of Plaintiffs' and Class Members' PHI, including their status as patients, to only those uses related to their care unless patients have provided express written authorization to the contrary.

215. Veradigm does not have a legal right to share Plaintiffs' and Class Members' PHI with third parties without their written consent because this information is protected from such disclosure by law. 45 C.F.R. § 164.508. Nor is Veradigm permitted to disclose Plaintiffs' and Class Members' PHI to advertising and marketing companies like Google without express written authorization from patients. 45 C.F.R. § 164.502(a)(5)(ii).

216. Indeed, as discussed above, the United States Department of Health and Human Services ("HHS") recently confirmed that hospitals are prohibited from transmitting PHI via tracking technology like Google Analytics without a patient's authorization and other protections like a business associate agreement with the recipient of the PHI. Among other things, HHS warned hospitals like those for whom Veradigm provides its Patients Portals and Mobile Application that: "Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of Health Information to tracking technology vendors or any other violations of the HIPAA Rules. For example, disclosures of Health Information to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures."[70]

217. Veradigm failed to obtain a valid written authorization from Plaintiffs or Class Members to allow the capture and exploitation of their PHI and the contents of their communications for marketing purposes.

---

[70] https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html

218. Plaintiffs' and Class Members' PHI is protected by federal law under HIPAA and its implementing regulations, which are promulgated by HHS.

219. The HIPAA Privacy Rule, located at 45 CFR Part 160 and Subparts A and E of Part 164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[71]

220. Business associates like Veradigm also must also comply with the privacy obligations imposed by HIPAA.[72]

221. The Privacy Rule broadly defines "protected health information" ("PHI") as "individually identifiable health information" ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. §160.103; *see* n.1, *supra*.

222. In relevant part, PHI is defined as "individually identifiable health information . . . transmitted by electronic media [or] maintained in electronic media."

223. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual";

---

[71] Department of Health and Human Services, *Health Information Privacy* (Mar. 31, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

[72] 78 Fed. Reg. 5568 (2013) (extending certain HIPAA Privacy and Security Rules, like those described here, to business associates).

and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. §160.103.

224. Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed:

> A. Names;
>
> . . .
>
> H. Medical records numbers;
>
> . . .
>
> J. Account numbers;
>
> . . .
>
> M. Device identifiers and serial numbers;
>
> N. Web Universal Resource Locators (URLs);
>
> O. Internet Protocol (IP) address numbers; … and
>
> R. Any other unique identifying number, characteristics, or code…; and"
>
> the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

45 C.F.R. § 164.514.

225. The HIPAA Privacy rule requires covered entities and business associates to maintain appropriate safeguards to protect the privacy of PHI and sets limits and conditions on the

uses and disclosures that may be made of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

226. An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

227. Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b). There is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both."

228. Courts have recognized that patient status is protected by HIPAA. *In re Meta Pixel Healthcare Lit.*, Case No. 3:22-cv-03580-WHO, Dkt. 159 at 12 (N.D. Cal. Dec. 22, 2022) ("I agree that the information at issue here appears to show patient status and thus constitutes protected health information under HIPAA."); *id.* at 15 ("[T]he Pixel captures information that connects a particular user to a particular health care provider – i.e., patient status – which falls within the ambit of information protected under HIPAA.").

229. Guidance from HHS confirms that patient status is protected by HIPAA:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated

> as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data. … **If such information was listed with health condition, health care provision** or payment data, **such as an indication that the individual was treated at a certain clinic**, then this information would be PHI.[73]

230. In December 2022, HHS issued a Bulletin "to highlight the obligations" of health care providers and their business associates under the HIPAA Privacy Rule "when using online tracking technologies" such as the "Meta Pixel," which "collect and analyze information about how internet users are interacting with a regulated entity's website or mobile application."[74]

231. In the Bulletin, which was amended in June 2024, HHS explained that tracking technologies on password-protected patient portals "generally have access to PHI" and may access diagnosis and treatment information, in addition to other sensitive data:

> Regulated entities may have user-authenticated webpages, which require a user to log in before they are able to access the webpage, such as a patient or health plan beneficiary portal or a telehealth platform. **Tracking technologies on a regulated entity's user-authenticated webpages generally have access to PHI.** Such PHI may include, for example, an individual's IP address, medical record number, home or email addresses, dates of appointments, or other identifying information that the individual may provide when interacting with the webpage. **Tracking technologies within user-authenticated webpages may even have access to an individual's diagnosis and treatment information, prescription information, billing information, or other information within the portal**.

[73] Office for Civil Rights, Department of Health and Human Services, *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule* at 5 (emphasis added) (Nov. 26, 2012), https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

[74] Office of Civil Rights, Department of Health and Human Services, HHS Office of Civil Rights Issue Bulletin on Requirements under HIPAA for Online Tracking Technologies to Protect the Privacy and Security of Health Information (Dec. 1, 2022), https://www.hhs.gov/about/news/2022/12/01/hhs-office-for-civil-rights-issues-bulletin-on-requirements-under-hipaa-for-online-tracking-technologies.html.

