**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**AT CHICAGO**

**JANE DOE, JANET DOE, JENNIFER DOE,** and **JESSICA DOE**, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

**VERADIGM, INC.** d/b/a **ALLSCRIPTS,** and **VERADIGM LLC**,

Defendants.

No. 1:25-cv-10147

Honorable Mary M. Rowland

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page(s)**


INTRODUCTION ........ 1

BACKGROUND ........ 3

a. Veradigm collects patient data under a duty to protect it ........ 3

b. Veradigm violates its duties to Plaintiffs and the class........ 5

LEGAL STANDARD........ 7

ARGUMENT........ 8

a. Veradigm shared Plaintiffs' protected health data with Google........ 8

b. Veradigm violated the Federal Wiretap Act........ 10

i. Veradigm disclosed Plaintiffs' PHI with an "improper purpose" ........ 10

ii. Veradigm intercepted "contents"........ 13

c. Veradigm violated California's Wiretap Act........ 14

i. Veradigm violated CIPA § 631(a)........ 15

ii. Veradigm violated CIPA § 632(a)........ 17

iii. Veradigm violated CIPA § 638.51........ 18

d. Veradigm's disclosures harmed Plaintiffs, entitling them to tort damages ........ 19

CONCLUSION........ 20

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*A.D. v. Aspen Dental Mgmt., Inc.*,
2024 U.S. Dist. LEXIS 161090 (N.D. Ill. Sept. 9, 2024) .................... 11, 15

*Berry v. City of Chicago*
2021 IL App (1st) 200179, 181 N.E.3d 679 .................... 19, 20

*Berthold Types Ltd. v. Adobe Sys.*,
242 F.3d 772 (7th Cir. 2001) .................... 5

*Bissessur v. Ind. Univ. Bd. of Trs.*,
581 F.3d 599 (7th Cir. 2009) .................... 7

*C. M. v. MarinHealth Med. Grp., Inc.*,
2024 WL 217841 (N.D. Cal. Jan. 19, 2024) .................... 11

*Castillo v. Costco Wholesale Corp.*,
2024 U.S. Dist. WL 4785136 (W.D. Wash. Nov. 14, 2024) .................... 11, 12

*Cooper v. Mount Sinai Health Sys., Inc.*,
742 F. Supp. 3d 369 (S.D.N.Y. 2024) .................... 11

*Cousin v. Sharp Healthcare*,
2023 WL 8007350 (S.D. Cal. Nov. 17, 2023) .................... 11

*Doe v. Bayhealth Med. Ctr., Inc.*,
2025 WL 1010403 (Del. Super. Ct. Apr. 4, 2025) .................... 11

*Doe v. Bon Secours Mercy Health*,
2021 WL 9939010 (Ohio Com. Pl. Nov. 22, 2021) .................... 11

*Doe v. Boone Health, Inc.*,
2023 WL 4996117 (Mo. Cir. July 20, 2023) .................... 11

*Doe v. Boston Medical Ctr. Corp.*,
2023 WL 7105628 (Mass. Super. Sep. 14, 2023) .................... 11

*Doe v. Davita Inc.*,
2024 U.S. Dist. LEXIS 74958 (S.D. Cal. Apr. 24, 2024) .................... 10

*Doe v. Eating Recovery Ctr.*
806 F. Supp. 3d 1109 (N.D. Cal. 2025). .................... 16

*Doe v. Hoag Mem'l Presbyterian Hosp.*,
2024 WL 1190907 (Cal. Super. Feb. 16, 2024) ........ 11

*Doe v. Meta Platforms, Inc.*,
2023 WL 5837443 (N.D. Cal. Sept. 8, 2023) ........ 13

*Doe v. Post Acute Med., LLC*,
2025 WL 511069 (M.D. Pa. Feb. 14, 2025) ........ 11

*Doe v. Tenet Healthcare Corp.*,
731 F. Supp. 3d 142 (D. Mass. 2024) ........ 11, 15, 16

*Doe v. Garnet Health*,
2024 WL 4203263 (S.D.N.Y. Sept. 16, 2024) ........ 13

*Gilligan v. Experian Data Corp.*,
2026 LEXIS 75435 (N.D. Cal. Jan. 6, 2026) ........ 14

*Hannant v. Sarah D. Culbertson Mem'l Hosp.*,
2025 U.S. Dist. LEXIS 161412 (C.D. Ill. Aug. 20, 2025) ........ 9

*Harris v. iHeartMedia, Inc.,*
2026 U.S. Dist. LEXIS 23256 (N.D. Cal. Jan. 29, 2026) ........ 18

*Hartley v. Univ. of Chi. Med. Ctr.*,
U.S. Dist. 2025 LEXIS 424088 (N.D. Ill. Oct. 1, 2025) ........ *passim*

*Hazel v. Prudential Fin., Inc.*,
2023 U.S. Dist. WL 3933073 (N.D. Cal. June 9, 2023) ........ 16

*In re Gallagher*,
631 F. Supp. 3d 573 (N.D. Ill. 2022) ........ 19

*In re Meta Pixel Healthcare Litig.*,
647 F. Supp. 3d 778 (N.D. Cal. 2022) ........ 14, 15, 18

*Jarrell v. Adena Health Sys.*,
2025 U.S. Dist. WL 81305 (S.D. Ohio Jan. 13, 2025) ........ 13

*Kane v. Univ. of Rochester*,
2024 WL 1178340 (W.D.N.Y. Mar. 19, 2024) ........ 11

*Kurowski v. Rush Sys. for Health*,
2024 U.S. Dist. LEXIS 126837 (N.D. Ill. July 18, 2024) ........ 7, 9, 11, 12

*Lugo v. Inova Health Care Servs.*,
2025 WL 905191 (E.D. Va. Mar. 25, 2025) ..................... 11

*Mekhail v. N. Mem'l Health Care*,
726 F. Supp. 3d 916 (D. Minn. 2024) ..................... 11

*Mekhail*,
726 F.Supp.3d 916 (D. Minn. Mar. 28, 2024) ..................... 12

*M.G. v. Therapymatch*, Inc.,
2024 U.S. Dist. LEXIS 166534 (N.D. Cal. Sept. 16, 2024) ..................... 16

*M.R. v. Salem Health Hosps. & Clinics*,
2024 WL 3970796 (D. Or. Aug. 28, 2024) ..................... 11