> Therefore, a regulated entity must configure any user-authenticated webpages that include tracking technologies to allow such technologies to **only** use and disclose PHI in compliance with the HIPAA Privacy Rule and must ensure that the electronic protected health information (ePHI) collected through its website is protected and secured in accordance with the HIPAA Security Rule.[75]

232. The HHS Guidance further explained that tracking technology vendors like Google are considered business associates under HIPAA and that entities who use their services must obtain a business associate agreement ("BAA") before utilizing their services:

> [T]racking technology vendors are business associates if they create, receive, maintain, or transmit PHI on behalf of a regulated entity for a covered function (*e.g.* health care operations) or provide certain services to or for a covered entity (or another business associate) that involve the disclosure of PHI. In these circumstances, regulated entities must ensure that the disclosures made to such vendors are permitted by the Privacy Rule and enter into a business associate agreement (BAA) with these tracking technology vendors to ensure that PHI is protected in accordance with the HIPAA Rules. For example, if an individual makes an appointment through the website of a covered health clinic for health services and that website uses third party tracking technologies, then the website might automatically transmit information regarding the appointment and the individual's IP address to a tracking technology vendor. In this case, the tracking technology vendor is a business associate and a BAA is required.[76]

233. HHS reiterated that "[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of HIPAA Rules."[77]

---

[75] Office of Civil Rights, Department of Health and Human Services, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last reviewed June 26, 2024) (emphasis added).

[76] *Id.*

[77] *Id.*

234. As HHS explained, an "impermissible disclosure" of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms:

235. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.[78]

**TOLLING, CONCEALMENT, AND ESTOPPEL**

236. The applicable statutes of limitation have been tolled because of Veradigm's knowing and active concealment and denial of the facts alleged herein.

237. Veradigm seamlessly incorporated trackers into its Patient Portals and Mobile Application, providing no indication to Plaintiffs and Class Members that they were being tracked for marketing purposes. Veradigm had knowledge that its Patient Portals and Mobile Application incorporated tracking technologies yet failed to disclose that by interacting with the Patient Portals, Plaintiffs' and Class Members' PHI would be intercepted, collected, used by, and disclosed to third parties.

238. Plaintiffs and Class Members could not, with due diligence, discover the full scope of Veradigm's conduct, because there were no disclosures or other indication that they were interacting with Patient Portals and a Mobile Application employing Google Analytics or other tracking technologies.

---

[78] *Id.*

239. All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Additionally, Veradigm was under a duty to disclose the nature and significance of its data collection practices but did not do so. Veradigm is therefore estopped from relying on any statute of limitations defenses.

## CLASS ACTION ALLEGATIONS

240. Plaintiffs re-allege and incorporate by reference the allegations set forth above.

241. Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class and subclass:

> **Nationwide Class:** During the fullest period allowable by law, all patients in the United States who logged into the Patient Portals and/or the Mobile Application provided by Veradigm where Google Analytics and/or Firebase Analytics was deployed.
>
> **California Subclass:** During the fullest period allowable by law, all current California citizens who logged into the Patient Portals and/or the Mobile Application provided by Veradigm where Google Analytics and/or Firebase Analytics was deployed.

242. Excluded from the Class are Veradigm and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; and the Court staff assigned to this case and their immediate family members. Plaintiffs reserve the right to modify or amend the Class definition, as appropriate, during the course of this litigation.

243. This action has been brought and may properly be maintained on behalf of the Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

244. **Numerosity—Federal Rule of Civil Procedure 23(a)(1)** – Class Members are so numerous that their individual joinder is impracticable. The precise number of Class Members and their identities are unknown to Plaintiffs at this time but will be determined through discovery through the records of Veradigm.

245. **Commonality and Predominance—Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3)** – Common questions of law and fact exist and predominate over questions affecting only individual Class Members. These common legal and factual questions include the following:

a. Whether Veradigm's practices relating to disclosures of Plaintiffs' and Class Members' PHI to third parties were intentional;

b. Whether Veradigm profited from disclosures to the third parties;

c. Whether Veradigm's conduct violates the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq.* and 18 U.S.C. § 2701, *et seq.*;

d. Whether Veradigm's practices constitute an unauthorized intrusion upon seclusion;

e. Whether Veradigm's practices constitute identity theft;

f. Whether Veradigm's practices constitute a breach of fiduciary duty;

g. Whether Veradigm's practices constitute tampering with computer data;

h. Whether Veradigm's practices constitute unjust enrichment;

i. Whether placement of the Google cookies disguised as belonging to Veradigm on Plaintiffs' and Class Members' computing devices is a highly offensive intrusion upon seclusion;

j. Whether Veradigm's conduct harmed and continues to harm Plaintiffs and Class Members, and if so, the extent of the injury;

k. Whether and to what extent Plaintiffs and Class Members are entitled to damages and other monetary relief;

l. Whether and to what extent Plaintiffs and Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction; and

m. Whether and to what extent Plaintiffs and Class Members are entitled to attorneys' fees and costs.