*Moorman Mfg. Co. v. Nat'l Tank Co.,*
435 F.2d 123 (7th Cir. 1982) ..................... 19

*Murphy v. Thomas Jefferson Univ. Hosps., Inc.*,
2024 WL 4350328 (E.D. Pa. Sept. 30, 2024); ..................... 11

*Nguyen v. Abbott Lab'ys, Inc.*,
2025 U.S. Dist. LEXIS 153248 (N.D. Ill. Aug. 8, 2025) ..................... 10

*Nienaber v. Overlake Hosp. Med. Ctr.*,
733 F. Supp. 3d 1072 (W.D. Wash. 2024) ..................... 10

*Olson v. Ferrara Candy Co.*,
2025 IL App (1st) 241126 ..................... 19

*R.S. v. Prime Healthcare Servs., Inc.*,
2025 U.S. Dist. WL 103488 (C.D. Cal. Jan. 13, 2025) ..................... 11, 12, 13

*Riganian v. LiveRamp Holdings, Inc.*,
791 F. Supp. 3d 1075 (N.D. Cal. 2025) ..................... 12, 16

*Rodriguez v. ByteDance, Inc.*
2025 U.S. Dist. LEXIS 168885 (N.D. Ill. Aug. 29, 2025) ..................... 17

*Roper v. Rise Interactive Media & Analytics, LLC*,
2024 U.S. Dist. WL 1556298 (N.D. Ill. Apr. 10, 2024) ..................... 19

*SEC v. Lipson*,
278 F.3d 656 (7th Cir. 2002) ..................... 12

*Smith v. Loyola Univ. Med. Ctr.*,
2024 U.S. Dist. LEXIS 119995 (N.D. Ill. July 9, 2024) .................................................. 11, 19

*St. Aubin v. Carbon Health Techs., Inc.*,
2024 U.S. Dist. WL 4369675 (N.D. Cal. Oct. 1, 2024) ........................................................ 16

*Stein v. Edward-Elmhurst Health*,
2025 WL 580556 (N.D. Ill. Feb. 21, 2025) .......................................................................... 11

*Strong v. LifeStance Health Grp. Inc.*,
2025 WL 317552 (D. Ariz. Jan. 28, 2025) ........................................................................... 11

*Sussman v. Am. Broad. Companies, Inc.*,
186 F.3d 1200 (9th Cir. 1999) ............................................................................................. 12

*Yockey v. Salesforce,*
2023 WL 5519323 (N.D. Cal. Aug. 25, 2023) ...................................................................... 14

*Yoon v. Meta Platforms, Inc.*,
2024 U.S. Dist. WL 5264041 (N.D. Cal. Dec. 30, 2024) .................................................. 13, 14

**Regulations**

45 C.F.R. § 160.103 ................................................................................................................. 3

**Statutes**

Wis. Statute § 968.27(3) ........................................................................................................ 13
18 U.S.C. § 2510(8) ............................................................................................................... 13
CIPA § 631(a) ........................................................................................................................ 14
CIPA § 632(a) .................................................................................................................... 17, 18
CIPA § 638.50(b) ................................................................................................................... 18

# INTRODUCTION

In 2026, privacy is an endangered species. Especially online, as companies creep further into people's lives, seeking to track and monetize their every act and behavior. Hardly anyone can avoid it. Clicking a link on a product on one page will cause that product to follow the person across the internet, their devices, and apps. But as companies spread their webs across people's digital lives, they start crossing lines. One line is medical privacy, a bastion in which people expect confidentiality because that is what the law requires. And this case is about how Veradigm invaded that bastion without consent, violating state and federal law across the country.

Veradigm had no right to do what it did and every obligation to avoid doing it. As an "electronic health records" company, Veradigm provides and supports the EHR systems to over 1,000 hospitals through its "FollowMyHealth" portal platforms. Veradigm has never denied its duty to safeguard the patient records stored in its platforms; nor could it, state and federal law mandate patient privacy as an obligation. And that obligation covers paper records and information just as it does the digital information collected on FMH, whether that is an IP address, device identifier, Web URL, or any "other characteristic that could uniquely identify [an] individual[.]" Yet Veradigm has violated this duty *en masse* without telling patients, sending that very data to Google without their knowledge or consent.

For years, Veradigm has embedded FMH with Google's tracking technologies across its patient portals. And because Veradigm never told them, patients like Plaintiffs had no idea Veradigm was giving Google all the data needed to identify *who* they were and *what* they were doing on FMH. Every time Jane Doe accessed her breast cancer treatment records using FMH, Google knew. Every time Janet Doe scheduled an appointment to treat her ongoing heart issues, Google knew. Google knew who they were and what they were doing. And this misconduct not

only violated state and federal law; it violated Veradigm's agreement with Google, as even Google recognized its trackers belonged nowhere near authenticated portals: "Authenticated pages are likely to be HIPAA-covered and customers should not set Google Analytics [on them]." Yet Veradigm did it anyway because it allowed Veradigm to measure its portal "analytics" for "free." But "free" is never free in the digital marketplace, and Veradigm paid for it with patient data.

Veradigm's motion to dismiss does not deny these facts so much as it ignores them. It says Plaintiffs failed to identify the data Veradigm disclosed, yet it ignores the paragraphs itemizing those disclosures. Plaintiffs explain Veradigm disclosed their "patient status[es]," "messages sent to [their] doctors," and the "precise days and times" they logged into Veradigm's portals. In other words, it was as if Veradigm printed out its portal user list and mailed it to Google, along with data showing when and why patients were accessing the portals.

Veradigm also cannot avoid liability by comparing its misconduct to cases considering pixel tracking on "public" webpages. This case is not about browsing "publicly available" webpages like Veradigm suggests. It is about tracking on Veradigm's authenticated, password-protected, *patient portals*. That fact separates this case from every case Veradigm cites, and matches the facts at issue in the cases Veradigm avoids, including this Court's decision in *Hartley v. Univ. of Chi. Med. Ctr.*, U.S. Dist. 2025 LEXIS 424088, at *20 (N.D. Ill. Oct. 1, 2025). There, as here, plaintiff alleged defendant installed tracking technology on its patient portal. *Id*. And here, like there, the Court should find Plaintiffs have stated claims under each theory asserted.