246. **Typicality—Federal Rule of Civil Procedure 23(a)(3)** – Plaintiffs' claims are typical of the claims of the Class and Plaintiffs have substantially the same interest in this matter as other Class Members. Plaintiffs have no interests that are antagonistic to, or in conflict with, the interests of the other Class Members. Plaintiffs' claims arise out of the same set of facts and conduct as all other Class Members. Plaintiffs and all Class Members are patients who used Veradigm Patient Portals and Mobile Application and are victims of Veradigm's unauthorized disclosures to third parties. All Plaintiffs' and Class Members' claims are based on Veradigm's wrongful conduct and unauthorized disclosures.

247. **Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4)** – Plaintiffs will fairly and adequately protect the interests of Class Members. Plaintiffs have retained competent counsel experienced in complex class action privacy litigation and Plaintiffs will prosecute this action vigorously. Plaintiffs have no interests adverse or antagonistic to those of the Class.

248. **Declaratory and Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2)** – Veradigm acted or refused to act on grounds generally applicable to Plaintiffs and the other Class Members, thereby making appropriate final injunctive relief and/or declaratory relief, as described below.

249. **Superiority—Federal Rule of Civil Procedure 23(b)(3)** – A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are small compared with the burden and expense that would be entailed by individual litigation of their claims against Veradigm. It would thus be virtually impossible for the Class Members, on an individual basis, to obtain effective redress for the wrongs done them. Furthermore, even if Class Members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

250. Additionally, the Class may be certified under Rule 23(b)(1) or (b)(2) because:

a. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Veradigm;

b. The prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

c. Veradigm has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class Members as a whole.

**COUNT I**

**VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**18 U.S.C. § 2511(1) et seq.**
**Unauthorized Interception, Use, and Disclosure**

251. Plaintiffs, individually and on behalf of the Nationwide Class, repeat and reallege the foregoing paragraphs as if fully alleged herein.

252. Title I of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2510, also known as the Wiretap Act, provides a private cause of action against any person who intercepts an electronic communication.

253. The ECPA protects individuals against eavesdropping committed with an improper purpose.

254. A violation of the ECPA occurs where any person "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any . . . electronic communication" or "intentionally discloses, or endeavors to disclose, to any other person the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication" or "intentionally uses, or endeavors to use, the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication." 18 U.S.C. §§ 2511(1)(a), (c)-(d).

255. Plaintiffs' and Class Members' communications via Patient Portals and Mobile Application, including their communications with their treating physicians, are covered communications under the ECPA.

256. The ECPA protects both the sending and receipt of electronic communications.

257. The ECPA provides a private right of action to any person whose electronic communications are "intercepted, disclosed, or intentionally used" in violation of the ECPA.

258. "Electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

259. The transmissions of data between Plaintiffs and Class Members, on the one hand, and their healthcare providers' Patient Portals and Mobile Application, which are hosted by Veradigm, on the other, qualify as communications under the ECPA.

260. "Intercept" under the ECPA means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

261. "Contents" includes "*any* information relating to the substance, purport, or meaning" of the communication at issue. 18 U.S.C. § 2510(8) (emphasis added).

262. The "contents" of Plaintiffs' and Class Members' electronic communications included at least:

c. the parties to the communications;

d. the precise text of their search queries;

e. personally identifiable information such as their IP addresses, Facebook IDs, browser fingerprints, and other unique identifiers;

f. the precise text of their communications about specific doctors;

g. the precise text of their communications about specific medical conditions;

h. the precise text of their communications about specific treatments;

i. the precise text of their communications about scheduling appointments with medical providers;

j. the precise text of their communications about billing and payment;

k. the precise text of specific buttons on Veradigm's Patient Portals and Mobile Application that they clicked to exchange communications, including Logins, Registrations, Requests for Appointments, and other buttons;

l. the precise dates and times when they clicked to Log-In on Veradigm's Patient Portals and Mobile Application;

m. the precise dates and times when they visited Veradigm's Patient Portals and Mobile Application;

n. information that is a general summary or informs third parties of the general subject of communications that Veradigm sent back to them in response to requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

o. any other content that Veradigm has aided third parties in scraping from webpages or communication forms in its Patient Portals and Mobile Application.

263. Plaintiffs' and Class Members' communications with their healthcare providers via Veradigm constitute "electronic communications" because they were wholly or partially transmitted by wire, electromagnetic, and/or photoelectronic systems including, but not limited to:

p. Plaintiffs and Class Members' personal computing devices;

q. Plaintiffs and Class Members' web browsers;

r. Plaintiffs and Class Members' browser-managed files;

s. Google Analytics;

t. Internet cookies;

u. Veradigm's computer servers; and

v. Third-party source code used by Veradigm.

264. The "parties" to Plaintiffs' and Class Members' communications between them and their healthcare providers via Veradigm's Patient Portal and Mobile Application were Plaintiffs and Class Members, on the one hand, and Veradigm, on the other. Veradigm was not a party or intended recipient of the communications between Plaintiffs and Class Members, on the one hand, and their healthcare providers, on the other, via Veradigm's Patient Portal and Mobile Application.

265. Whenever Plaintiffs and Class Members interacted with Veradigm's Patient Portals and Mobile Application, Veradigm, through the source code it embedded and ran on its Patient Portals and Mobile Application, intentionally intercepted and divulged the contents of Plaintiffs and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Google.