As a result, the Court should deny Veradigm's motion for three reasons. ***First***, Plaintiffs meet their pleading burden in alleging Veradigm disclosed their protected health data. ***Second***, those disclosures violated state and federal wiretap acts. And ***third***, those disclosures harmed Plaintiffs, entitling them to damages under their tort claim.

## BACKGROUND

### a. Veradigm collects patient data under a duty to protect it

Veradigm is "one of the largest providers of healthcare information technology services in the United States, providing patient portal access to millions of patients." Doc. 40 (Second Amended Complaint "SAC") ¶ 2. Across the country, patients like Plaintiffs use Veradigm's portals to view "medical records, schedul[e] appointments, and messag[e] members of their care team." *Id*. Veradigm provides these functionalities under the "FollowMyHealth" branding on two platforms: a web portal and a mobile application. *Id*. ¶¶ 1, 22–26. Hospitals use the FMH platforms to provide patients access to their records, including sprawling hospital systems like "Kaiser Permanente, Northwell Health, Excela Health, Blessing Health, and Atlantic General Hospital." *Id*. ¶ 26. In total, over 1,000 hospital systems and their patients use FMH to access records. *Id*.

Because Veradigm maintains patient data, it accepts the duty to maintain patient confidentiality as a "business associate" under HIPAA, which means it must safeguard all "protected health information" under its possession, defined as all "individually identifiable health information" relating to a patient's treatment with a healthcare provider. *Id*. ¶ 3; *See* 45 C.F.R. § 160.103. In other words, Veradigm cannot share patient records without patient consent. *Id*. ¶ 215.

The government has affirmed the rule protects digitized records just as it does paper records, as makes sense in a digitized world. *Id*. ¶ 216. The rule thus requires entities like Veradigm to "de-identify" digital identifiers connected to patients and their devices. *See* 45 C.F.R. § 160.103. Identifiers include "IP addresses," "device identifiers," and "[a]ny other unique identifying number[], characteristic[], or code[.]" *Id*. ¶ 224; *See* 45 C.F.R. § 160.103. If companies like Veradigm transfer this data without consent, they must ensure the data cannot be used by an "anticipated recipient"—like Google—to identify the patient. *Id*. Put another way, HIPAA requires

Veradigm to ensure it is either de-identifying data sent to third parties, or that those third parties cannot use the data to identify patients. As explained below, Veradigm did neither.

In 2022 and 2024, Health and Human Services clarified these rules prohibit healthcare companies from embedding patient portals with tracking technologies like Google Analytics because "Tracking technologies on a regulated entity's user-authenticated webpages generally have access to PHI." *Id.* ¶ 231. And once that happens, third parties may learn about a person's "diagnosis and treatment information, prescription information, billing information[.]" *Id.*

Google echoes this mandate in its terms governing its analytics code, warning customers like Veradigm *not* to install the technology on patient portals: "Customers must refrain from using [analytics code] in any way that may create obligations under HIPAA[,]" adding "Authenticated pages are likely to be HIPAA-covered and customers should not set Google Analytics tags on those pages." *Id.* ¶ 7. This is because Google knows better than anyone what data its analytics code collects—data revealing *who* is accessing the page and *what* they are accessing. *Id.* ¶¶ 34–36, 53–60. That includes IP addresses, cookie identifiers "unique" to the patient, device identifiers, and "browser fingerprints" that allow Google to identify users with fingerprint-like accuracy. *Id.* Along with knowing who they are, Google identifies what they are doing through "full-string, detailed URLs" and page views detailing what the user is accessing. *Id.*

Even Veradigm's policies recognize the risk in disclosing patient data to Google. Although it exists outside Plaintiffs' complaint, Veradigm cites its privacy policy in its motion, and the policy reveals it *enhances* Plaintiffs' patient privacy rights. Veradigm promises to "de-identify" data as HIPAA requires and only share "Aggregate Data" that does not identify patients. Def.'s Mot. p. 3, n. 2. Indeed, Veradigm promises it will only share "identifiable" data with consent or with a third party who promises to maintain confidentiality, while assuring it will never sell their

identifiable data. *Id*. n. 3. Nowhere in those policies does Veradigm forewarn it will deploy Google analytics codes on its portals, claim patients consent to do so, or commit to de-identifying data before sending it to Google. *Id*. Quite the opposite, Veradigm says nothing at all about Google analytics code or that it shared "identifiable" data using it. *Id*. As a result, while Plaintiffs object to the Court considering the policies—because they are "materials outside the complaint"—they reinforce Plaintiffs' arguments in any event.[1]

**b. Veradigm violates its duties to Plaintiffs and the class**

For years, Veradigm has embedded Google analytics technologies on its patient portal platforms without telling patients, including Plaintiffs. SAC ¶¶ 32–36, 53–55. It did so in two ways, installing Google's tracking code on its web-based portal and its mobile app, to ensure it was tracking patients across all platforms. *Id*. ¶¶ 44–60. Both tracking technologies were for analytics purposes, with Veradigm using Google Analytics on its web platform (*id*. ¶¶ 44–55) and Google Firebase on its mobile app (*id*. ¶¶ 56–60). Both captured identifiers like IP addresses, advertiser IDs, device properties, device information, URLs, and cookies. *Id*. ¶¶ 44–60. They also captured the content showing what patients are doing on those platforms, through "full-string" URLs that disclose the patient's queries and actions on the web, and page views and "app events" on Veradigm's app. *Id*. Worse, patients could not avoid these disclosures because they could not change Veradigm's source code themselves or prevent it from capturing information through identifiers like cookies, as "Veradigm *requires* patients to have first-party cookies enabled to access its Patient Portals." *Id*. ¶ 48 (emphasis in original).

[1] Plaintiffs object to the Court considering matters "materials outside the complaint." *Berthold Types Ltd. v. Adobe Sys.*, 242 F.3d 772, 776 (7th Cir. 2001). The problem with Veradigm's policies is not what they say, but that Veradigm has not shown those policies applied throughout the class period. Def.'s Mot. p. 3, n. 2–3. But either way, the policies favor Plaintiffs' position, not Veradigm's, so the result should be the same in any event.