266. Without Plaintiffs' and Class Members' knowledge or consent, Veradigm acquired the content of Plaintiffs' and Class Members' communications while they were still exchanging

communications with their healthcare providers inside the Patient Portal and Mobile Application. Veradigm then caused these same communications to be disclosed to Google and third parties in return for marketing and advertising benefits.

267. In violation of 42 U.S.C. § 1320d-6, Veradigm knowingly disclosed "individually identifiable health information to another person"—*i.e.*, Google. Veradigm further violated 42 U.S.C. § 1320d-6 by intentionally disclosing Plaintiffs' and Class Members' PHI to Google for the purpose of obtaining "commercial advantage" over its rivals in the marketplace such as Epic, Athena Health, and Cerner Health. Specifically, Veradigm shared Plaintiffs' and Class Members' PHI with Google in return for free advertising and marketing tools from Google, along with aggregated patient data, that Veradigm used to optimize its Patient Portals, Mobile Application, and marketing campaigns, so that Veradigm could increase its profitability. By exploiting Plaintiffs' and Class Members' PHI in this manner, Veradigm hoped to take market share away from its business rivals in the patient portal market.

268. Google, in turn, used the PHI it received from Veradigm to sell targeted advertising to other third parties. While that bargain may have enriched Google and Veradigm, it came at the expense of Plaintiffs and Class Members.

269. When a patient makes contact with a Veradigm Patient Portal or its Mobile Application to exchange communications with his or her health care provider, a "TLS handshake" occurs that opens a line between the patient's communications device and the Patient Portal server. The line remains open and communications continue to flow back and forth from the patient's communications device and Veradigm's servers. The patient's communications with his or her healthcare provider flow through this open line. At the same time that the line is open and communications remain "in transit" between the patient's communications device and Veradigm's

servers, Veradigm has also placed the content of the communication in temporary electronic storage and long-term storage, rendering a communication in transit, electronic storage, and storage all at the same time.

270. Veradigm was not a party to many of the communications that it intercepted and disclosed. For example, when Plaintiffs and Class Members sent messages to their health care providers or paid their healthcare providers bills, they were not communicating with Veradigm. Rather, Plaintiffs and Class Members were communicating directly with their doctors without any knowledge that Veradigm was secretly intercepting, recording, and disclosing their communications.

271. Veradigm's conduct occurred through the use of "devices" within the meaning of the ECPA, 18 U.S.C. § 2510(5), including:

a. Cookies, including the Google cookies disguised as Veradigm's cookies;

b. Healthcare providers' web servers;

c. Google's web servers;

d. The Veradigm Mobile Application;

e. Veradigm's web servers; and

f. The Google source code described herein.

272. The ECPA provides that a "party to the communication" may liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d).

273. Neither Veradigm nor Google were parties to Plaintiffs' and Class Members' communications with their healthcare providers.

274. But even if Veradigm was a party to the communications, Veradigm is still liable under the ECPA because it acted with the purpose of committing criminal and tortious acts in violation of federal and state laws, including but not limited to:

a. A criminal violation of 42 U.S.C. § 1320d-6 regardless of any subsequent purpose or use of the individually identifiable health data; and

b. A violation of HIPAA, particularly 42 U.S.C. § 1320d-6, which is a criminal offense punishable by fine or imprisonment with increased penalties where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage [or] personal gain."

c. A knowing breach of Veradigm's fiduciary duties to Plaintiffs and the Class.

275. Veradigm accessed and obtained Plaintiffs' and Class Members' PHI for the purpose of committing the crimes and torts described herein. More specifically, Veradigm intercepted Plaintiffs' and Class Members' communications so it could share those communication with Google and other third parties in return for advertising and marketing benefits. This intended and intentional disclosure violated both federal and state laws as set out above. Veradigm would not have been able to obtain these advertising or marketing services if it had complied with those laws.

276. Veradigm acted without Plaintiffs' or Class Members' consent.

277. Veradigm acted without the consent of Plaintiffs' or Class Members' healthcare providers.

278. Although Plaintiffs and Class Members consented to Veradigm acquiring their PHI for purposes of providing medical care and access to their health records, Plaintiffs and Class Members did not consent to Veradigm acquiring their PHI for purposes of re-directing it to Google or exploiting it for marketing purposes.

279. As such, Defendant cannot viably claim any exception to ECPA liability.

280. As a direct and proximate result of Veradigm's violation of the ECPA, Plaintiffs and Class Members were damaged by Veradigm's conduct:

a. Veradigm harmed Plaintiffs' and Class Members' interest in privacy;

b. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is private no longer;

c. Plaintiffs and Class Members cannot remediate the privacy harms they have suffered without spending hundreds of dollars a year to pay for third-party services to scrub their PHI from data broker rolls;

d. Veradigm eroded the essential confidential nature of the provider-patient relationship;

e. Veradigm took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' authorization, informed consent, or knowledge, and without sharing the benefit;

f. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included their healthcare providers' duty to maintain confidentiality; and

g. Veradigm's actions diminished the value of Plaintiffs and Class Members' PHI.