In other words, Plaintiffs had no reason to suspect Veradigm was tracking them in this way, and no way to prevent it even if they did. Again, while Veradigm cites its privacy policy in its motion to excuse these disclosures, the policy does Veradigm no favors. Nowhere does Veradigm's policy disclose Veradigm uses Google tracking technologies. Def.'s Mot. p. 3, n. 2–3. Quite the opposite, the policy bolsters Plaintiffs' privacy rights under HIPAA, detailing how Veradigm will protect Plaintiffs' data while promising not to disclose it without permission. *Id*. Indeed, each policy under HIPAA, Google's terms, and Veradigm's terms prohibited Veradigm from doing what it did, and Veradigm did it anyway. And it did so for profit while knowing it was violating HIPAA. *Id*. ¶ 162. As Plaintiffs allege, "Veradigm intentionally deployed Google Analytics inside its Patient Portals… in return for access to free marketing tools and aggregated data about how individuals interacted with its Patient Portals[.]" *Id*.

As a result, each time Plaintiffs visited Veradigm's portals, either by web or app, Google knew. Google knew who they were and what they were doing. That is what Google analytics technologies are designed to do, and the pleadings allege that is what it did. SAC ¶¶ 32–40, 53–55; 150–160. Plaintiffs confirm they are all portal users, and they all used the portals during the class periods, including through today. *Id*. And Google's analytics trackers fired each time Plaintiffs visited the portals by web and app, disclosing HIPAA-protected identifiers and "content" revealing what they were doing. *Id*. ¶¶ 109–147; 150–160. That includes IP addresses, "unique" cookies assigned to patients, Advertising IDs (connected to patients by name), and browser fingerprints. *Id*.

Plaintiffs personalize these allegations, explaining what PHI Veradigm disclosed about each Plaintiff. Jane Doe alleges she used Veradigm's FMH app to "review test results, review doctor's notes, and search for treatment information in connection with her ongoing breast cancer

treatment." *Id*. ¶ 150. Google knew who she was and when she was visiting those pages within the app, along with the "precise days and times" that she visited them. *Id*. ¶ 151. So too for Janet Doe, who used Veradigm's web and app portals to "review blood work results related to her treatment for a blood clot in her heart and lung, and treatment for a collapsed lung." *Id*. ¶ 153. And here again, Google knew, because that is what Google's analytics code is designed to do. *Id*. ¶ 154. The allegations continue in the same fashion for Jennifer and Jessica Does, who both detail what conditions they treated for, how they used the portals to facilitate that treatment, and how Google knew each time they did. *Id*. ¶¶ 154–159.

Thus, Plaintiffs allege Google used the information to identify them and determine what they were doing *as patients* within Veradigm's portals. Again, because that is what Google *designed* its software to do—identify people and what they are doing online. *Id*. ¶ 81 (Analytics is "explicitly designed to track individuals across different devices and apps"). And as explained below, that violated every policy and law at issue.

## LEGAL STANDARD

A Rule 12(b)(6) motion requires the Court to "accept as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor." *Kurowski v. Rush Sys. for Health*, No. 22 C 5380, 2024 U.S. Dist. LEXIS 126837, at *3 (N.D. Ill. July 18, 2024). To survive the motion, plaintiffs need only allege "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 602 (7th Cir. 2009). And that standard requires only plausibility, not certainty. *Id*.

## ARGUMENT

### a. Veradigm shared Plaintiffs' protected health data with Google

Google's analytics trackers worked as designed when deployed on Veradigm's FHM platforms for hospitals across the country, capturing and disclosing data identifying who they were and what they were doing from the moment they logged in to Veradigm's portals. Calling those allegations "vague" does not make them so, and Veradigm cannot avoid each Plaintiff "plausibly" pleads Veradigm disclosed their PHI. *See* Def.'s Mot. p. 12.

There is nothing mystifying about Plaintiffs' allegations. They allege Veradigm deployed Google's tracking technologies on its portals (*See* SAC ¶¶ 29–35), Plaintiffs used the portals (*id.* ¶¶ 150–160), disclosed information about their conditions on those portals (*id.*), and Veradigm captured their identifiers, URLs, and page views revealing what they were doing (*id.* ¶¶ 44–65; 150–160). In fact, Plaintiffs specified what information *about them* was disclosed to Google: data related to their surgeries (*id.* ¶ 155), blood clot issues (*id.* ¶ 153), breast cancer treatments (*id.* ¶ 150), and a collapsed lung (*id.* ¶ 153). And they explain how Google's trackers captured Plaintiffs' identifiers at the same time (IP addresses, cookies, advertising identifiers, device identifiers, browser fingerprints) along with content describing their portal actions (through page views and URLs). *Id.* ¶¶ 44–60.

Altogether, this data established who Plaintiffs were and what they were doing within the portal. This is not to mention that Google knew each time Plaintiffs messaged their providers, checked test results, and scheduled appointments. SAC ¶¶ 150–160. Each time they logged in and took those actions, Veradigm's trackers "intercepted patients' communications for the purpose of redirecting Plaintiffs' and Class Members' PHI to Google[.]" *Id.* ¶ 53. Altogether, Plaintiffs detail how that transfer worked after Veradigm installed Google's analytics trackers on its web and app

portal source codes. *Id*. ¶¶ 52–64. Thus, contrary to Veradigm's view, this explains "how the disclosure happened," and how "their PHI was allegedly shared[.]" Def.'s Mot. p. 11 (emphasis added).

Every court considering allegations like these has found they suffice to establish a violation at the pleading stage. Consider this Court's decision in *Hartley*, 2025 LEXIS 424088, at *6. There, this Court held plaintiff had "plausibly" stated claims by alleging the "specific" actions plaintiff took while using the University of Chicago Medical Center's bugged website. *Id*. Likewise, plaintiff's allegations were "specific to herself," allowing the Court to find plaintiff alleged defendant disclosed *her* PHI without consent, not some hypothetical patient's data. *Id*. That reasoning echoes what this Court held in *Kurowski*, 2024 LEXIS 126837, at *7. There too the Court held allegations asserting defendant had "transmitted" patient data with identifiers established a claim. *Id*. (citations and quotations omitted). And as this Court held in *Hartley*, "[t]he act of logging into a healthcare provider's patient portal" can reveal a patient's status and thus establish a claim on those facts alone. *Hartley*, 2025 LEXIS 424088, at *8. Plaintiffs allege those same facts here, along with alleging Veradigm disclosed their every act within the portal. SAC ¶¶ 150–160. These allegations surpass those found in like cases, including cases holding that "button-click data on *public* websites, as opposed to within password-protected patient portals, revealed patient status." *Hartley*, 2025 LEXIS 424088, at *8 (collecting cases) (emphasis added). In other words, if tracking "button-clicks" on a "public website" establishes a claim, tracking every action within a patient portal should without question.