281. In violating the ECPA, Veradigm's conduct was a knowing, conscious, and deliberate wrongdoing, and carried out with an evil or wrongful motive, an intent to injure Plaintiffs, and a recklessly negligent or callous indifference to Plaintiffs' and Class Members' protected rights under both state and federal law. Indeed, Veradigm not only intentionally harmed Plaintiffs and Class Members without just cause but also acted with a deliberate and flagrant disregard for their safety and privacy. Specifically:

a. Veradigm knew it had a duty to safeguard and keep confidential Plaintiffs' Class Members' PHI under HIPAA;

b. Veradigm knew that Plaintiffs and Class Members reasonably expected their communications with their healthcare providers to remain private;

c. Veradigm knew that Plaintiffs' and Class Members' communications involved private and sensitive matters concerning Plaintiffs' and Class Members' healthcare;

d. Veradigm knew it was prohibited by law from intercepting and disclosing Plaintiffs' and Class Members' communications;

e. Veradigm knew that Google used the patient data that it was receiving via Google Analytics for marketing purposes;

f. Veradigm knew that it was required to sign a business associate agreement with any tracking technology vendor with whom Veradigm was sharing patients' PHI;

g. Veradigm knew that its use of the tracking technology at issue violated its duties under HIPAA, as set forth in the December 2022 HHS Bulletin;

h. Veradigm nonetheless knowingly and deliberately intercepted and disclosed to third-party advertisers Plaintiffs' and Class Members' PHI without Plaintiffs' or and Class Members' consent, in a knowing violation of the ECPA;

i. Veradigm carried out its unlawful conduct with the wrongful and evil motive to appropriate Plaintiffs' and Class Members' private PHI at Plaintiffs' and Class Members' expense and for Veradigm's own financial gain; and

j. Veradigm's conduct was particularly egregious and reprehensible because it acquired Plaintiffs' and Class Members' PHI under the guise of offering healthcare services to Plaintiffs and Class Members.

282. The ECPA provides that persons whose electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119 may recover statutory damages of the greater of $100 a day for each day of violation or $10,000. 18 U.S.C. § 2520.

283. The harm being suffered by Plaintiffs and Class Members is ongoing because—as of the time of the filing of this complaint—Veradigm continues to deploy Firebase Analytics on the Mobile Application it offers the public.

284. Plaintiffs, individually, on behalf of the Class Members, seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

**COUNT II**

**Negligence**

285. Plaintiffs individually and on behalf of the Nationwide Class repeat and reallege the foregoing paragraphs as if fully alleged herein.

286. Under Illinois law, to state a negligence claim a plaintiff must plead that the defendant owed a duty of care to the plaintiff, that the defendant breached that duty, and that the breach was the proximate cause of the plaintiff's injuries." *Cowper v. Nyberg*, 28 N.E.3d 768, 772 (Ill. 2015).

287. Illinois law recognizes that companies like Veradigm who handle, collect, and otherwise manage non-public health information owe a duty to prevent the unauthorized disclosure of patients' health information. *Mayer v. Midwest Physician Admin. Servs., LLC*, No. 23-CV-3132, 2025 WL 963779, at *5 (N.D. Ill. Mar. 31, 2025)

288. It was foreseeable to Veradigm that deploying Google Analytics on its Patient Portals and Mobile Application would result in the patients' PHI being shared with Google. By deploying Google Analytics inside its Patient Portals, Veradigm acted with wanton and reckless disregard for the security and confidentiality of Plaintiff and the Class Members' PHI.

289. Veradigm also had a duty to notify Plaintiff and Class Members within a reasonable a reasonable time frame of any breach to the confidentiality and security of their PHI. This duty is required and necessary for Plaintiffs and Class Members to take appropriate measures to protect the confidentiality of their PHI and to mitigate the harm caused by Veradigm's conveyance of their PHI to Google.

290. Veradigm owed these duties to Plaintiffs and the Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Veradigm knew

or should have known would suffer injury-in-fact from Veradigm's deployment of Google Analytics inside its Patient Portals and Mobile Application.

291. The risk that Google would access, exploit, and misuse Plaintiffs' and Class Members' PHI was foreseeable. Given that Veradigm holds vast amounts of PHI, and that Google warns health care systems not to share health data with it via Google Analytics, Veradigm was on notice of the need to protect Plaintiffs' and Class Members' PHI from unauthorized disclosures via analytics technologies.

292. PHI is highly valuable, and Veradigm knew or should have known the risks in obtaining, storing, handling, transmitting, and using Plaintiffs' and Class Members' PHI, and the importance of exercising reasonable care in the handling and protection of Plaintiffs' and Class Members' PHI.

293. Veradigm breached its duty of reasonable care to Plaintiffs and Class Members in deploying Google Analytics on its Patient Portals and Mobile Application and by failing to supervise its employees, agents, contractors, and vendors in the acquisition, handling, and securing of the Plaintiffs' and Class Members' PHI. Veradigm further breached its duty of reasonable care to Plaintiffs and Class Members by sharing their PHI with Google, which actually and proximately caused injuries to Plaintiffs and the Class Members.