In response, Veradigm cites cases that cannot compare. In *Hannant v. Sarah Culbertson Mem'l*, plaintiff accessed only the "public" website without alleging she "logged into the patient portal." *Hannant v. Sarah D. Culbertson Mem'l Hosp.*, No. 4:24-cv-04164-SLD-RLH, 2025 U.S.

Dist. LEXIS 161412, at *13 (C.D. Ill. Aug. 20, 2025). That cannot suffice because it is merely browsing data and does not establishing plaintiff as a patient. *Id.* And that makes sense when accessing a site anyone can access does not establish the visitor as a patient. But those are not the facts here—Plaintiffs were not browsing Veradigm's "public" platforms; they were logging in and using Veradigm's *patient portals*, which individually identifies them when the information is then shared. Thus, the cases Veradigm cites fail to compare for the same reason: none implicated an authenticated portal that could establish plaintiffs as patients. *See Nguyen v. Abbott Lab'ys, Inc.*, No. 24 CV 8289, 2025 U.S. Dist. LEXIS 153248, at *13 (N.D. Ill. Aug. 8, 2025) (plaintiff alleged only "browsing and searching" on a public site); *Nienaber v. Overlake Hosp. Med. Ctr.*, 733 F. Supp. 3d 1072, 1083 (W.D. Wash. 2024) ("Plaintiff does not even clearly allege whether she used MyChart"); *Doe v. Davita Inc.*, No. 23-cv-01424-AJB-BLM, 2024 U.S. Dist. LEXIS 74958, at *5 (S.D. Cal. Apr. 24, 2024) (no allegation plaintiff was a portal user).

At its core, Veradigm's motion claims that even if Google's tracking technologies were on Veradigm's portals, it captured and disclosed nothing. But that is not what Plaintiffs allege. They allege the trackers worked as designed and captured their PHI. Thus, the Court should find Plaintiffs "plausibly" allege Veradigm disclosed their PHI using Google's trackers.

**b. Veradigm violated the Federal Wiretap Act**

i. <u>Veradigm disclosed Plaintiffs' PHI with an "improper purpose"</u>

Veradigm violated the Federal Wiretap Act when it installed Google's trackers on FMH without patient consent because Veradigm did so with an "improper purpose." While Veradigm claims it could send Plaintiffs' data to Google under the Wiretap Act's "one-party consent" exception, it misunderstands the exception to that exception. Veradigm's purpose in violating

Plaintiffs' privacy was "tortious" and "criminal," and that conduct is never allowed under the Wiretap Act.

Courts across the country have found "purpose" element is met whenever defendant commits a wrongful act in addition to the wiretap violation, centering their reasoning on asserted HIPAA or state tort law violations. *E.g.*, *Hartley*, 2025 LEXIS 424088, at *9. Courts have applied that reasoning in the "pixel" tracking context in over 30 cases and found plaintiffs satisfy the "improper" purpose element when they allege defendant tracked them without consent.[2] At their core, those cases reason that violating HIPAA satisfies the "crime-tort" exception to the Wiretap Act's one-party consent rule, as HIPAA imposes liability when an entity violates it. *Aspen Dental Mgmt., Inc.*, 2024 LEXIS 161090, at *9 ("Plaintiffs' allegations are sufficient to invoke HIPAA for purposes of the ECPA's crime-tort exception").

---

[2] *E.g.*, *Cooper v. Mount Sinai Health Sys., Inc.*, 742 F. Supp. 3d 369, 381 (S.D.N.Y. 2024); *Kane v. Univ. of Rochester*, 2024 WL 1178340, at *4–*5 (W.D.N.Y. Mar. 19, 2024); *Stein v. Edward-Elmhurst Health*, 2025 WL 580556, at *3–*6 (N.D. Ill. Feb. 21, 2025); *R.S. v. Prime Healthcare Servs., Inc.*, 2025 U.S. Dist. WL 103488, at *1 (C.D. Cal. Jan. 13, 2025); *C. M. v. MarinHealth Med. Grp., Inc.*, 2024 WL 217841, at *6 (N.D. Cal. Jan. 19, 2024); *A.D. v. Aspen Dental Mgmt., Inc.*, No. 24 C 1404, 2024 U.S. Dist. LEXIS 161090, at *1 (N.D. Ill. Sept. 9, 2024); *Doe v. Post Acute Med., LLC*, 2025 WL 511069, at *1 (M.D. Pa. Feb. 14, 2025); *M.R. v. Salem Health Hosps. & Clinics*, 2024 WL 3970796, at *8 (D. Or. Aug. 28, 2024); *Strong v. LifeStance Health Grp. Inc.*, 2025 WL 317552, at *1 (D. Ariz. Jan. 28, 2025); *Doe v. Tenet Healthcare Corp.*, 731 F. Supp. 3d 142, 148 (D. Mass. 2024); *Smith v. Loyola Univ. Med. Ctr.*, No. 23 CV 15828, 2024 U.S. Dist. LEXIS 119995, at *1 (N.D. Ill. July 9, 2024); *Murphy v. Thomas Jefferson Univ. Hosps., Inc.*, No. 22-CV-4674, 2024 WL 4350328, at *1 (E.D. Pa. Sept. 30, 2024); *Mekhail v. N. Mem'l Health Care*, 726 F. Supp. 3d 916, 925 (D. Minn. 2024); *Lugo v. Inova Health Care Servs.*, 2025 WL 905191, at *7 (E.D. Va. Mar. 25, 2025); *Kurowski*, 2024 LEXIS 126837, at *3; *Castillo v. Costco Wholesale Corp.*, No. 2:23-CV-01548-JHC, 2024 U.S. Dist. WL 4785136, at *1 (W.D. Wash. Nov. 14, 2024); *Hartley,* 2025 LEXIS 424088, at *20;
*Doe v. Bayhealth Med. Ctr., Inc.*, 2025 WL 1010403, at *1 (Del. Super. Ct. Apr. 4, 2025); *Doe v. Hoag Mem'l Presbyterian Hosp.*, 2024 WL 1190907, at *2 (Cal. Super. Feb. 16, 2024); *Cousin v. Sharp Healthcare*, 2023 WL 8007350, at *1 (S.D. Cal. Nov. 17, 2023); *Doe v. Boston Medical Ctr. Corp.*, 2023 WL 7105628, at *2 (Mass. Super. Sep. 14, 2023); *Doe v. Boone Health, Inc.*, 2023 WL 4996117, at *3 (Mo. Cir. July 20, 2023); *Doe v. Bon Secours Mercy Health*, 2021 WL 9939010, at *1 (Ohio Com. Pl. Nov. 22, 2021).