294. Veradigm also breached its duty of care by failing to provide reasonable and timely notice to Plaintiffs and the Class Members that their PHI had been shared with Google, which actually and proximately caused additional injuries to Plaintiffs and the Class Members.

295. As a direct and traceable result of Veradigm's negligence, Plaintiffs and Class Members have suffered damages, including monetary damages, increased risk of future harm, loss of privacy, and fear, anxiety, and worry about their loss of control over their PHI.

296. Veradigm's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiffs' and Class Members' actual, tangible, injury-in-fact and damages, including, without limitation, the improper disclosure of PHI, lost value of their PHI, and lost time and money incurred to mitigate this improper disclosure that resulted from and were caused by Veradigm's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

297. But for Veradigm's wrongful and negligent breach of its duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured. These injuries were the reasonably foreseeable result of Defendant's breach of its duties. Veradigm knew or should have know that it was failing to meet its duties and that its breach would cause Plaintiff and Class Members to suffer the foreseeable harm associated with the exposure of their PHI.

298. A data broker is a company that collects personal information from various sources, including online activities, and sells it to other businesses. These businesses then use this information for marketing, risk assessment, insurance pricing, and other purposes. Data brokers often operate effectively anonymously because they do not have direct contact with consumers. As a result, the vast majority of consumers are not even aware that their personal data is being sold and re-sold.

299. As a consequence of Defendant's negligence, Plaintiffs and Class Members have been harmed by losing control over their own PHI, which has now been shared with Google, with advertisers, and with online data brokers who buy, sell, and resell this information. The only way for Plaintiffs and Class Members to claw back the privacy of their PHI is to pay a data broker opt service to go out into the marketplace and remove their PHI from data broker rolls. Such data broker opt out services are offered by a variety of companies including DeleteMe, CyEx, and

Optery for prices that range from $100 to $300 a year. Without hiring one of these data broker opt out services, however, Plaintiffs and Class Members have no way of recovering their privacy because Veradigm itself has no control over their PHI once Veradigm shared that data with Google.

300. Had Plaintiffs and Class Members known that Veradigm would not adequately protect their PHI, Plaintiffs and Class Members would not have entrusted Defendant with their PHI.

301. Plaintiffs and Class members had a legitimate and reasonable expectation of privacy with respect to their PHI and were accordingly entitled to protection of this PHI against the acquisition and disclosure of their PHI by unreasonable means.

302. Veradigm had notice and knew that its deployment of third-party cookies on its Patient Portals, where Plaintiffs and Class Members shared their PHI, would cause injury to Plaintiffs and Class Members. Veradigm, like other healthcare providers, had notice from Google that it was improper to deploy Google Analytics inside a password protected patient portal but did so anyway because it valued profits more than patients' privacy. Veradigm's conduct is reprehensible because it deployed Google Analytics technology knowing that this technology would share patient data with Google from inside the password-protected Patient Portal and Mobile Application, but nevertheless did it anyway—regardless of the consequences for the thousands of patients who trusted Veradigm to safeguard their most sensitive health information.

303. As a proximate result of Veradigm's acts and omissions, Plaintiffs' and Class Members' PHI was subject to intrusion, causing Plaintiffs and Class Members to suffer injury, including, at minimum, the following damages:

*a.* General damages for invasion of their privacy rights in an amount to be determined by a jury without reference to specific pecuniary harm;

*b.* Plaintiffs and Class Members cannot remediate the privacy harms they have suffered without spending hundreds of dollars a year to pay for third-party services to scrub their PHI from data broker rolls;

*c.* Sensitive and confidential information including patient status and appointments that Plaintiffs and Class Members intended to remain private is no longer private;

*d.* Veradigm eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

*e.* Veradigm took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit; and

304. The harm being suffered by Plaintiffs and Class Members is ongoing because—as of the time of the filing of this complaint—Veradigm continues to deploy Firebase Analytics on the Mobile Application it offers the public.

305. Plaintiffs and Class Members have no adequate remedy at law for the injuries that they have suffered (and will continue to suffer) because of Veradigm's wrongful practices in that a judgment for money damages will not end the invasion of privacy for Plaintiffs and Class Members. Accordingly, Plaintiffs and Class Members seek such injunctive relief as the Court deems legal, equitable, and proper.

## COUNT III

**Violation of the California Invasion of Privacy Act ("CIPA")**
**Cal. Penal Code §§ 631, 632, 632.01, 632.7, and 638.51**
**(on behalf of Plaintiffs Jennifer Doe and Jessica Doe and the California Subclass)**

306. Plaintiffs repeat and reallege the foregoing paragraphs as if fully alleged herein.

307. Plaintiffs Jennifer Doe and Jessica bring this claim on behalf of themselves and all members of the California Subclass.

308. The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.* ("CIPA") finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id.* § 630. Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state." *Id.*

309. Cal. Penal Code § 631(a) generally prohibits individuals, businesses, and other legal entities from "aid[ing], agree[ing] with, employ[ing], or conspir[ing] with" a third party to read, attempt to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or to use, or attempt to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained.

310. Cal. Penal Code § 632(a) generally prohibits individuals, businesses, and other legal entities from recording confidential communications without consent of all parties to the communication.