In response, Veradigm says it was only trying to make money, and that cannot be a crime. Def.'s Mot. p. 12. But this argument has consistently failed for the same reason: even if defendant commits a crime or tort to make money, it is still committing a crime or tort. Indeed, "[m]any crimes and torts are motivated by a desire to make money, and 'it defies common sense that a clearly harmful act could escape liability as long as it was done for profit.'" *Kurowski*, 2024 LEXIS 126837, at *5 (quoting *Mekhail*, 726 F.Supp.3d 916 at 928 n.4 (D. Minn. Mar. 28, 2024)). If a defendant blackmails a plaintiff after wiretapping them, the Wiretap Act does not exempt defendant's misconduct just because defendant was motivated to make money. *Prime Healthcare Servs., Inc.*, 2025 WL 103488, at *7 ("This cannot be the case"). Veradigm is thus contradicting the statute and caselaw, which require only that the interception was done with "the purpose of facilitating some further impropriety"—*i.e.*, the purpose of committing the relevant crime or tort. *See Sussman v. Am. Broad. Companies, Inc.*, 186 F.3d 1200, 1202 (9th Cir. 1999). In other words, that pecuniary motives may have existed for committing the crime or tort does not make them any less a crime or tort.

This is not to mention that "nothing in section 2511(2)(d) requires that a party act with the *sole* purpose of committing the underlying crime or tort. Thus, even if the Court views "[Defendant's] 'purpose' in employing the tracking technologies as, for example, improving [their] advertising outcomes and [their] profit margins, that does not mean that [they] didn't also 'consciously desire' to make unauthorized disclosures of [Plaintiffs'] IIHI to achieve that goal." *Id.* This is because "[t]he existence of [a] legitimate purpose [does] not sanitize the illegitimate one." *SEC v. Lipson*, 278 F.3d 656, 661 (7th Cir. 2002), *Castillo*, 2024 WL 4785136, at *4 (declining to adopt a "bright-line rule insulating financial motives from the crime-tort exception"). Indeed, "a tort and seeking a profit are not mutually exclusive (if anything, the latter is often the

reason for the former)." *Riganian v. LiveRamp Holdings, Inc.*, 791 F. Supp. 3d 1075, 1091 (N.D. Cal. 2025).

Outliers to these courts' reasoning exist, but they are just that, "outlier[s]." *Hartley*, 2025 LEXIS 424088, at *9. And even if the Court entertains Veradigm's logic—that Plaintiffs must allege an independent act in addition to a violation—Plaintiffs have established that here, as Veradigm intercepted *and* disclosed the data at issue to Google. *Jarrell v. Adena Health Sys.*, 2025 U.S. Dist. WL 81305, at *3 (S.D. Ohio Jan. 13, 2025) (a violation occurs "not from the mere interception of Plaintiff's clicks and search terms, but from the *disclosure* of that Biddle material to third parties" (emphases in original)); *Prime Healthcare Servs., Inc.*, 2025 WL 103488, at *6 (violating HIPAA "constitutes a 'further impropriety' independent and separate from [defendant's] interception"); *Garnet Health*, 2024 WL 4203263, at *3–4 (finding disclosure "is secondary to the interception").

As a result, the Court should find Plaintiffs have established Veradigm's "improper purpose" at this stage.

ii. <u>Veradigm intercepted "contents"</u>

Google's trackers were designed to collect "contents," defined as "information concerning the substance, purport, or meaning of [a] communication." 18 U.S.C. § 2510(8); Wis. Stat. § 968.27(3). Google could not know what Plaintiffs were doing within Veradigm's patient portals without receiving their URLs and Page Titles—data that disclosed what Plaintiffs were viewing, searching for, and finding. And that data has been held to be "contents" in like cases. *Doe v. Meta Platforms, Inc.*, 2023 WL 5837443, at *4 (holding "log-in buttons" and "descriptive URLs" disclosed via Meta Pixel were "contents" under the Federal Wiretapping Act); *Yoon v. Meta Platforms, Inc.*, 2024 U.S. Dist. WL 5264041, at *5 (N.D. Cal. Dec. 30, 2024) (holding URLs that

showed user watched video within "HGTV's outdoor, gardens, and planting and maintenance section" constituted "content" because URL "shows content categories and details that describe the current section of the site"); *Yockey*, 2023 WL 5519323, at *6 (same). Indeed, URLs and the "specific pages Plaintiffs viewed" are not meaningless; they told Google that Plaintiffs and other patients had authenticated themselves as patients because they either accessed or entered their credentials on the portal logins. *Gilligan v. Experian Data Corp.*, No. 25-cv-02873-RFL, 2026 LEXIS 75435, at *7 (N.D. Cal. Jan. 6, 2026).

At minimum, Plaintiffs each logged in to Veradigm's portal and Veradigm disclosed their patient status each time. SAC ¶¶ 150, 153, 160. That data point alone constitutes "contents." *See In re Meta Pixel*, 647 F.Supp.3d at 793 (holding logins to patient portal reveal HIPAA-protected "patient status"); *Hartley*, 2025 LEXIS 424088, at *8 (same). This is in addition to each action Plaintiffs took within the portal, from reviewing test results to scheduling appointments to messaging with their doctors. *See* SAC ¶¶ 13–16, 39, 63, 150–160, 322. Here, as in *Meta Pixel*, Plaintiffs allege that the third-party tracking technology Veradigm installed transmitted terms—not addressing information. *See Yoon,* 2024 WL 5264041, at *14 (denying motion to dismiss, holding that URLs "descriptive of the content" are "contents," not mere record information).