311. Cal. Penal Code § 632.01 further provides enhanced penalties for the disclosure of the contents of a confidential communication with a health care provider in violation of § 632.

312. Cal. Penal Code § 632.7 also prohibits individuals, businesses, and other legal entities from recording confidential communications transmitted by cellular radio telephone without consent of all parties to the communication.

313. Likewise, Cal. Penal Code § 638.51 prohibits persons from installing or using a pen register or a trap and trace device without first obtaining a court order.

314. All alleged communications between Plaintiffs or Class Members and Defendant qualify as protected communications under CIPA because each communication is made using personal computing devices or cellular radio telephones (*e.g.*, computers, smartphones, tablets) that send and receive communications in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.

315. As described above, Defendant covertly embedded recording devices in its Patient Portals and Mobile Application to intercept, record, and eavesdrop upon, and to assist third parties to intercept, record, and eavesdrop upon, Plaintiffs' and Class Members' confidential communications while those communications were in transit and without the consent of Plaintiffs or Class Members.

316. Defendant intercepted and eavesdropped on the confidential communications of Plaintiffs or Class Members, and assisted, aided, and abetted third parties like Google and Facebook in doing the same, while the communications were in transit between Plaintiffs and Class Members, on the one hand, and their medical providers, on the other.

317. At all relevant times, Defendant's aiding Facebook and Google to learn the contents of communications and Defendant's recording of confidential communications was without authorization and consent.

318. The Plaintiffs and Class Members had a reasonable expectation of privacy regarding the confidentiality of their communications with Defendant. Defendant told them it would not sell, rent, license, or trade their personally identifiable information to third parties without express consent. Defendant never received that express consent. Nor could Defendant

have received consent from Plaintiffs and Class Members because Defendant never sought to, or did, obtain Plaintiffs' and Class Members' consent to transmit their PHI to Facebook or Google.

319. Defendant engaged in and continues to engage in interception by aiding others (including Facebook and Google) to secretly record the contents of Plaintiffs' and Class Members' wire communications.

320. The intercepting devices used in this case include, but are not limited to:

a. Plaintiffs and Class Members' personal computing devices;

b. Plaintiffs and Class Members' web browsers;

c. Plaintiffs and Class Members' browser-managed files;

d. Facebook's Meta Pixel;

e. The Google Analytics Pixel

f. Google Firebase Code

g. Internet cookies;

h. Defendant's computer servers;

i. Third-party source code utilized by Defendant; and

j. Computer servers of third parties (including Facebook and Google) to which Plaintiffs and Class Members' communications were disclosed.

321. Defendant aided in, and continues to aid in, the interception of contents in that the data from the communications between Plaintiffs and/or Class Members and Defendant that were redirected to and recorded by the third parties include information which identifies the parties to each communication, their existence, and their contents.

322. Defendant aided in the interception of "contents" in at least the following forms:

a. The parties to the communications;

b. The precise text of patient search queries;

c. Personally identifying information such as patients' IP addresses, Facebook IDs, browser fingerprints, and other unique identifiers;

d. The precise text of patient communications about specific doctors;

e. The precise text of patient communications about specific medical conditions;

f. The precise text of patient communications about specific treatments;

g. The precise text of patient communications about scheduling appointments with medical providers;

h. The precise text of patient communications about billing and payment;

i. The precise text of specific buttons on Defendant's Patient Portals and Mobile Application that patients click to exchange communications, including Log-Ins, Registrations, Requests for Appointments, Search, and other buttons;

j. The precise dates and times when patients click to Log-In on Defendant's Patient Portals and Mobile Application;

k. The precise dates and times when patients visit Defendant's Patient Portals and Mobile Application;

l. Information that is a general summary or informs third parties of the general subject of communications that Defendant send back to patients in response to search queries and requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

m. Any other content that Defendant has aided third parties in scraping from Patient Portals and Mobile Application or communication forms at its Patient Portals and Mobile Application.

323. Plaintiffs and Class Members reasonably expected that their PHI was not being intercepted, recorded, and disclosed to Facebook or Google.

324. No legitimate purpose was served by Defendant's willful and intentional disclosure of Plaintiffs' and Class Members' PHI to Facebook and Google. Neither Plaintiffs nor Class Members consented to the disclosure of their PHI by Defendant to Facebook or Google. Nor could they have consented, given that Defendant never sought Plaintiffs' or Class Members' consent, or even told visitors to its website that their every interaction was being recorded and transmitted to Facebook and Google via the Tracking Technologies.

325. Defendant gave substantial assistance to Facebook and Google in violating the privacy rights of Defendant's patients, despite the fact that Defendant's conduct constituted a breach of the duties of confidentiality that medical providers owe their patients. Defendant knew that the installation of the Tracking Technologies on its Patient Portals and Mobile Application would result in the unauthorized disclosure of its patients' communications to Facebook and Google, yet nevertheless did so anyway.

326. Plaintiffs' and Class Members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or wrongful purpose of monetizing their PHI, including using their sensitive medical information to develop marketing and advertising strategies.