As a result, the Court should deny Veradigm's motion on this ground.

**c. Veradigm violated California's Wiretap Act**

Veradigm wants "lenity" to insulate it from liability under CIPA, as if the statute should not apply even when Plaintiffs establish a claim under its elements. Def.'s Mot. p. 15. But even Veradigm's motion shows why CIPA applies here, and why the "mess" it complains about is not at issue. *Id*.

i. Veradigm violated CIPA § 631(a)

CIPA § 631(a) provides four protections under its terms and Plaintiffs allege claims under two, pleading Veradigm violated CIPA when it: (1) attempted to learn the "contents of a communication"; and (2) at minimum aided another party in doing so. Veradigm challenges these liability theories on two grounds, claiming again that Plaintiffs' PHI is not "contents" and that their data was not captured "while in transit." Def.'s Mot. p. 22. But here again, Veradigm is ignoring what it means to intercept contents and what contents are under case law.

First, Plaintiffs each logged in to Veradigm's portal and Veradigm disclosed their patient status each time. SAC ¶¶ 150, 153, 160. And again, knowing a patient has logged into a portal is "contents" in-and-of-itself. *In re Meta Pixel*, 647 F.Supp.3d at 793 (holding logins to patient portal reveal HIPAA-protected "patient status"); *Hartley*, 2025 LEXIS 424088, at *8 (same). In addition, Veradigm disclosed each action Plaintiffs took within the portal, from reviewing test results to scheduling appointments to messaging with their doctors. *See* SAC ¶¶ 13–16, 39, 63, 150–160, 322. And it did so by disclosing the "full-string, detailed URL to Google" in "the precise text of" any queries they entered into the portal's search functions. SAC ¶ 55. Courts hold that is "contents" under CIPA.

For example, in *In re Meta Pixel Healthcare Litigation*, the court held that URLs transmitted from hospital websites to Facebook were "contents" because they revealed "the substance, purport, and meaning of patient requests for information from their health care providers." 647 F.Supp.3d at 795. The court explained that the information at issue—namely, "searches for doctors, appointment information, and patient portal activity"—"relate[s] to the past, present, or future physical or mental health or condition of an individual." *Id.* at 792. A recent decision from Judge Kendall agrees, holding that plaintiffs plausibly alleged "contents" because

"the URLs at issue include terms entered into search fields and fillable forms." *Aspen Dental*, 2024 LEXIS 161090, at *5. Likewise, in *Tenet Healthcare Corp.*, the court held that search queries disclosed to Meta in full-string URLs containing patients' personal health information and personally identifiable information went "beyond keystrokes, mouse clicks, (and) pages viewed" to constitute actionable "contents." 789 F. Supp. 3d at 837. As a result, the Court should find that Plaintiffs meet this element under CIPA.

And second, Veradigm captured this information while it was "in transit." To start, Veradigm's challenge is suited for summary judgment, not a motion to dismiss, as "whether communications are 'read' in transit or only after storage is a fact-intensive question" that is "better left for summary judgment." *Riganian,* 791 F. Supp. 3d at 1092; *St. Aubin v. Carbon Health Techs., Inc.*, 2024 U.S. Dist. WL 4369675, at *7 (N.D. Cal. Oct. 1, 2024) ("[T]he key to the interception analysis is whether the plaintiff alleges that transmission was simultaneous."); *Hazel v. Prudential Fin., Inc.*, 2023 U.S. Dist. WL 3933073, at *4 (N.D. Cal. June 9, 2023) (concluding that "whether information was intercepted . . . before it was stored … is a question for summary judgment"). This is even established in the case Veradigm relies on, as *Doe v. Eating Recovery Ctr.* was a summary judgment decision. 806 F. Supp. 3d 1109 (N.D. Cal. 2025).

That aside, Plaintiffs allege the information was captured while in transit. Plaintiffs allege how (embedded third-party code and deposited cookies that command devices to share information) and when (real-time surveillance and simultaneous re-direction) Veradigm and third parties intercepted their communications. *See* SAC ¶¶ 9, 52, 65, 147. Plaintiffs thus establish third parties read or attempted to read the contents of communications while they were "in transit" to their destination. *Riganian*, 791 F. Supp. 3d at 1092; *St. Aubin*, 2024 WL 4369675, at *7. That the capture was "simultaneous" in nature does not change the analysis. *See M.G. v. Therapymatch*,

Inc., No. 23-cv-04422-AMO, 2024 U.S. Dist. LEXIS 166534, at *4 (N.D. Cal. Sept. 16, 2024) (finding "simultaneous" transfer sufficed to state a claim); *Tenet Healthcare Corp.*, 789 F. Supp. 3d at 838–39 (same).

As a result, the Court should deny Veradigm's motion on this ground.

ii. Veradigm violated CIPA § 632(a)

Veradigm devotes one paragraph disputing Plaintiffs have stated a claim under CIPA § 632(a), and it glosses over the section's requirements without grappling with how Plaintiffs meet them. Citing *Rodriguez v. ByteDance, Inc.*, Veradigm compares its PHI disclosures to the TikTok disclosures at issue in *ByteDance*, even though plaintiff there could not explain "how the interception occurred, whose communications were intercepted, or what was contained in those communications." No. 23 CV 4953, 2025 U.S. Dist. LEXIS 168885, at *18 (N.D. Ill. Aug. 29, 2025). Plaintiffs here succeed where the TikTok plaintiffs failed. They detail how Google's technology intercepted Veradigm's portal URLs and page locations in real time. SAC ¶¶ 9, 29, 39, 46, 49, 52–55, 57, 63–65, 150–160. For example, "[t]he Google source code that Veradigm deployed on its Patient Portals and Mobile Application deposited Google cookies on patients' browsers; disguised Google cookies as being associated with Veradigm rather than Google; and commanded Plaintiffs' and Class Members' browsers to re-direct identifiers and communications content on and inside the Patient Portals and Mobile Application to Google." SAC ¶ 52. As a result, "[w]hen patients interacted with its Patient Portals, Veradigm disclosed a full-string, detailed URL to Google, typically containing the name of the website, folder, and sub-folders on the webserver; the name of the precise file requested; and the exact contents of the patients' communications[.]" SAC ¶¶ 55, 150–160.