327. Veradigm installed and used pen registers and/or trap and trace devices on its websites, patient portals, and mobile applications without a court order in violation of Cal. Penal

Code § 638.51. Specifically, Veradigm deployed Google Analytics on its Patient Portals and Google Firebase Code on its Mobile Application, which recorded and captured Plaintiffs' and Class Members' IP addresses, first and third-party cookie data, and device and browser configuration, including geo-location information, when Plaintiffs and Class Members used Veradigm's Patient Portals and Mobile Application.

328. Plaintiffs and Class Members did not consent to Veradigm's deployment or use of pen registers, including Google Analytics and Google Firebase Code on Veradigm's Patient Portals and Mobile Application.

329. Plaintiffs and the Class Members seek statutory damages in accordance with § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the Class in an amount to be proven at trial, as well as injunctive or other equitable relief.

330. Pursuant to California law, Plaintiffs and Class Members are entitled to statutory damages for each instance in which Defendant intercepted and aided in the interception of Plaintiffs' and Class Members' confidential communications with their healthcare providers. *In re Stephenson*, 41 F. App'x 936, 937 (9th Cir. 2002).

331. In addition to statutory damages, Defendant's breach caused Plaintiffs and Class Members, at minimum, the following damages:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Plaintiffs and Class Members cannot remediate the privacy harms they have suffered without spending hundreds of dollars a year to pay for third-party services to scrub their PHI from data broker rolls;

c. Defendant eroded the essential confidential nature of the doctor-patient relationship;

d. Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without sharing the benefit of such value;

e. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality; and

f. Defendant's actions diminished the value of Plaintiffs and Class Members' PHI.

332. Plaintiffs and Class Members have also suffered irreparable injury from Defendant's unauthorized acts of disclosure. Their personal, private, and sensitive data has been collected, viewed, accessed, stored, and used by Defendant and Facebook and Google without their consent and has not been destroyed. Plaintiffs and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights. Plaintiffs continue to desire to search for health information on Veradigm's Patient Portals and Mobile Application. Plaintiffs will continue to suffer harm if the Patient Portals and Mobile Application are not redesigned. If the Patient Portals and Mobile Application were redesigned to comply with applicable laws, Plaintiffs would use Veradigm's Patient Portals and Mobile Application to search for health information and review their medical records in the future. Due to the continuing threat of injury, Plaintiffs and Class Members have no adequate remedy at law, and Plaintiffs and Class Members are therefore entitled to injunctive relief.

333. Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

## DEMAND FOR JURY TRIAL

334. Plaintiffs hereby demand a trial by jury on all issues so triable.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other Class Members, respectfully requests relief against Veradigm as set forth below:

a. Certifying the Class and appointing Plaintiffs as the Class's representatives;

b. Finding that Veradigm's conduct as alleged herein was unlawful;

c. Awarding such injunctive and other equitable relief as the Court deems just and proper, including, but not limited to, enjoining Veradigm from making any further disclosure of Plaintiff or Class Members' communications to third parties without the Plaintiff or Class Members' express, informed, and written consent; requiring Veradigm to implement adequate procedures for ensuring the confidentiality of patients' PHI; mandating that Veradigm hire third-party monitors for a period of at least three years to ensure that the these steps have been taken; and mandating that Veradigm provide written verifications on a quarterly basis to the court and counsel for Plaintiffs and Class Members in the form of a declaration under oath that the above steps.

d. Awarding statutory damages of $5,000 per violation for Veradigm's violation of the Electronic Communications Privacy Act;

e. Imposing a constructive trust against Defendants through which Plaintiffs and Class Members can be compensated for any unjust enrichment gained by Defendants;

f. Awarding Plaintiffs and Class Members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

g. Awarding Plaintiffs and Class Members pre-judgment and post-judgment interest as provided by law;

h. Awarding Plaintiffs and Class Members reasonable attorney's fees, costs, and expenses;

i. Awarding costs of suit; and

j. Such other and further relief to which Plaintiffs and Class Members may be entitled.

Dated: January 9, 2026

Respectfully submitted,

By: /s/ Samuel J. Strauss
Samuel J. Strauss
Raina C. Borrelli
**STRAUSS BORRELLI PLLC**
One Magnificent Mile
980 N. Michigan Ave., Suite 1610
Chicago, IL 60611
Telephone: (872) 263-110
Facsimile: (608) 509-4423
sam@straussborrelli.com
raina@straussborrelli.com

Foster C. Johnson*
Joseph Ahmad*
**AHMAD, ZAVITSANOS, & MENSING, PLLC**
1221 McKinney, Suite 2500
Houston, Texas 77010
Telephone: (713) 655-1101
Facsimile: (713) 655-0062

*Counsel for Plaintiffs, individually and on behalf of all others similarly situated*

** Pro Hac Vice Pending*

**CERTIFICATE OF SERVICE**

I, Samuel J. Strauss, hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record via the ECF system.

DATED this 9th day of January, 2026.

STRAUSS BORRELLI PLLC

By: */s/ Samuel J. Strauss*

Samuel J. Strauss
STRAUSS BORRELLI PLLC
One Magnificent Mile
980 N. Michigan Ave., Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
sam@straussborrelli.com