This is not to mention those communications were "confidential." Veradigm invents its own standard for what "confidential" means under the statute, suggesting only "patient-doctor" messages suffice. Def.'s Mot. p. 23. But § 632(a) is not a patient-doctor specific statute; it protects all "confidential" information, including Plaintiffs' portal logins, appointment scheduling, and record viewing. SAC ¶¶ 13–16, 150, 153, 155, 158, 160. That information is protected under § 632(a) as it is elsewhere. *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d at 799.

Thus, this case does not compare to *ByteDance*, and the Court should deny Veradigm's motion on this ground as a result.

iii. Veradigm violated CIPA § 638.51

Plaintiffs allege a pen register claim because Veradigm's tracking technology is "a device or process that records … information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." CIPA § 638.50(b). Plaintiffs do so with the context that the "overwhelming majority of courts … have concluded that third-party internet trackers meet the technical requirements of a pen register under CIPA." *Harris v. iHeartMedia, Inc.,* No. 25-cv-06038-EKL, 2026 U.S. Dist. LEXIS 23256, at *8 (N.D. Cal. Jan. 29, 2026) (collecting cases).

Veradigm disagrees, but only because it ignores that caselaw and narrows the data at issue to "IP addresses." Def.'s Mot. p. 23. That caselaw does not apply because Plaintiffs allege Veradigm disclosed IP addresses, cookies, device identifiers, account numbers, URLs, and "browser fingerprints." SAC ¶ 53. And Veradigm did so in addition to the contents within Plaintiffs' transmissions. *Id.* ¶ 54. As a result, because Plaintiffs plead the dual capture of content and at least six types of identifying information, this case falls within the "overwhelming majority"

in which tracking technology "meet[s] the technical requirements of a pen register under CIPA." *Harris,* 2026 LEXIS 23256, at *8.

**d. Veradigm's disclosures harmed Plaintiffs, entitling them to tort damages**

Veradigm also moves to dismiss Plaintiffs' negligence cause, claiming its privacy violations cannot have harmed Plaintiffs. Def.'s Mot. p. 25. But it does so on theory that Illinois limits negligence recovery to "tangible bodily harm." *Id*. Nothing supports that notion. Illinois courts recognize "emotional harms such as anxiety and increased concerns for the loss of privacy" are "non-economic damages [that] are recoverable under Illinois law." *In re Gallagher*, 631 F. Supp. 3d 573, 587 (N.D. Ill. 2022). That applies in "the data privacy context." *See Loyola*, 2024 LEXIS 119995, at *20 (citing *Roper v. Rise Interactive Media & Analytics, LLC*, No. 23 C 1836, 2024 U.S. Dist. WL 1556298, at *2 (N.D. Ill. Apr. 10, 2024)). Plaintiffs meet that standard in spades, as violating their medical privacy caused them "loss of privacy, and fear, anxiety, and worry about their loss of control over their PHI." SAC ¶ 295. And Veradigm's cited authority does not say otherwise. *Berry v. City of Chicago* held that a "risk" for suffering harm is not enough to state a claim alone. 181 N.E.3d 679, 687 (Ill. 2020). But Plaintiffs allege the "actual harm" *Berry* explains is required, not just the "risk" that it may happen. As a result, Plaintiffs can claim the emotional injuries arising from Veradigm's privacy violation.

That aside, Veradigm is stretching the *Moorman* Doctrine beyond its product liability limits, trying to apply it even "where plaintiffs' alleged injuries were not caused by any defect in an actual product of a transaction[.]" *Olson v. Ferrara Candy Co.*, 2025 IL App (1st) 241126, ¶ 53. But there is no basis to do so. In *Ferrara*, the court considered data privacy violations like those here, in the context that there was no "express contract" between the parties. *Id*. ¶ 47. And there, the court explained the *Moorman* Doctrine cannot apply to the "service industry" unless the

"service is defined by a contract executed with the client." *Id*. ¶ 53. Even though plaintiffs in that case alleged defendant promised to safeguard their data under an *implied* duty defined in part by a privacy policy, that was not an "express" contract implicating the *Moorman* Doctrine. *Id*. ¶¶ 12, 53. That is the same case here: Plaintiffs never allege an "express" contract between the parties, and Veradigm has tried introducing a privacy policy that would create implied obligations, not "express."

Last, Veradigm leans on *Berry* again to say the "loss of privacy, fear, anxiety, and worry" harms Plaintiff pleads are insufficient "alone," to support a negligence claim, citing to one case, *Berry*, 181 N.E.3d at 688. But in *Berry*, the plaintiff *only* alleged an increased risk of harm. *Id*. at. 32–33. By contrast, here, Plaintiffs allege multiple concrete, present injuries—including, but not limited to, improper disclosure of PHI, loss of confidentiality, misappropriation of valuable information, erosion of the doctor-patient relationship, and costs to mitigate the disclosure—of which the increased risk of future harm is merely one element. In addition, the harm suffered by Plaintiffs and Class Members is present and ongoing because, as of the time of the filing of the SAC, Veradigm continued to deploy Firebase Analytics on the Mobile Application it offers the public. SAC ¶ 304.

As a result, the Court should deny Veradigm's motion on this ground.

## CONCLUSION

For the reasons above, the Court should deny Veradigm's motion.

*[Counsel signatures to follow on next page.]*

RESPECTFULLY SUBMITTED this 13th day of March, 2026.

By: *<u>/s/ Raina C. Borrelli</u>*
Raina C. Borrelli
Samuel J. Strauss
**STRAUSS BORRELLI PLLC**
980 N Michigan Ave., Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
raina@straussborrelli.com
sam@straussborrelli.com

Mark C. Holden
**AHMAD, ZAVITSANOS & MENSING PLLC**
1221 McKinney St, 2500
Houston, TX 77010
Telephone: (713) 655-1101
mholden@azalaw.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Raina C. Borrelli, hereby certify that on March 13, 2026, I caused the foregoing to be electronically filed with the Court using the Court's CM/ECF system which will send an electronic copy to all parties and/or their counsel of record.

DATED this 13th day of March, 2026.

Respectfully submitted,

By: */s/ Raina C. Borrelli*
Raina C. Borrelli
**STRAUSS BORRELLI PLLC**
980 N Michigan Ave., Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
raina@straussborrelli.com